# COMMUNIST PARTY OF THE UNITED STATES *v.* SUBVERSIVE ACTIVITIES CONTROL BOARD.

No. 12.   Argued October 11–12, 1960.—
Decided June 5, 1961.

1

2

4

[redacted]

*John J. Abt* and *Joseph Forer* argued the cause and filed a brief for petitioner.

*Solicitor General Rankin* argued the cause for respondent. With him on the brief were *Assistant Attorney General Yeagley, Bruce J. Terris, Kevin T. Maroney, George B. Searls, Lee B. Anderson* and *Frank R. Hunter, Jr.*

Briefs of *amici curiae,* urging reversal, were filed by *Nanette Dembitz* for the American Civil Liberties Union; *Thomas I. Emerson* for the National Lawyers Guild; and *Royal W. France* for Rev. Edwin E. Aiken et al.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

This is a proceeding pursuant to § 14 (a) of the Subversive Activities Control Act of 1950 to review an order of the Subversive Activities Control Board requiring the Communist Party of the United States to register as a Communist-action organization under § 7 of the Act. The United States Court of Appeals for the District of Columbia has affirmed the Board's registration order. Because important questions of construction and constitutionality of the statute were raised by the Party's petition for certiorari, we brought the case here. 361 U. S. 951.

The Subversive Activities Control Act is Title I of the Internal Security Act of 1950, 64 Stat. 987, 50 U. S. C. § 781 *et seq.* It has been amended, principally by the Communist Control Act of 1954, 68 Stat. 775, and certain of its provisions have been carried forward in sections of the Immigration and Nationality Act adopted in 1952, 66 Stat. 163, 8 U. S. C. §§ 1182, 1251, 1424, 1451. A brief outline of its structure, in pertinent part, will frame the issues for decision.

Section 2 of the Act recites legislative findings based upon evidence adduced before various congressional committees. The first of these is:

"There exists a world Communist movement which, in its origins, its development, and its present practice, is a world-wide revolutionary movement whose purpose it is, by treachery, deceit, infiltration into other groups (governmental and otherwise), espionage, sabotage, terrorism, and any other means deemed necessary, to establish a Communist totalitarian dictatorship in the countries throughout the world through the medium of a world-wide Communist organization."

The characteristics of a "totalitarian dictatorship," as set forth in subsections (2) and (3) are the existence of a single, dictatorial political party substantially identified with the government of the country in which it exists, the suppression of all opposition to the party in power, the subordination of the rights of the individual to the state, and the denial of fundamental rights and liberties characteristic of a representative form of government. Subsection (4) finds that the direction and control of the "world Communist movement" is vested in and exercised by the Communist dictatorship of a foreign country; and subsection (5), that the Communist dictatorship of this foreign country, in furthering the purposes of the world Communist movement, establishes and utilizes in various countries action organizations which are not free and independent organizations, but are sections of a world-wide Communist organization and are controlled, directed, and subject to the discipline of the Communist dictatorship of the same foreign country. Subsection (6) sets forth that

"The Communist action organizations so established and utilized in various countries, acting under such control, direction, and discipline, endeavor to

6

carry out the objectives of the world Communist movement by bringing about the overthrow of existing governments by any available means, including force if necessary, and setting up Communist totalitarian dictatorships which will be subservient to the most powerful existing Communist totalitarian dictatorship. Although such organizations usually designate themselves as political parties, they are in fact constituent elements of the world-wide Communist movement and promote the objectives of such movement by conspiratorial and coercive tactics, instead of through the democratic processes of a free elective system or through the freedom-preserving means employed by a political party which operates as an agency by which people govern themselves."

In subsection (7) it is found that the Communist organizations thus described are organized on a secret conspiratorial basis and operate to a substantial extent through "Communist-front" organizations, in most instances created or used so as to conceal their true character and purpose, with the result that the "fronts" are able to obtain support from persons who would not extend their support if they knew the nature of the organizations with which they dealt. Congress makes other findings: that the most powerful existing Communist dictatorship has caused the establishment in numerous foreign countries of Communist totalitarian dictatorships, and threatens to establish such dictatorships in still other countries (10); that Communist agents have devised ruthless espionage and sabotage tactics successfully carried out in evasion of existing law (11); that the Communist network in the United States is inspired and controlled in large part by foreign agents who are sent in under various guises (12); that international travel is prerequisite for the carrying on of activities in furtherance of the Communist movement's purposes (8); that Com-

munists have infiltrated the United States by procuring naturalization for disloyal aliens (14); that under our present immigration laws, many deportable aliens of the subversive, criminal or immoral classes are free to roam the country without supervision or control (13). Subsection (9) finds that in the United States individuals who knowingly participate in the world Communist movement in effect transfer their allegiance to the foreign country in which is vested the direction and control of the world Communist movement. Finally, in § 2 (15), Congress concludes that

"The Communist movement in the United States is an organization numbering thousands of adherents, rigidly and ruthlessly disciplined. Awaiting and seeking to advance a moment when the United States may be so far extended by foreign engagements, so far divided in counsel, or so far in industrial or financial straits, that overthrow of the Government of the United States by force and violence may seem possible of achievement, it seeks converts far and wide by an extensive system of schooling and indoctrination. Such preparations by Communist organizations in other countries have aided in supplanting existing governments. The Communist organization in the United States, pursuing its stated objectives, the recent successes of Communist methods in other countries, and the nature and control of the world Communist movement itself, present a clear and present danger to the security of the United States and to the existence of free American institutions, and make it necessary that Congress, in order to provide for the common defense, to preserve the sovereignty of the United States as an independent nation, and to guarantee to each State a republican form of government, enact appropriate legislation recognizing the existence of such world-wide con-

8

spiracy and designed to prevent it from accomplishing its purpose in the United States."

Pursuant to these findings, § 7 (a) of the Act requires the registration with the Attorney General, on a form prescribed by him by regulations, of all Communist-action organizations. A Communist-action organization is defined by § 3 (3) as

"(a) any organization in the United States (other than a diplomatic representative or mission of a foreign government accredited as such by the Department of State) which (i) is substantially directed, dominated, or controlled by the foreign government or foreign organization controlling the world Communist movement referred to in section 2 of this title, and (ii) operates primarily to advance the objectives of such world Communist movement as referred to in section 2 of this title; and

"(b) any section, branch, fraction, or cell of any organization defined in subparagraph (a) of this paragraph which has not complied with the registration requirements of this title."

Registration must be made within thirty days after the enactment of the Act, or, in the case of an organization which becomes a Communist-action organization after enactment, within thirty days of the date upon which it becomes such an organization; in the case of an organization which is ordered to register by the Subversive Activities Control Board, registration must take place within thirty days of the date upon which the Board's order becomes final. § 7 (c). Registration is to be accompanied by a registration statement, which must contain the name of the organization and the address of its principal office; the names and addresses of its present officers and of individuals who have been its officers within the past twelve months, with a designation of the office held

by each and a brief statement of the functions and duties of each; an accounting of all moneys received and expended by the organization during the past twelve months, including the sources from which the moneys were received and the purposes for which they were expended; the name and address of each individual who was a member during the past twelve months; in the case of any officer or member required to be listed and who uses or has used more than one name, each name by which he is or has been known; and a listing of all printing presses and machines and all printing devices which are in the possession, custody, ownership, or control of the organization or its officers, members, affiliates, associates, or groups in which it or its officers or members have an interest. § 7 (d). Once an organization has registered, it must file an annual report containing the same information as is required in the registration statement. § 7 (e). A registered Communist-action organization must keep accurate records and accounts of all moneys received and expended, and of the names and addresses of its members and of persons who actively participate in its activities. § 7 (f).

Section 7 (b) requires the registration of Communist-front organizations, defined as those substantially directed, dominated, or controlled by a Communist-action organization and primarily operated for the purpose of giving aid and support to a Communist-action organization, a Communist foreign government, or the world Communist movement. § 3 (4). The procedures and requirements of registration for Communist fronts are identical with those for Communist-action organizations, except that fronts need not list their non-officer members.[1] In case of the failure of any organization to

---

[1] By the Communist Control Act of 1954, 68 Stat. 775, the Subversive Activities Control Board is given jurisdiction to determine, in proper proceedings, whether any organization is a Communist-

register, or to file a registration statement or annual report as required by the Act, it becomes the duty of the executive officer, the secretary, and such other officers of the organization as the Attorney General by regulations prescribes, to register for the organization or to file the statement or report. § 7 (h). Any individual who is or becomes a member of a registered Communist-action organization which he knows to be registered as such but to have failed to list his name as a member is required to register himself within sixty days after he obtains such knowledge; and any individual who is or becomes a member of an organization concerning which there is in effect a final order of the Subversive Activities Control Board requiring that it register as a Communist-action organiza-

---

infiltrated organization, defined as (A) an organization substantially directed, dominated, or controlled by an individual or individuals who are, or who within three years have been actively engaged in, giving aid or support to a Communist-action organization, a Communist foreign government, or the world Communist movement, (B) which organization is serving or within three years has served as a means for giving aid or support to any such organization, government or movement, or for the impairment of the military strength of the United States or its industrial capacity to furnish logistical or other material support required by its armed forces. Evidentiary matters relevant to this determination are prescribed for the consideration of the Board. Communist-infiltrated organizations are not required to register with the Attorney General, but are required to label their publications mailed or transmitted through instrumentalities of interstate or foreign commerce, and their communications broadcasts, and are deprived of federal income-tax exemption, of certain benefits under the National Labor Relations Act as amended, etc.

Under § 13A (h), added to the Subversive Activities Control Act of 1950 by the Communist Control Act of 1954, 68 Stat. 775, 779, the provisions depriving labor organizations of National Labor Relations Act labor-union benefits apply to labor organizations determined by the Board to be Communist-action or Communist-front, as well as Communist-infiltrated, organizations. 50 U. S. C. § 792a (h).

tion, but which has not so registered although more than thirty days have elapsed since the order became final, is required to register himself within thirty days of becoming a member or within sixty days after the registration order becomes final, whichever is later. § 8. Criminal penalties are imposed upon organizations, officers and individuals who fail to register or to file statements as required: fine of not more than $10,000 for each offense by an organization; fine of not more than $10,000 or imprisonment for not more than five years or both for each offense by an officer or individual; each day of failure to register constituting a separate offense. Individuals who in a registration statement or annual report willfully make any false statement, or willfully omit any fact required to be stated or which is necessary to make any information given not misleading, are subject to a like penalty. § 15.

The Attorney General is required by § 9 to keep in the Department of Justice separate registers of Communist-action and Communist-front organizations, containing the names and addresses of such organizations, their registration statements and annual reports, and, in the case of Communist-action organizations, the registration statements of individual members. These registers are to be open for public inspection. The Attorney General must submit a yearly report to the President and to Congress including the names and addresses of registered organizations and their listed members. He is required to publish in the Federal Register the fact that any organization has registered as a Communist-action or Communist-front organization, and such publication constitutes notice to all members of the registration of the organization.

Whenever the Attorney General has reason to believe that any organization which has not registered is an organization of a kind required to register, or that any individual who has not registered is required to register, he shall petition the Subversive Activities Control Board

for an order that the organization or individual register in the manner provided by the Act. §§ 12, 13 (a). Any organization or any individual registered, or any individual listed in any registration statement who denies that he holds office or membership in the registered organization and whom the Attorney General, upon proper request, has failed to strike from the register, may, pursuant to designated procedures, file with the Subversive Activities Control Board a petition for cancellation of registration or other appropriate relief. § 13 (b).

The Board, whose organization and procedure are prescribed, §§ 12, 13 (d), 16, is empowered to hold hearings (which shall be public), to examine witnesses and receive evidence, and to compel the attendance and testimony of witnesses and the production of documents relevant to the matter under inquiry. § 13 (c), (d). If after hearing the Board determines that an organization is a Communist-action or a Communist-front organization or that an individual is a member of a Communist-action organization, it shall make a report in writing and shall issue an order requiring the organization or individual to register or denying its or his petition for relief. § 13 (g), (j). If the Board determines that an organization is not a Communist-action or a Communist-front organization or that an individual is not a member of a Communist-action organization, it shall make a report in writing and issue an order denying the Attorney General's petition for a registration order, or canceling the registration of the organization or the individual, or striking the name of the individual from a registration statement or annual report, as appropriate. § 13 (h), (i).

The party aggrieved by any such order of the Board may obtain review by filing in the Court of Appeals for the District of Columbia a petition praying that the order be set aside. The findings of the Board as to the facts, if supported by the preponderance of the evidence, shall

be conclusive. If either party shall apply to the court for leave to adduce additional evidence and shall show to the satisfaction of the court that such additional evidence is material, the court may order such additional evidence to be taken before the Board, and the Board may modify its findings as to the facts, and shall file such modified or new findings, which, if supported by the preponderance of the evidence, shall be conclusive. The court may enter appropriate orders. Its judgment and decree shall be final, except that they may be reviewed in this Court on writ of certiorari. § 14 (a). When an order of the Board requiring the registration of a Communist organization has become final upon the termination of proceedings for judicial review or upon the expiration of the time allowed for institution of such proceedings, the Board shall publish in the Federal Register the fact that its order has become final, and that publication shall constitute notice to all members of the organization that the order has become final. §§ 13 (k), 14 (b).

Section 13 (e) of the Act provides that

"In determining whether any organization is a 'Communist-action organization', the Board shall take into consideration—

"(1) the extent to which its policies are formulated and carried out and its activities performed, pursuant to directives or to effectuate the policies of the foreign government or foreign organization in which is vested, or under the domination or control of which is exercised, the direction and control of the world Communist movement referred to in section 2 of this title; and

"(2) the extent to which its views and policies do not deviate from those of such foreign government or foreign organization; and

"(3) the extent to which it receives financial or other aid, directly or indirectly, from or at the direc-

tion of such foreign government or foreign organization; and

"(4) the extent to which it sends members or representatives to any foreign country for instruction or training in the principles, policies, strategy, or tactics of such world Communist movement; and

"(5) the extent to which it reports to such foreign government or foreign organization or to its representatives; and

"(6) the extent to which its principal leaders or a substantial number of its members are subject to or recognize the disciplinary power of such foreign government or foreign organization or its representatives; and

"(7) the extent to which, for the purpose of concealing foreign direction, domination, or control, or of expediting or promoting its objectives, (i) it fails to disclose, or resists efforts to obtain information as to, its membership (by keeping membership lists in code, by instructing members to refuse to acknowledge membership, or by any other method); (ii) its members refuse to acknowledge membership therein; (iii) it fails to disclose, or resists efforts to obtain information as to, records other than membership lists; (iv) its meetings are secret; and (v) it otherwise operates on a secret basis; and

"(8) the extent to which its principal leaders or a substantial number of its members consider the allegiance they owe to the United States as subordinate to their obligations to such foreign government or foreign organization."

Similarly, § 13 (f) enumerates a set of evidentiary considerations to guide the inquiry and judgment of the Board in determining whether a given organization is or is not a Communist-front organization.

When an organization is registered under the Act, or when there is in effect with respect to it a final order of the Board requiring it to register, § 10 (1) prohibits it, or any person acting in behalf of it, from transmitting through the mails or by any means or instrumentality of interstate or foreign commerce any publication which is intended to be, or which it may be reasonably believed is intended to be, circulated or disseminated among two or more persons, unless that publication, and its envelope, wrapper or container, bear the writing: "Disseminated by [the name of the organization], a Communist organization." Section 10 (2) prohibits the organization, or any person acting in its behalf, from broadcasting or causing to be broadcast any matter over any radio or television station unless the matter is preceded by the statement: "The following program is sponsored by [the name of the organization], a Communist organization." Under § 11 of the Act, the organization is not entitled to exemption from federal income tax under § 101 of the 1939 Internal Revenue Code, and no deduction for federal income-tax purposes is allowed in the case of a contribution to it. It is unlawful for any officer or employee of the United States, or of any department or agency of the United States, or of any corporation whose stock is owned in a major part by the United States, to communicate to any other person who such officer or employee knows or has reason to believe is an officer or member of a Communist organization, any information classified by the President as affecting the security of the United States, knowing or having reason to know that such information has been classified. § 4 (b). It is unlawful for any officer or member of a Communist organization knowingly to obtain or receive, or attempt to obtain or receive, any classified information from any such government officer or employee. § 4 (c). When a Communist organization is registered or when there is in effect with respect to it a

final registration order of the Subversive Activities Control Board, it is unlawful for any member of the organization, knowing or having notice that the organization is registered or the order final, to hold non-elective office or employment under the United States or to conceal or fail to disclose that he is a member of the organization in seeking, accepting, or holding such office or employment; and it is unlawful for him to conceal or fail to disclose that he is a member of the organization in seeking, accepting or holding employment in any defense facility,[2] or, if the organization is a Communist-action organization, to engage in any employment in any defense facility. It is unlawful for such a member to hold office or employment with any labor organization, as that term is defined in § 2 (5) of the National Labor Relations Act, as amended, 29 U. S. C. § 152, or to represent any employer in any matter or proceeding arising or pending under that Act. § 5 (a)(1). It is unlawful for any officer or employee of the United States or of a defense facility, knowing or having notice that the organization is registered or a registration order concerning it is final, to advise or urge a member of the organization, with knowledge or notice that he is a member, to engage in conduct which constitutes any of the above violations of the Act, or for such an officer or employee to contribute funds or services to the organization. § 5 (a)(2). When a Communist organization is registered or when there is in effect with respect to it a final registration order of the Subversive Activities Control Board, it is unlawful for a member of the organization, with knowledge or notice that it is registered or the order final, to apply for a passport, or the renewal of a passport, issued under the authority of the United States,

---

[2] Under § 5 (b) the Secretary of Defense is authorized and directed to designate and proclaim a list of facilities with respect to the operation of which he finds that the security of the United States requires the application of the controls prescribed by the Act.

or to use or to attempt to use a United States passport; and, in the case of a Communist-action organization, it is unlawful for any officer or employee of the United States to issue or renew a passport for any individual, knowing or having reason to believe that he is a member of the organization. § 6. Aliens who are members or affiliates of any organization during the time it is registered or required to be registered, unless they establish that they did not have knowledge or reason to believe that it was a Communist organization, are ineligible to receive visas, are excluded from admission to the United States, and, if in the United States, are subject to deportation upon the order of the Attorney General. Immigration and Nationality Act, §§ 212 (a)(28)(E), 241 (a)(6)(E), 66 Stat. 163, 185, 205, 8 U. S. C. §§ 1182 (a)(28)(E), 1251 (a)(6)(E).[3] No person shall be naturalized as a citizen of the United States who is, or, with certain exceptions, has within ten years immediately preceding filing of his naturalization petition been, a member or affiliate of any Communist-action organization during the time it is registered or is required to be registered, or a member or affiliate of any Communist-front organization during the time it is registered or required to be registered unless he establishes that he did not have knowl-

---

[3] The proviso respecting alien members of Communist fronts is: ". . . unless such aliens establish that they did not have knowledge or reason to believe at the time they became members of or affiliated with such an organization (and did not thereafter and prior to the date upon which such organization was so registered or so required to be registered have such knowledge or reason to believe) that such organization was a Communist organization."

The provisions of § 212 (a)(29)(C) of the Immigration and Nationality Act, 66 Stat. 163, 186, 8 U. S. C. § 1182 (a)(29)(C), also exclude aliens who the consular officer or the Attorney General knows or has reasonable ground to believe probably would, after entry, join, affiliate with, or participate in the activities of an organization registered or required to be registered.

18

edge or reason to believe that it was a Communist-front organization. Immigration and Nationality Act, § 313 (a)(2)(G), (H), (c), 66 Stat. 163, 240, 241, 8 U. S. C. § 1424 (a)(2)(G), (H), (c). If any person naturalized after the effective date of the Act [4] becomes within five years following his naturalization a member or affiliate of any organization, membership in which or affiliation with which at the time of naturalization would have precluded his having been naturalized, it shall be considered prima facie evidence that such person was not attached to the principles of the Constitution and was not well disposed to the good order and happiness of the United States at the time of naturalization, and in the absence of countervailing evidence, this shall suffice to authorize the revocation of naturalization. Immigration and Nationality Act, § 340 (c), 66 Stat. 163, 261, 8 U. S. C. § 1451 (c). Service in the employ of any organization then registered or in connection with which a final registration order is then in effect is not "employment" for purposes of the Social Security Act, as amended, 70 Stat. 807, 839, 42 U. S. C. § 410 (a)(17), and Chapter 21 of the Internal Revenue Code of 1954, as amended, 70 Stat. 807, 839, 26 U. S. C. § 3121 (b)(17), if performed after June 30, 1956.

Section 4 (f) of the Subversive Activities Control Act of 1950 provides that neither the holding of office nor membership in any Communist organization by any person shall constitute *per se* a violation of penal provisions of the Act or of any other criminal statute, and the fact of registration of any person as an officer or member of such an organization shall not be received in evidence against the person in any prosecution for violations of

[4] Section 25 of the Subversive Activities Control Act of 1950 provided: "If a person who shall have been naturalized after January 1, 1951," etc.

penal provisions of the Act or any other criminal statute. Section 32 provides:

"If any provision of this title, or the application thereof to any person or circumstances, is held invalid, the remaining provisions of this title, or the application of such provision to other persons or circumstances, shall not be affected thereby."

I.

This litigation has a long history. On November 22, 1950, the Attorney General petitioned the Subversive Activities Control Board for an order to require that the Communist Party register as a Communist-action organization. The Party thereupon brought suit in the District Court for the District of Columbia, seeking to have the proceedings of the Board enjoined. A statutory three-judge court denied preliminary relief, *Communist Party of the United States* v. *McGrath,* 96 F. Supp. 47, but stayed answer and hearings before the Board pending appeal. After this Court denied a petition for extension of the stay, 340 U. S. 950, the Party abandoned the suit. Hearings began on April 23, 1951, and ended on July 1, 1952.[5] Twenty-two witnesses for the Attorney General and three for the Party presented oral testimony; 507 exhibits, many of book length, were received; the stenographic record, exclusive of these exhibits, amounted to more than 14,000 pages. On April 20, 1953, the Board issued its 137-page report concluding that the Party was

---

[5] During the course of proceedings before the Board, the Party had again instituted suit in the District Court to enjoin continuation of the hearings because of alleged bias of the hearing panel and because of the Senate's failure before adjournment to confirm the nomination of one member of the Board, who consequently withdrew from the panel. This second injunction suit was dismissed on motion of the Board on February 15, 1952.

a Communist-action organization within the meaning of the Subversive Activities Control Act, and its order requiring that the Party register in the manner prescribed by § 7.[6] Pending disposition in the Court of Appeals for the District of Columbia of the Party's petition for review of the registration order, the Party moved in that court, pursuant to § 14 (a),[7] for leave to adduce additional evidence which it alleged would show that three witnesses for the Attorney General—Crouch, Johnson, and Matusow— had testified perjuriously before the Board. The Court of Appeals denied the motion and affirmed the order of the Board, one judge dissenting. *Communist Party of the United States* v. *Subversive Activities Control Board,* 96 U. S. App. D. C. 66, 223 F. 2d 531. Finding that the Party's allegations of perjury had not been denied by the Attorney General, and concluding that the registration order based on a record impugned by a charge of perjurious testimony on the part of three witnesses whose evidence constituted a not insubstantial portion of the Government's case could not stand, this Court remanded to the Board "to make certain that [it] bases its findings upon untainted evidence." 351 U. S. 115, 125.

On remand the Party filed several motions with the Board seeking to reopen the record for the introduction of additional evidence. These were denied. A motion in the Court of Appeals for leave to adduce additional evidence was similarly denied, except that the Board

[6] S. Doc. No. 41, 83d Cong., 1st Sess.

[7] Section 14 (a) provides: ". . . If either party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material, the court may order such additional evidence to be taken before the Board and to be adduced upon the proceeding in such manner and upon such terms and conditions as to the court may seem proper. The Board may modify its findings as to the facts, by reason of the additional evidence so taken, and it shall file such modified or new findings . . . ."

was granted permission to entertain a motion concerning the Party's offer to show that another of the Attorney General's witnesses, Mrs. Markward, had committed perjury with regard to a specified aspect of her testimony. The Board granted the Party's motion; hearings were reopened; Mrs. Markward was cross-examined. Motions by the Party for orders requiring the Government to produce certain documents relevant to the matter of her testimony were denied. On December 18, 1956, the Board issued its 240-page Modified Report. It found that Mrs. Markward was a credible witness, made new findings of fact, and, having expunged the testimony of Crouch, Johnson and Matusow, reaffirmed its conclusion that the Party was a Communist-action organization and recommended that the Court of Appeals affirm its registration order. That court, while affirming the Board's actions in other regards, held that the Party was entitled to production of several documents relating to Mrs. Markward's testimony, and remanded. *Communist Party of the United States* v. *Subversive Activities Control Board,* 102 U. S. App. D. C. 395, 254 F. 2d 314. The scope of this remand was enlarged by subsequent orders requiring the production of recorded statements made to the F. B. I. by the Attorney General's witness Budenz, the existence of these recordings having become known to government counsel and to the Board only at this time. These statements related to Budenz's testimony at the original hearings concerning the "Starobin letter" and the "Childs-Weiner conversation." Motions pursuant to § 14 (a) seeking the production of other government-held documents—memoranda furnished to the Government by the Attorney General's witness Gitlow, and recordings made by the F. B. I. of interviews with Budenz—were denied.

On second remand, the documents specified by the orders of the Court of Appeals were made available to the Party. The hearing was reopened before a member of

the Board sitting as an examiner. When the illness of Budenz made impossible his recall for cross-examination in connection with the documents produced, the examiner denied the Party's motion to strike all of Budenz's testimony, but did strike so much as related to the Starobin and Childs-Weiner matters. After re-evaluating the credibility of Budenz and Markward, and affirming the action of its examiner in striking only that portion of Budenz's testimony which concerned the Starobin letter and the Childs-Weiner conversation, the Board re-examined the record as a whole and issued its Modified Report on Second Remand—its findings of fact consisting principally of the findings contained in its first Modified Report, with a few deletions—again concluding that the Communist Party of the United States was a Communist-action organization, and again recommending that its order to register be affirmed. The same panel of the Court of Appeals affirmed the order, at the same time denying the Party's motion under § 14 (a) for an order requiring production of all statements made by government witnesses and now in the possession of the Government, 107 U. S. App. D. C. 279, 277 F. 2d 78, the dissenting judge again dissenting in part. It is this decision which is now before us for review.

## II.

The Communist Party urges, at the outset, that procedural rulings by the Board and the Court of Appeals constitute prejudicial error requiring that this proceeding be remanded to the Board. Before reaching the statutory and constitutional issues which this case presents, we must consider these rulings.

A. *The Board's Refusal to Strike All Testimony of the Witness Budenz.* At the original hearing before the Board, Budenz testified during almost two days on direct examination and five days on cross-examination. His

testimony fills more than 700 pages. Of these, eight pages of direct and thirty pages of cross-examination relate to the Starobin letter; two pages of direct and ten pages of cross-examination relate to the Childs-Weiner conversation. Motions to require production of reports or statements by Budenz to the F. B. I. on these two subjects were denied at that time by the Board. After this Court's remand, the motions were repeated and again denied. The Court of Appeals affirmed the denial of the motions on the ground that there did not then appear to be in the possession of the Government any such reports or statements. Subsequent to the court's remand on other grounds, however, government counsel for the first time discovered in the F. B. I. files mechanical transcriptions of interviews with Budenz concerning the Starobin and Childs-Weiner matters. Counsel reported this discovery to the Court of Appeals, which thereupon enlarged the scope of remand to require the production of all "statements," as defined in 18 U. S. C. § 3500, made by Budenz to the F. B. I. relating to these matters. The question of the propriety of these various rulings on the Party's motions for production is not now before us.

After an inspection of the F. B. I. recordings *in camera* by a member of the Board sitting as an examiner, excerpts relating to the Starobin letter and Childs-Weiner conversation were furnished to the Party. The Party sought to recall Budenz for further cross-examination in light of these statements. Upon receipt of a letter from Budenz's personal physician stating that, because of a serious heart condition, it would imperil Budenz's health to appear, the member-examiner caused an independent physical examination of the witness by a heart specialist. The specialist confirmed that cross-examination might seriously affect Budenz's health or cause his death, and counsel for the Government and the Party agreed that the witness was unavailable for recall. The Party then moved that all of

Budenz's testimony be stricken, on the grounds that its unreliability was shown by his prior statements and that cross-examination which, with the aid of the recordings produced, might permit the Party to discredit Budenz entirely, had been rendered impossible by delay for which the Government was responsible. The examiner denied the motion, but granted an alternative motion to strike so much of Budenz's testimony as concerned the Starobin letter and the Childs-Weiner conversation. The Board and the Court of Appeals have affirmed these rulings. The Party argues that they are error.

The "Childs-Weiner conversation" concerns an interview in New York at which Budenz, Childs and Weiner discussed the financing of the Midwest Daily Record, a Party newspaper then edited by Budenz. At the hearing before the Board, Budenz testified that Childs had asked Weiner if money couldn't be got from abroad, and that Weiner replied that normally it might, but that the channels of communication had been broken for the time being, that perhaps they might be re-established so that money could come. Budenz testified that although it was not definitely stated what Weiner meant by "abroad," Budenz's familiarity with the term as used by Party members led him to believe that it meant "from Moscow." In the recordings produced by the Government made during a series of F. B. I. interviews in 1945, Budenz did not mention this incident, although he did advert to the financing problems of the Daily Record and to trips which he made to New York to seek funds for it. Asked whether he had seen any indication of funds coming from Russia, Budenz replied: "The only indication would be is that in addition to Krumbein as Treasurer, Weiner still maintains a certain general supervisory control over finances." Budenz explained that Weiner was "trusted financially," and again mentioned that Weiner's being "a super financial person" was "indicative" of the source of money. He

did not relate any specific conduct of Weiner's which rendered his status "indicative." In an interview in 1946, as reported in an office memorandum prepared by an F. B. I. agent, Budenz stated that he "could recall only one instance wherein it was indicated that the Soviet Union might be sending money": this was the Childs-Weiner conversation in New York. Childs had asked Weiner, the memorandum stated, whether he didn't expect a consignment "from across the sea."

> ". . . Weiner immediately changed the subject matter, indicating that he did not want to discuss the question of transmission of Soviet funds in the presence of Budenz, even though Budenz was a trusted Communist. Budenz concluded from the remark that was made that funds were actually being sent to this country at that time by the Soviet Union for propaganda purposes."

An F. B. I. document based on an interview with Budenz in 1947 describes the incident as follows:

> ". . . Childs suggested that Weiner try to get some money from Moscow to finance the paper. Weiner stated that he had temporarily lost his contacts in Moscow, hence, he could not do anything."

Finally, in a 1950 interview, as recorded in an office memorandum, Budenz related:

> ". . . Childs asked that funds be advanced him by Weiner from the reserve fund [large sums of money held in bank accounts "in reserve for Moscow" or earmarked for Communist organizations] and Weiner advised that he didn't have any at that time as his communication system had temporarily broken down. Budenz took this to mean that Weiner's source of supply was from foreign countries, particularly Russia."

The "Starobin letter" was an alleged communication from Starobin, a Daily Worker correspondent at the United Nations Conference in San Francisco in 1945, which Budenz had opened and of which he had read only a part before it was taken from him and transmitted to certain higher-ups at the Daily Worker. The letter was purportedly received at about the time of the appearance in a French Communist journal of an article by Jacques Duclos, severely criticizing the reorganization of the Communist Party of the United States as the Communist Political Association under Earl Browder in 1944, a reorganization apparently marked by an ideological shift away from the more revolutionary Marxist-Leninist principles, and toward a doctrine of peaceful Soviet-American coexistence. At roughly the same time, Budenz was instructed to reprint the Duclos article in the Daily Worker; shortly thereafter, the Communist Political Association was reconstituted as the Communist Party U. S. A., Browder was ousted, and the Party, in the words of its new national chairman, William Z. Foster, "suddenly reverted to its basic Communist principles." Budenz testified at the hearing that "In this letter Mr. Starobin stated that D. Z. Manuilsky [a Ukrainian delegate to the conference and an important Communist figure] . . . had expressed indignation at the fact that the American Party had not criticized the American leaders, that is, in the government, more severely, and that the American Party should observe more carefully the guidance and the counsel of the French Communists." The F. B. I. recordings produced pursuant to the remand order of the Court of Appeals show that in 1945 interviews with the F. B. I., Budenz had spoken of "private communications sent from Starobin to us," in connection with the ideological shift which marked the end of the Browder "collaborationist" policy. He did not then speak specifically of the Starobin letter as he described

it in his testimony. In response to a question by his F. B. I. examiner, Budenz agreed that Starobin himself was not an important enough figure to inaugurate a change of policy. This colloquy followed:

"Q. Do you think then that the instructions relative to this change of policy that Starobin and Fields must have received came from the Russian delegation? Oh, you said maybe Manuilsky, the Ukrainian delegate? A. Sure, sure, I mean—after all, they got the atmosphere there. In fact I mentioned Manuilsky very much, because definitely he is a figure in the CI.

"Q. He certainly is. A. He used to lay down the law like a general, you know, to his troops. . . ."

In 1946, Budenz reported to the F. B. I. that in a letter from the San Francisco Conference, Starobin advised that " 'the French comrades have the line and the support of the Soviet Union—and the French comrades blasted Stettinius and the United States Delegation, and therefore Starobin directed that the Party in this country should immediately blast Stettinius and the United States Delegation.' Budenz stated that in this letter Starobin inferred [sic] that he and/or his associates at the Conference had conferred with Manuilsky regarding this question, and that the changed policy was predicated upon Manuilsky's instructions as well as on advice received from French Communists at UNCIO." Testifying in that same year before the House Committee on Un-American Activities, Budenz quoted the Starobin letter as relating that the French Comrades asserted there should be more of an attack upon Stettinius by the American Communists, and that this was likewise the opinion of Comrade Manuilsky.

In ruling on the Party's motion to strike all of Budenz's testimony because of his unavailability for cross-examina-

tion in light of these earlier statements, the Board took account not only of the similarities and variations of the witness's several accounts of the Starobin and Childs-Weiner matters, but also of Budenz's responses under extensive cross-examination on all subjects of his testimony at the initial hearing; of the substantial corroboration of Budenz's testimony by other evidence in the administrative record; and of the failure of the Party to attempt to rebut that testimony, which was specific and detailed.  The Board found that the prior statements produced did not demonstrate, in the context of the "pertinent circumstances of record," that Budenz's Starobin and Childs-Weiner testimony was deliberately false, and also that, assuming *arguendo* such testimony were false, all of Budenz's evidence would not thereby be discredited.  It concluded that "the fair disposition of the question" was to strike Budenz's testimony only on the two subjects as to which failure of timely production of prior statements had deprived the Party of effective cross-examination. The Court of Appeals, independently reviewing the record, affirmed the Board's refusal to strike, finding that the discrepancies among the various versions of the Starobin-letter and Childs-Weiner-conversation incidents "are not such as to indicate perjury, much less the habit of perjury essential to be shown to taint all the witness's testimony." 107 U. S. App. D. C., at 283, 277 F. 2d, at 82.

The considerations relevant to the Party's contention that all of Budenz's testimony must be expunged are, first, the extent to which his prior statements to the F. B. I., compared with his testimony in the present proceedings, discredit him as a witness and impugn his testimony in its entirety, and, second, the extent to which, on the whole record, it appears that the inability to cross-examine Budenz in light of those prior statements had prejudiced the Party.  These are questions which can best be answered by those entrusted with ascertaining the fact; that

is, the tribunal that conducts the hearing and passes judgment on the reliability of the witness in light of his total testimony and its relation to the more than 14,000 pages, exclusive of exhibits, of the administrative transcript. Wide discretion would be left to a trial judge and not less must be left to an agency like the Board in a matter of this kind—a matter of adjusting the process of inquiry to the exigencies of a particular situation as they appear to administrators immediately acquainted with the course of proceedings. On this record we cannot say that both the hearing examiner and the Board abused that discretion, or that the Court of Appeals erred in affirming their rulings. In saying this, we do not ignore the argument of the Party that the deprivation of its opportunity to cross-examine Budenz on the basis of his prior statements is the "fault" of government counsel. Suffice that we find no basis for overruling the determinations below that the Government is not to be charged with an attempt unfairly to hamper the Party's presentation of its case. We would not, therefore, be justified in holding that evidence should have been struck which the Board found otherwise probative, inherently believable, and not discredited despite five days of cross-examination by the Party, and which the Court of Appeals found unexceptionable.

B. *The Board's Refusal to Order Production of the Gitlow Memoranda.* In 1940 Gitlow, who had been during the years prior to 1929 a high official of the Communist Party, turned over to the F. B. I. a quantity of documents and papers pertaining to the Party. Shortly thereafter he dictated a series of memoranda explaining and interpreting them. At the original hearing in the present proceeding, Gitlow, testifying for the Attorney General, identified a number of these documents, which were then put in evidence, and described their contents and significance. The Party moved the Board for an order requiring that the

Attorney General produce the explanatory memoranda. The motion was denied. In its first petition in the Court of Appeals to review the order of the Board, the Party assigned the Board's refusal to order the production of documentary evidence as error; but it did not mention the Gitlow memoranda in the argument portion of its brief, nor, apparently, in oral argument. The point was not among the questions presented in the petition for certiorari in this Court in 1955 and was not relied on in the briefs here. After our remand, the Party again moved the Board to order production of the memoranda. The Board again refused. The Court of Appeals, in its second opinion reviewing the Board proceedings, held that the ruling by the Board declining to order production could not be corrected on petition to review the Board's order. Relying on *Consolidated Edison Co.* v. *Labor Board,* 305 U. S. 197, the court said that the Party's exclusive remedy was to move the Court of Appeals, under § 14 (a) of the Act, for leave to adduce additional evidence, and that failure to make such a motion at the time when the Board refused to order the documents produced barred the Party from later challenging the action of the Board. After the second remand, the Party did make a motion pursuant to § 14 (a) seeking the Gitlow memoranda. This the court refused, holding that the Party's procedural error could not be cured *nunc pro tunc.*

We may assume *arguendo,* without deciding the point, that the Board erred in refusing to order the Gitlow memoranda produced at the original hearing. But we do not reach the question of the applicability of the *Consolidated Edison* case to this situation. It is too late now for the Party to raise this error of the Board. That error could have been raised here five years ago. Had it been raised then, we could have ordered it cured at the time of the first remand to the Board. The demands not only of orderly procedure but of due procedure as the means of

achieving justice according to law require that when a case is brought here for review of administrative action, all the rulings of the agency upon which the party seeks reversal, and which are then available to him, be presented. Otherwise we would be promoting the "sporting theory" of justice, at the potential cost of substantial expenditures of agency time. To allow counsel to withhold in this Court and save for a later stage procedural error would tend to foist upon the Court constitutional decisions which could have been avoided had those errors been invoked earlier.[8] We hold that the Communist

---

[8] A totally different situation was presented in *Ballard* v. *United States*, 329 U. S. 187, in which it was held that a litigant who had been a party respondent in a case previously here on certiorari had not lost his right to complain of error in the selection of a jury by failing to argue the error as an independent ground for sustaining the first decision of the Court of Appeals, holding in his favor on other grounds.

Reference is also made to cases in which this Court has exercised its power to control the course of litigation immediately before it—a power which finds an appropriate exercise in the avoidance of premature constitutional adjudication. But the rule which petitioner urges, which would permit saving for a possible later stage in the proceedings errors available but not raised in this Court on review of administrative action, far from enhancing the Court's ability to give effect to the policy of deferring unnecessary constitutional decision, would impede that policy. For it would allow the agencies and lower courts, after our remand, to consider potentially dispositive contentions which, had they been brought to our attention, might have derailed issues on which decision turned.

The reason for demanding that all available issues be raised in the orderly course of administrative review proceedings is made particularly evident by the circumstances of this case. This was a litigation already five years old when it first came here. Unusually extensive hearings and argument had been had before the Board and exhaustive briefing and argument before the Court of Appeals. The petition for certiorari, a document of ninety-three pages plus appendices, presented ten major questions and innumerable subsidiary points. Yet the matter of the Gitlow memoranda, which it is now argued looms so large in the context of this extraordinarily lengthy and complex

Party abandoned its claim of error in the Board's denial of its motion to require the Gitlow documents produced, by failing to raise that question in its previous petition for certiorari here. Of course, it could not resurrect that claim by repeating the same motion before the Board after our remand.

C. *Denial by the Court of Appeals of the Party's Motions for Orders Requiring Production of All Statements by the Witness Budenz, and of All Statements by All Witnesses for the Attorney General.* On February 14, 1958, after this case had been remanded to the Board for the second time, and more than five and a half years after the termination of the initial hearings, the Party moved the Court of Appeals, under § 14 (a), for an order requiring production of all recordings, notes and memoranda made by the F. B. I. of interviews with Budenz, insofar as these related to his testimony at the hearings. On April 14, 1959, after the Board had considered the record for the third time and written its third opinion, the Party filed a second motion in the Court of Appeals, seeking production of all statements by all government witnesses

---

proceeding, was not raised, and not raised by highly experienced lawyers who vigorously contended every step of the litigation. We remanded on other grounds and now—after five more years have passed, after the Board and the Court of Appeals have each twice more reconsidered this steadily growing record—we are asked to reverse on a ground which the Party had every opportunity to bring here but which it abandoned. To ignore the abandonment would be a most artificial, decision-shrinking abuse of the wise rule of putting off decisions of constitutional scope. Avoidance of such decisions, however compelling a policy within the limitations of ordered judicial regularity, ought not to be countenanced by grafting an *ad hoc* exception onto a generally applicable rule of appellate procedure and permitting particular litigants to avail themselves of otherwise uncognizable points. No decision of this Court can be found which in similar circumstances authorizes disregard of all that has transpired over ten years of litigation so as to allow petitioner to make waste the half of it by resuscitating a long-stale claim.

relating to their testimony. A motion of similar scope had been made before the Board on second remand in December 1958. The court denied these motions as untimely. We cannot say that in doing so it abused its discretion.

With reference to the Budenz records, the Party seeks to excuse its delay by pointing out that not until early in February 1958 did it discover that the F. B. I. had made mechanical transcriptions of interviews with this witness. The Party was misled, it argues, at the time of the original Board hearings, into believing that no prior statements by Budenz were in the possession of the Government. The short answer to this may be found in the transcript of Budenz's replies to questions of counsel for the Party during his testimony on cross-examination.[9]

---

[9] "Q: Did you give [the Starobin letter incident] to . . . the FBI.

"A: I am satisfied I gave it to the FBI. I couldn't say definitely, but the FBI question me about everything I write and say, and also about many other things. They question me, and I answer their questions.

"Q: Were your answers reduced in writing?

"A: As a matter of fact, I do know now, since you mention it, that I did give this to the FBI.

"Q: In writing?

"A: No, not in writing.

"Q: Was it taken down by a stenographer?

"A: No, not by a stenographer. They never do that, except in rare cases.

"Q: Was a report written up and then shown to you afterwards?

"A: No. That never happens.

"Q: So all you did was simply have an oral conversation about this incident?

"A: Yes, that is all.

. . . . .

"Q: Was it recorded?

"A: I judge so. It was taken down.

"Q: It was taken down?

Although the Party might not have known of the disc recordings made of the Budenz interviews, it knew that notes or records had been taken of those interviews by the F. B. I. Indeed the Party sought production of such reports, insofar as they related to the Starobin letter and the Childs-Weiner conversation, by motions made to the Board at the time Budenz testified. Had similar motions been made with regard to other aspects of Budenz's testimony, or with regard to other witnesses, and had the Board denied those motions, this issue could have been brought here on review five years ago.[10]   If production had

---

"A: Yes. I mean, it wasn't by a stenographer, but by an FBI agent.

"Q: It was taken down by an agent?

"A: Right.

"Q: Was it taken down in shorthand or longhand, or what?

"A: Longhand.

"Q: When?

"A: That I don't know. The reason I recall it, counselor, if I may say so, is because in connection with my book, everything that was in my book was gone over by the FBI, either before or after its publication . . . .

.          .          .          .          .

"When I say 'gone over,' I mean the information was given to them."

[10] The Party did move, at the original Board hearing, for the production of certain reports by particular government witnesses which, it may be, would be comprehended among those sought by its 1959 motion for "All statements . . . which were made by witnesses who testified for the Attorney General at the administrative hearing and which relate to the subject matters of their testimony." As in the case of the Gitlow memoranda, the question of the Board's denials of these motions was not raised in the petition for certiorari here in 1955, and has thus been waived. We note that one such motion was adverted to in a footnote in the Party's brief in this Court at that time, in connection with its argument that the Board erred in relying on the testimony of Scarletto; this and a similar footnote reference to denial of the Party's motion for production of statements of Budenz concerning the Starobin letter were the only mentions

been ordered, presumably all statements by Budenz would have been found. Statements by others, if they existed, would have been found. We cannot say that the Court of Appeals was clearly wrong in holding that at the time these motions were made it was too late to remand to the Board and require production of documents in order to reopen cross-examination of witnesses who testified in 1951 and 1952.

## III.

We come to the Communist Party's contentions that the Board and the Court of Appeals erred in their construction of the Act and in their application of it, on the facts of this record, to the Party. It is argued that both elements of the statutory definition of a Communist-action organization in § 3 (3) of the Act—what have come in the course of this litigation to be known as the "control" and "objectives" components—were misinterpreted below; that the Board misconceived the nature of each of the eight evidentiary considerations directed to its attention by § 13 (e) as pertinent to its determination whether an organization is or is not a Communist-action organization; that the Board misapplied the phrase "world Communist movement" in § 2; and that the Board erred in taking account, as relevant to that determination, of conduct of the Party prior to the date of the Act. The Court of Appeals is said to have erred in failing to remand to the

in the Party's 224-page brief of motions for production denied by the Board. These were plainly insufficient to raise the issue here. Supreme Court Rules 23, subd. 1 (c), 40, subd. 1 (d)(2).

Nor can we agree that the Party was excused from the necessity of making appropriate motions before the Board respecting documents which it wanted produced, because similar motions with respect to other documents had previously been denied. Especially in administrative proceedings of this length and complexity, it is important that a party bring his particular requests explicitly to the attention of the agency and the reviewing courts.

Board after striking one of its subsidiary findings as unsupported by the evidence. Finally, it is contended, the record as a whole does not support by the preponderance of the evidence, as required by § 14 (a), the conclusion that the Party is a Communist-action organization within the correct meaning of that phrase.

A. *The "Control Component."* Under § 3 (3) of the Act an organization cannot be found to be a Communist-action organization unless it is "substantially directed, dominated, or controlled by the foreign government or foreign organization controlling the world Communist movement . . . ." The Party asserts that this requirement is not satisfied by any lesser demonstration than that the foreign government or foreign organization controlling the world Communist movement exercises over the organization an enforceable, coercive power to exact compliance with its demands. The Court of Appeals disagreed, holding that in the circumstances of this record a consistent, undeviating dedication, over an extended period of time, to carrying out the programs of the foreign government or foreign organization, despite significant variations in direction of those programs, was sufficient. The Subversive Activities Control Board has not, in its reports, articulated any other understanding of the standard, and since its final factual determination was made after the Court of Appeals had put this definitive gloss on § 3 (3), we must attribute to it acceptance of the court's interpretation.

We agree that substantial direction, domination, or control of one entity by another may exist without the latter's having power, in the event of non-compliance, effectively to enforce obedience to its will. The issue which the Communist Party tenders as one of construction of statutory language is more sharply drawn in the abstract sphere of words than in the realm of fact. It is true that the Court of Appeals compendiously expressed

its understanding of the Party's conduct over a course of thirty years, as revealed by this record and as found by the Board, in terms of "voluntary compliance." Opposing this phrase, the Party insists that the statute demands "enforceable control." But neither of these verbalisms was used by Congress, and neither has an invariant content. Nor has the language of the statute: "substantially directed, dominated, or controlled." Each of these notions carries meaning only as a situation in human relationships which arises and takes shape in different modes and patterns in the context of different circumstances.

The statute, as amended, uses the same phrase three times. A Communist-action organization must be one substantially directed, dominated, or controlled by a foreign government or foreign organization of a designated kind. A Communist-front organization must be one substantially directed, dominated, or controlled by a Communist-action organization. § 3 (4). A Communist-infiltrated organization must be one substantially directed, dominated, or controlled by an individual or individuals engaged in giving aid or support to a Communist-action organization, Communist foreign government, or the world Communist movement. § 3 (4)(A). Variations of this language also occur. Subsection 13 (e)(1) refers to "the foreign government or foreign organization in which is vested, or under the domination or control of which is exercised, the direction and control of the world Communist movement . . . ." Section 2 (5) relates that the action organizations established by the Communist dictatorship in which is vested the direction and control of the world Communist movement are sections of a world-wide Communist organization and are "controlled, directed, and subject to the discipline of [that] . . . Communist dictatorship . . . ." Manifestly, the various relationships among nations, organizations, movements and individuals of which the

Act speaks will take a multiplicity of forms. A foreign government "dominates" or "controls" the "direction" of the world Communist movement through very different means and in very different ways than one organization "dominates" or "controls" another, or than an individual "dominates" or "controls" an organization. These differences do not deprive the concepts "domination" and "control" of ample meaning. Throughout various manifestations these concepts denote a relationship in which one entity so much holds ascendancy over another that it is predictably certain that the latter will comply with the directions expressed by the former solely by virtue of that relationship, and without reference to the nature and content of the directions. This is the sense we find in the opinions expounding the decisions of the Court of Appeals. The reports of the Board evidence a similar understanding.

Nothing in the Committee Reports pertinent to the Internal Security Act of 1950, or in what was said by Congressmen in charge of its passage, affords a gloss on "substantially directed, dominated, or controlled," as used in § 3 (3). There is nothing to indicate that Congress meant that phrase to have any arcane, technical meaning. Its reach is suggested, however, by comparison with a cognate enactment, the so-called Voorhis Act of 1940, 54 Stat. 1201, now 18 U. S. C. § 2386, requiring the registration with the Attorney General of, *inter alia,* certain organizations "subject to foreign control." [11] Section 1 (e) of that Act, 54 Stat. 1202, provided that

> "An organization shall be deemed 'subject to foreign control' if (1) it solicits or accepts financial contributions, loans, or support of any kind, directly

---

[11] A Committee Report pertinent to that Act, H. R. Rep. No. 2582, 76th Cong., 3d Sess. 1, described the organizations at which it was directed as those "substantially controlled or directed by a foreign power . . . ."

or indirectly, from, or is affiliated directly or indirectly with, a foreign government or a political subdivision thereof, or an agent, agency, or instrumentality of a foreign government or political subdivision thereof, or a political party in a foreign country, or an international political organization, or (2) its policies, or any of them, are determined by or at the suggestion of, or in collaboration with, a foreign government or political subdivision thereof, or an agent, agency, or instrumentality of a foreign government or a political subdivision thereof, or a political party in a foreign country, or an international political organization."

The Committee Report on the House bill from which the Subversive Activities Control Act derived indicates that its enactment was occasioned, in part, by the inadequacy of existing legislation. Although the Voorhis Act had been directed "against both Nazis and Communists," it had "proved largely ineffective against the latter, due in part to the skill and deceit which the Communists have used in concealing their foreign ties." H. R. Rep. No. 2980, 81st Cong., 2d Sess. 2; see also H. R. Rep. No. 1844, 80th Cong., 2d Sess. 5. It is reasonable to infer that Congress intended the registration provisions of the 1950 Act to be applicable, at the very least, to organizations concerning which a showing of "control" was made which would have brought the organization under the registration provisions of the Voorhis Act. And the 1940 Act, by its explicit definitions, did not require what the Party signifies by "enforceable" control.

The subjection to foreign direction, domination, or control of which § 3 (3) speaks is a disposition unerringly to follow the dictates of a designated foreign country or foreign organization, not by the exercise of independent judgment on the intrinsic appeal that those dictates carry, but for the reason that they emanate from that

country or organization. No more apt term than domination or control could be used to describe such a relationship. The nature of the circumstances which bind an organization to unwavering compliance may be diverse. They may consist, of course, of the sort of enforceable power over the organization's members which an employer has over an employee—the power to compel obedience by threat of discharge. But they may also consist of other incidents which assure that the organization will unquestioningly adhere to the line of conduct appointed for it. Some of these incidents are suggested by the evidentiary considerations which Congress has enumerated in § 13 (e) of the Act—foreign financial or other aid whose menaced withdrawal may serve as an instrument of influence, § 13 (e)(3); subjection to, or recognition of, personal disciplinary power of the designated foreign organs by the leaders or a substantial number of the members of an organization, § 13 (e)(6); obligations in the nature of allegiance owed to those foreign organs by an organization's leaders or a substantial number of its members. § 13 (e)(8). Other incidents may involve other forces felt by individuals or groups to be compelling: a recognition of mastery, for example, which makes criticism itself a severe sanction. The existence of direction, domination, or control in each instance is an issue of particular fact. The question whether in the case of a given organization such a compulsion or impulsion arises from the complex of ties which link it to a foreign government or organization that it will, because of those ties alone, adhere in its conduct to decisions made for it abroad, is one which Congress has committed, in the first instance, to an expert trier of fact. Since the determination that an organization is or is not a Communist-action organization is largely a matter of the working out of legislative policy in multiform situations of potentially great variety, the "construction" of

the statute which ensues from its application to particular circumstances by the administrative agency charged with its enforcement is to be given weight by a reviewing court. Cf. *Labor Board* v. *Hearst Publications, Inc.,* 322 U. S. 111. Our decision in *Rochester Telephone Corp.* v. *United States,* 307 U. S. 125, is especially apposite here. The case involved the question whether one communications corporation controlled another for purposes of § 2 (b) of the Communications Act of 1934, 48 Stat. 1065, providing that the Federal Communications Commission should not have jurisdiction over any carrier "engaged in interstate or foreign communication solely through physical connection with the facilities of another carrier not directly or indirectly controlling or controlled by . . . such carrier." Refusing to set aside an order based on the Commission's finding that the New York Telephone Company controlled the Rochester Telephone Corporation, we said: "Investing the Commission with the duty of ascertaining 'control' of one company by another, Congress did not imply artificial tests of control. This is an issue of fact to be determined by the special circumstances of each case. So long as there is warrant in the record for the judgment of the expert body it must stand." *Id.,* at 145–146.

While under § 14 (a) of the Subversive Activities Control Act, providing that the findings of the Board as to facts shall be conclusive if supported by the preponderance of the evidence, a stricter standard of re-examination is set than that to which administrative findings are ordinarily subject, we cannot in this case say that the Board—and, in affirming its order, the Court of Appeals—have misapplied the Act. Neither its written report nor the opinion of the court below supports the Party's interpretation of them. They do not hold, as the Party suggests, that conformity which stems from nothing more than ideological agreement satisfies the requirements of § 3 (3). What they do hold is that "the definition of a

Communist-action organization was not intended by the Congress to be restricted to organizations which are subject to enforceable demands of the Soviet Union. . . . An organization or a person may be substantially under the direction or domination of another person or organization by voluntary compliance as well as through compulsion. This is especially true if voluntary compliance is simultaneous in time with the direction and is undeviating over a period of time and under variations of direction. If the Soviet Union directs a line of policy and an organization voluntarily follows the direction, the terms of this statutory definition would be met." 102 U. S. App. D. C. 395, 400, 254 F. 2d 314, 319.

This must be read in the context of the facts of record in this proceeding. Since the determinative issue of the meaning of "substantially directed, dominated, or controlled," and the constitutional questions which the construction of this statutory language raises, are to be determined essentially on the basis of the assignment of legal significance to the Board's findings of fact, those findings must be allowed to speak for themselves. They can neither be summarized nor fairly conveyed in bits and pieces. Their large scope and critical importance necessitates and justifies burdening this opinion with more extensive quotation than is customary in cases where summaries of the record may more meaningfully be made. The Board wrote:

> "The present world Communist movement was first manifested organizationally by the formation in March of 1919 in Moscow, Russia, of the Third Communist International. As this event is recorded in the *History of the Communist Party of the Soviet Union* . . . , it was 'on the initiative of the Bolsheviks, headed by Lenin,' that the first Congress of Communist Parties was called in Moscow, the work of which 'was guided by Lenin'; and, 'Thus was

founded an international revolutionary proletarian organization of a new type—the Communist International—the Marxist-Leninist International.'

.          .          .          .          .

"One year later, July 17–August 7, 1920, the Second Congress of the Communist International adopted and promulgated its *Theses and Statutes,* setting forth its aims and purposes as later herein detailed, and described itself as *'a single universal Communist party, of which the parties operating in every country form individual sections.'* . . .

"A 'Statute' of the Comintern insured that it would serve the interests of Russia by providing:

" 'The Communist International fully and unreservedly upholds the gains of the great proletarian revolution in Russia, the first victorious socialist revolution in the world's history, and calls upon all workers to follow the same road. The Communist International makes it its duty to support with all the power at its disposal every Soviet Republic, wherever it may be formed.' . . .

.          .          .          .          .

"The Communist International was in fact a world Communist Party, organized and controlled as to policies and activities by the Soviet Union, consisting of the various Communist Parties of the countries throughout the world, which constituted its sections. With headquarters in Moscow, it embodied an elaborate organizational structure, related to implementing the basic strategy and tactics of Marxism-Leninism. . . . There was no North American Bureau, but the Political Bureau of respondent acted in that capacity, supervising the Communists in Canada, Cuba, Mexico, and others down to the Panama Canal.

"The Soviet Union was the leader of the Communist International, exercising control over its policies

and activities. The Communist Party of the Soviet Union had five votes to one each for the other larger Parties in the Executive Committee of the Comintern (ECCI), which respondent in a 1934 resolution acknowledged to be 'the general staff of the world revolutionary movement giving unity and leadership to the Communist Parties of the world.' . . . The Government of the Soviet Union financed the Comintern. All of the heads of the Comintern who were identified in the record were leading members of the Communist Party of the Soviet Union. . . .

.        .        .        .        .

"Respondent joined this international Communist organization shortly after it was constituted and admittedly until 1940 participated therein. . . . [R]espondent recognized that its membership therein subordinated any national interests . . . .

.        .        .        .        .

"Further, that complete and total allegiance and dedication was demanded in affiliation with the Comintern, and was acknowledged and in turn stressed by respondent, is also shown by its 'Program':
" ' . . . The Communist International is an organization for waging class warfare for the liberation of the working class; there can be no reservations in endorsement and' affiliation with it. Loyalty "with reservations" is treachery. Endorsement and defense of Soviets in Russia, with failure to advocate the Soviet form of proletarian dictatorship in the United States is hypocrisy.' . . .

.        .        .        .        .

"Fundamental to the world Communist movement were the 21 'Conditions of Admission to the Communist International' promulgated in its *Theses and Statutes* in 1920 . . . . Uncontradicted testimony

and documents establish that these 'Conditions' were endorsed and accepted by respondent and were binding upon it.

.       .       .       . .            .

". . . Condition No. 12 required the party to be formed upon the basis of democratic centralism, stressing that only when possessed of an 'iron discipline'. . . will it be able to fully and thoroughly carry out its duty as part of the world Communist movement.  Condition No. 20, in order to aid control, required that two-thirds of all committee members and members of central institutions consist of comrades who have made open declarations as to their desire to join the Comintern.  Condition No. 11 required an inspection of personnel and the removal of unreliable elements from parliamentary party fractions, and Condition No. 13 required a systematic check of personnel to remove petty bourgeois elements which may have infiltrated a party.  Condition No. 16 made binding upon the party all resolutions of the Comintern, and Condition No. 21 made liable to exclusion from the party anyone who rejected the theses and conditions of the Third Communist International.

.          .          .          .          .

"As to specific policies and programs, Condition No. 15 required the maintenance of a program in accordance with the resolutions of the Comintern. . . .

.          .          .          .          .

"Another aspect of the 'Conditions' was to make the allegiance of a section party and its members to the Comintern, and hence to the Soviet Union, paramount to any other.  For example, Condition No. 14 obligates every member party of the Comintern 'to render every possible assistance to the Soviet Re-

publics in their struggle against all counter-revolutionary forces.' . . . It directs the member parties to use legal and illegal means to obstruct military efforts against the Soviet Union. . . .

.      .      .      .      .

"These 21 'Conditions' were never changed by the Communist International and were enforced and implemented by respondent and used to educate its members. Considerable documentary material of record also established that respondent fully complied with and fulfilled the requirements of membership in the Communist International and faithfully followed and carried out its instructions and directives.

.      .      .      .      .

"The Communist International was formally dissolved as such in 1943, at which time the United States and the Soviet Union were military allies. One reason given for this formal dissolution by Stalin was that it would remove the foundation for 'fascist' charges that the Soviet Union was meddling in the internal affairs of other nations. . . .

.      .      .      .      .

"The world Communist movement, under the hegemony of the Soviet Union, continued, notwithstanding the 'dissolution' of its organizational form embodied in the Communist International. . . . [T]he world Communist movement, intact in the basic orientation, policies and programs discussed above, continued via the Cominform and by Communist Parties not formally affiliated with it, such as respondent.

.      .      .      .      .

"Respondent, although never formally a member of the Cominform, has . . . remained dedicated to

'proletarian internationalism,' Marxism-Leninism, and the policies and programs of the world Communist movement as continued by the Cominform.

.        .        .        .        .

"We have previously set forth that respondent joined the Communist International shortly after it was constituted and admittedly participated therein until 1940. Respondent offered no substantial evidence concerning this period of its activities, contending that this period is irrelevant, primarily because of an announced disaffiliation from the Communist International in 1940. The circumstances of the disaffiliation . . . show that there was no fundamental or significant change in respondent's relationship to the world Communist movement. . . .

.        .        .        .        .

"The oral testimony and official documents of respondent and of the Comintern show that respondent was under the complete control and direction of the Comintern. Gitlow was a top official of respondent and in the late 1920's a member of the Executive Committee of the Communist International. He stated unequivocally that the Comintern controlled all major policies of respondent. Kornfeder, also a functionary of respondent and who attended the Sixth Congress of the Comintern held in Moscow, corroborated this stating that he knew of no instance during his experience, which lasted until 1934, when respondent deviated from Comintern instructions. Nowell, based on personal experience as a member of respondent and personal contact with the Comintern, as well as what he was instructed while attending the Lenin School in Moscow in 1932, stated that the decisions of the Comintern were binding on respondent. Honig testified to Comintern directives which were carried out by respondent. . . .

"Among the specific instances of record, much of which is uncontroverted documentary material, showing the control exercised over respondent by the Comintern were: a Comintern decision in 1924 which resulted in the amalgamation of various Communist factions in the United States into the single Communist Party; a decision by Joseph Stalin in 1929, adopted by the Comintern, which expelled certain top officials of respondent and designated other individuals as leaders of respondent; advance approval by the Comintern for the holding of Communist Party conventions in the United States; Comintern instructions in 1927 that respondent charge the United States and Great Britain with intervention in Chinese affairs and to attack Chiang Kai-Shek; Comintern decision directing respondent to work for the formation of a farmer-labor party in the United States and a subsequent change directing respondent to go into elections with the Communist Party ticket; and, advance approval by the Comintern of members of respondent who were sent to training schools in Moscow. . . .

.        .        .        .        .

"Respondent makes much of the fact that it 'disaffiliated' from the Communist International in 1940. There was no dispute that respondent in 1940 announced its disaffiliation for the stated purpose of avoiding registration as a foreign agent under the Voorhis Act of October 17, 1940. An issue is the effect of the disaffiliation.

.        .        .        .        .

". . . The Browder report makes clear that the disaffiliation was but an expediency to avoid registration under the Voorhis Act and contains nothing which negatives an intent to continue as before the principle of 'proletarian internationalism.' Various

passages of Browder's report indicate an intent to end only the 'formal' and 'organizational' connection with the Communist International but not to alter the preexisting fundamental relationship. Illustrative of this is that the report states the disaffiliation would not even be considered if it were thought that it would cause the Party to 'waiver' or 'vacillate' in carrying out 'the internationalism founded by Marx and Engels, and brought to its great, historically decisive victories under the leadership of Lenin and Stalin,' and to which 'the life of every Communist is unconditionally consecrated.' . . . Also, the Browder report, by characterizing the Voorhis Act as 'an extreme example of the most vicious and oppressive *Exceptional Laws*' . . . indicates that the *organizational* disaffiliation was in accord with a Comintern 'Condition' that 'In every country where, in consequence of martial law or of other *exceptional laws, the Communists are unable to carry on their work lawfully, a combination of lawful and unlawful work is absolutely necessary.' . . .

.     .     .     .     .

"The 1929 reorganization followed a solution dictated by Stalin, which was adopted by the Comintern, and accepted by respondent. Lovestone, Gitlow, and others were deposed as leaders of respondent and the leadership placed in a group which included William Z. Foster, present national chairman. The reorganization of respondent was due to a factional dispute which was a reflection of a struggle in the Communist Party of the Soviet Union and in the Communist International between forces led by Stalin and those led by Bukharin. The Foster faction in respondent, representing a minority of only about 10 per cent, supported Stalin whereas the Lovestone-Gitlow faction, representing about 90 per cent, sided with

Bukharin. Notwithstanding this, respondent complied with the Stalin-dictated solution. The record contains no evidence of subsequent material organizational changes until May of 1944 when respondent's name was changed to the Communist Political Association then changed back in 1945 to the name Communist Party. The change to 'CPA' was in the year following the dissolution of the Comintern and, like the announcements on that dissolution, the change was assertedly to promote a peaceful co-existence of the United States and the Soviet Union. While operating under the name 'Communist Political Association,' there was a deemphasis on the more militant principles of Marxism-Leninism and the current publications of the Party put forward the so-called 'Teheran line.' No evidence was presented by respondent to show a break with the basic principles of the international Communist movement. The leadership of respondent remained the same.

"Relevant to the reconstitution of respondent under the name Communist Party, the record shows that in April of 1945 Jacques Duclos, a spokesman for the world Communist movement, issued a statement the substance and effect of which was that it was a mistake to dissolve the Communist Party of the United States. . . .

.        .        .        .        .

"After preparation throughout the Party, respondent was reconstituted as the Communist Party of the United States of America. Earl Browder, for departing from the orthodoxy of Marxism-Leninism, was branded a 'revisionist' and 'deviationist' and deposed as the leader. Foster took over as national chairman. Otherwise those who had been officials and leaders of the CPA and the Party before that, with a few minor exceptions, remained the officers and

leaders of the reconstituted Communist Party. Upon taking over as national chairman, Foster pointed out the necessity for reemphasizing the revolutionary line of Marxism-Leninism. In a report to the reconstitution convention, subsequently published in *Political Affairs,* Foster declared 'Our Party has suddenly reverted to its basic Communist principles' and 'As never before, we must train our Party in the fundamentals of Marxism-Leninism.' . . .

.          .          .          .          .

"As previously found, Foster became a leading officer in respondent in 1929 as a result of a Soviet Union directive. He has been national chairman since the 1945 reconstitution. A prior letter of his to respondent's National Committee in which he opposed Browder's policies had been suppressed from respondent's membership but his position set forth in the letter was approved in the Duclos statement while Browder's policies were condemned. For a number of years prior to respondent's announced disaffiliation from the Communist International, Foster was an an [*sic*] official of the International. He has been to the Soviet Union on numerous occasions on Party business. . . .

.          .          .          .          .

"In addition to Foster, a number of respondent's other present leaders have been functionaries of respondent since the time of the Communist International, have been to the Soviet Union on Party business, and have been indoctrinated and trained in the Soviet Union on Communist strategy and policies. These leaders have taught in Party schools, written for the Party press, and spoken at Party meetings, on various phases of Marxism-Leninism, including the leading position of the Soviet Union,

proletarian internationalism, and the necessity of revolutionary overthrow of imperialist nations, particularly the United States. . . .

.          .          .          .          .

"The continuance in office of Moscow-trained leaders of respondent who were functionaries during the period that respondent was an open member of the open, formal organization of the world Communist movement, and the absence of any substantial evidence showing a repudiation by respondent's leaders of the program and policy of the world Communist movement, as well as the fact that Marxism-Leninism continues to be basic to respondent, are all probative of the issues herein. . . .

.          .          .          .          .

"The reorganization of respondent's leadership pursuant to Stalin's solution for the 1929 factional dispute, . . . was supervised by a Soviet Union representative sent to the United States for that purpose. A number of individuals were identified as having in the past been in the United States as representatives from the Soviet Union to supervise the carrying out of various policies, programs, and activities by respondent. Respondent's acceptance of the authority of these foreign representatives was required by the rule of the Communist International that:

" 'The E. C. C. I. [executive committee] and its Presidium have the right to send their representatives to the various Sections of the Communist International. Such representatives receive their instructions from the E. C. C. I. or from its Presidium, and are responsible to them for their activities. Representatives of the E. C. C. I. have the right to participate in meetings of the central Party bodies as well

as of the local organizations of the Sections to which they are sent . . . . Representatives of the E. C. C. I. are especially obliged to supervise the carrying out of the decisions of the World Congresses and of the Executive Committee of the Communist International.' . . .

.      .      .      .      .

"Eisler is the only foreign representative shown by the record to have been in the United States subsequent to the announced dissolution of the Communist International. Respondent ceased open affiliation with the Comintern to avoid identification as a foreign representative in the United States and the Comintern as an open organization was dissolved in 1943 for Soviet tactical reasons. The absence of further showing as to foreign representatives does not itself, in the context of the record, indicate any change in respondent's nature or character.

.      .      .      .      .

"Respondent's policies, programs, and activities were originally formulated and carried out pursuant to directives of the foreign leadership of the world Communist movement. Such policies, programs, and activities of respondent have been consistently applied throughout respondent's existence in the United States without change or repudiation. Various tactical fluctuations in emphasis have followed those laid down by the world Communist movement. An examination of respondent's current activities shows respondent is still pursuing policies enunciated by the Soviet Union through the Communist International. . . .

.      .      .      .      .

". . . Respondent's witnesses were unable to cite a single instance throughout its history where, in

taking a position on a question which found the views or policies of the Soviet Union and the United States Government in conflict, the CPUSA had agreed with the announced position of the United States; nor could they show a single instance when the CPUSA had disagreed with the Soviet Union on any policy question where both respondent and the Soviet Union have announced a position.

"The testimony of Dr. Mosely and documents submitted through him embraced a tremendous area of international questions on which respondent and the Soviet Union have taken positions. . . . The uniformity is constant and on a wide variety of questions, and is corroborated by other evidence of record.

"It is a material consideration in viewing the spread of this evidence spanning thirty-odd years that respondent, for the first twenty such years in this area of activity, was required by the 'Conditions' for membership in the Communist International to conform to the 'programme and decisions' of the Comintern in its 'propaganda and agitation' . . . ; that during the years since 1943 respondent has without a single exception, as before, continued to adhere to the views and policies of the Soviet Union; and that its witnesses when asked to do so were unable to show conflict in any of these policies. This is strong evidence that the preexisting relationship between respondent and the Soviet Union continued as before, notwithstanding the formal dissolution of the Comintern by the Soviet Union." (Original emphasis throughout.)

It is on the basis of these detailed findings that the Board and the court below predicated their conclusion that the Communist Party was substantially directed, dominated, or controlled by the Soviet Union. We cannot hold that they erred in the construction of the

statute and in finding that the facts shown bring the Party within it.

B. *The "Objectives Component."* Section 3 (3), defining a Communist-action organization, requires a finding that the organization "operates primarily to advance the objectives of [the] . . . world Communist movement as referred to in section 2 of this title." Although asserting that the reference to § 2 is unclear, the Party offered in the Court of Appeals a construction of this requirement which defines the objectives of the world Communist movement as (a) overthrow of existing government by any means necessary, including force and violence, (b) establishment of a Communist totalitarian dictatorship, (c) which will be subservient to the Soviet Union. See § 2 (1), (2), (3), (6). We need not now determine whether this interpretation, insofar as it implies that an organization must operate to advance all of these objectives in order to come within the Act, is correct. Certainly, the elements which the Party has isolated are, singly or collectively, the major "objectives" described in § 2. The Court of Appeals accepted the Party's analysis *arguendo,* and its judgment affirming the order of the Board rests on its conclusion that the Party operates to advance all three of these objectives. This conclusion is supported by the findings of the Board. It adopts the interpretation most favorable to the Party.

Within the framework of these definitions, the Court of Appeals held sufficient to demonstrate the Communist Party's objective to overthrow existing government the finding of the Board that the Party advocates the overthrow of the Government of the United States by force and violence if necessary. The Party argues that this finding is inadequate to satisfy the conception of overthrow embodied in § 2 (1) and (6); that under the compulsion of the First Amendment the Act must be read as reaching only organizations whose purpose to over-

throw existing government is expressed in illegal action or incitement to illegal action; that advocacy of the use of violence "if necessary" amounts at most to the promulgation of abstract doctrine, not incitement. Section 2 (1) recites that the purpose of the world Communist movement is "by treachery, deceit, infiltration . . . , espionage, sabotage, terrorism, and any other means deemed necessary, to establish a Communist totalitarian dictatorship in the countries throughout the world through the medium of a world-wide Communist organization." Section 2 (6) recites that Communist-action organizations "endeavor to carry out the objectives of the world Communist movement by bringing about the overthrow of existing governments by any available means, including force if necessary . . . ." We think that an organization may be found to operate to advance objectives so defined although it does not incite the present use of force. Nor does the First Amendment compel any other construction. The Subversive Activities Control Act is a regulatory, not a prohibitory statute. It does not make unlawful pursuit of the objectives which § 2 defines. In this context, the Party misapplies *Yates* v. *United States,* 354 U. S. 298, and *Dennis* v. *United States,* 341 U. S. 494, on which it relies. See *Barenblatt* v. *United States,* 360 U. S. 109; *Uphaus* v. *Wyman,* 360 U. S. 72; *American Communications Assn.* v. *Douds,* 339 U. S. 382.

C. *The Evidentiary Considerations of Section 13 (e); the Striking by the Court of Appeals of a Subsidiary Finding Under Section 13 (e)(7).* Section 13 (e) prescribes that in determining whether any organization is a Communist-action organization, the Board shall take into consideration the extent of its conduct in eight enumerated dimensions. Accordingly, the Board made basic findings of fact in each, and on them based conclusions. The Party attacks each conclusion as based upon

a misinterpretation or misapplication of the statutory considerations.

As to three of these considerations upon which the Board placed substantial reliance in its determination that the Communist Party is controlled by the Soviet Union and operates primarily to advance the objectives of the world Communist movement—the extent to which its policies are formulated and carried out and its activities performed pursuant to directives or to effectuate policies of the Soviet Union (§ 13 (e)(1)), the extent to which its principal leaders or a substantial number of its members are subject to or recognize the disciplinary power of the Soviet Union (§ 13 (e)(6)), and the extent to which its principal leaders or a substantial number of its members consider the allegiance they owe to the United States as subordinate to their obligations to the Soviet Union (§ 13 (e)(8))—the Party contends that the conclusions of the Board are not supported by its findings of fact. We have considered the Board's report and find the Party's contention without merit.

As to three other considerations—the extent to which an organization receives financial or other aid from the foreign government or foreign organization controlling the world Communist movement (§ 13 (e)(3)), the extent to which it sends its members to a foreign country for instruction and training in the principles, tactics, etc., of the world Communist movement (§ 13 (e) (4)), and the extent to which it reports to the foreign government or foreign organization controlling the world Communist movement (§ 13 (e)(5))—the Board found, respectively, that the Communist Party had received financial aid from the Soviet Union and the Comintern, and had sent its members to the Soviet Union for training, prior to about 1940, but that there was no evidence that these activities continued after that time, and that the Communist Party

"upon occasion" reports to the Soviet Union. From a reading of its Modified Report on Second Remand, it does not appear that the Board relied on these three findings to support its ultimate determination; rather it regarded them as inconclusive, except insofar as Soviet financial aid to the Party during the period before it became a going organization could be considered "a tile in the mosaic," and insofar as foreign-trained Party members themselves served as instructors in Party schools in the United States at later times when there was no evidence of continued foreign training as such. The Party argues that the Board's findings required it to conclude that evidence pertinent to the considerations of § 13 (e)(3), (4), and (5) tended to negate a finding that the Party was foreign-controlled. We cannot say that the basic findings of the Board compelled that conclusion and precluded its own. The Board, directed by Congress to consider "the extent to which" an organization engages in certain classes of conduct, was not, of course, obligated to make findings in each dimension which would be conclusive of the ultimate issues before it. It was required only to consider each of these dimensions—this it has painstakingly done—and, on the whole record before it, to appraise the probative force of the evidence in each dimension. See *Secretary of Agriculture* v. *Central Roig Ref. Co.,* 338 U. S. 604; 96 Cong. Rec. 14530–14534; cf. *id.,* at 13764, 15634. The Board has explained in detail the factors which urged it to take the view it has taken of the evidence concerning financial aid, foreign training and reporting. We cannot say that on the basis of all its findings it accorded inadmissible weight to these considerations.

By § 13 (e)(2), the Board is directed to consider, in determining whether a given organization is a Communist-action organization, "the extent to which its views

and policies do not deviate from those of [the] . . . foreign government or foreign organization" directing the world Communist movement. In connection with this consideration, Dr. Philip Mosely, Professor of International Relations at Columbia University and Director of the University's Russian Institute, appeared as an expert witness for the Attorney General. He enumerated some forty-five major international issues during thirty years with respect to which, his testimony indicated, there had been no substantial difference between the announced positions of the Soviet Union and the Communist Party.[12] As to each issue, documents representative of the respective views of the Soviet and the Party were identified by Dr. Mosely and put into the record as exhibits. Both the Board and the Court of Appeals credited Dr. Mosely's testimony and placed significant reliance on it in concluding that the Communist Party is substantially dominated by the Soviet Union.

The Party urges two contentions relating to this aspect of the case. The first is that the Mosely evidence has no tendency to prove non-deviation, within the meaning of § 13 (e)(2), and no rational relevance to the ultimate issue of Soviet domination of the Party, because Dr. Mosely did not establish that as to each of the international issues concerning which Soviet Union and Party views coincided, the announced Soviet position antedated

[12] Among these were the League of Nations; the Russo-Finnish War, 1939; the Hitler-Stalin non-aggression pact, 1939; attitude toward World War II before and after the German attack on the Soviet Union; dissolution of the Communist International, 1943; West Germany; the Italian election of 1948; North Atlantic Pact; control of atomic energy; election of Yugoslavia to the United Nations Security Council, 1949; Cardinal Mindszenty case, 1949; United Nations action in Korea; Communist China's intervention in Korea, 1950; seating of Communist China in the United Nations; Peace Treaty with Japan, 1951; peace in Korea.

that of the Party,[13] nor did Dr. Mosely testify that the coincidence of views evidenced parroting of the Soviet position by the Party—indeed, he expressly declined, as a matter of expert judgment, to draw any inference from the coincidence alone with respect to the reasoning processes by which the Party arrived at its views. The Party contends that under § 13 (e)(2) the Board was not authorized to consider evidence merely of sameness of policy, but that sameness would become relevant only after the Attorney General had shown that the Party took its position subsequent to, and not independently of, the announced policy of the Soviet. Second, the Party argues that the Board erred in refusing to let it show, both by cross-examination of Dr. Mosely and by proffered original evidence, that many other, assertedly non-Communist groups and individuals also expressed, contemporaneously with the Soviet Union and the Party, views identical to those in which the two concurred—and, further, that the views were correct.

We do not agree that the Board was not entitled to consider and evaluate evidence of a consistent identity of policies of an organization and the Soviet Union until the Government had shown the temporal antecedence of the Soviet's position and negatived the possibility that independent reasoning processes brought about the identity. Here the Board found that the coincidence of policies extended over a vast area of subject matter, was

---

[13] The Party points out that with respect to a major portion of the paired sets of exhibits put in through Dr. Mosely, the documents demonstrating the Communist Party's position bear earlier dates than those demonstrating the Soviet Union's position. These exhibits were offered only as illustrative of the views which Dr. Mosely testified—his expert opinion being based on a far wider selection of readings—were those taken approximately contemporaneously by the Soviet and the Party in each instance. The Government expressly disclaimed any attempt to establish chronological sequence between the announced positions of the two.

absolutely invariant during more than thirty years—the entire life of the Party—and was unbroken even in the face of sharp reversals in the Soviet's views. Section 13 (e)(2), directing the Board to consider the extent of non-deviation, does not purport to establish a litmus test of domination or control, requiring some fixed minimum level of policy-parroting. This requirement is satisfied by consideration of whatever is logically relevant in this regard. Of course, the Government would have established a stronger case had it shown not only identity of views on more than forty issues, but also that the Soviet's view had always led and the Party's always followed, and that the similarity could not conceivably be the result of autonomous application of similar basic philosophical principles. But this is no reason to say that the Board could not consider, and form its judgment on, the showing that the Government did make in the present proceeding. Certainly, if the Act contained no § 13 (e), Dr. Mosely's testimony would be both relevant and significantly probative with respect to the issue of Soviet domination of the Party. To hold that § 13 (e)(2) makes it a condition precedent to Board consideration of this long-continued, totally unwavering identity of policy lines, that the Attorney General also establish such elusive determinants as the dates of birth of the policies and the ratiocinative processes by which they came into being, we would have to find that by § 13 (e)(2) Congress meant to limit, and severely limit, the evidences of Soviet domination of which the Board could take account. The structure of § 13 (e) will not bear that construction.[14]

---

[14] The committee reports and other authoritative legislative history pertinent to § 13 (e)(2) are unilluminating in this connection. It is significant that on the occasion of a proposed House amendment which would have deleted the similar non-deviation consideration now found in § 13 (f)(4) of the Act (pertaining to Communist-front organizations), Mr. Nixon, who had been a leading proponent of the legislation

With respect to the rulings precluding the Party from showing certain facts which would have tended to establish that the views in which it paralleled the Soviet Union were correct views, or were reached independently, or were also held by other persons, we do not think that the Board abused its discretion. The questions which the Party sought to ask Dr. Mosely on cross-examination relating to the correctness of the Party's views were of two sorts. The first involved matters of value judgment or opinion, capable of interminable debate but incapable of proof, and which, the Board might reasonably have found, would have added little to the record beyond the witness's personal views.[15] The second sort called for answers of a more

in its several forms, argued that "if this particular standard is stricken out, it would be virtually impossible in many cases to get sufficient evidence before the Subversive Activities Control Board to justify a finding that an organization was a Communist front." 96 Cong. Rec. 13764. The implication is that Mr. Nixon, and presumably other proponents of the enactment, regarded the § 13 (e) and (f) evidentiary considerations as *expanding* the scope of evidentiary matters of which the Board might take account in determining whether organizations met the definitions of § 3 (3) and (4). The proposed amendment was defeated after debate in the course of which all Congressmen seemed tacitly to assume that non-deviation involved a question of identity of policies, not of causal connection between policies. *Id.*, at 13765–13768. And see *id.*, at 14531–14533, 15194.

[15] *E. g.*, "The article denounces the Japanese invasion of Manchuria as a clear and unprovoked act of aggression against China, does it not? . . . Was [that] . . . not the opinion of every right-thinking person at that time?" "Is it not the universal opinion of every informed observer that the Greek monarchy is a reactionary, fascist and corrupt regime?" "Is it not true that virtually every Commentator on an analysis of the Italian elections in 1948 has expressed the opinion that there was widespread American intervention and interference in these elections? . . . Was there not widespread interference on the part of the United States in that election?" "Was not this United States intervention in Formosa a violation of the Cairo Agreement on Formosa?" "Did not this policy [sending American

objective kind, but related in general to the truth or falsity of particular, detailed assertions of fact selected out of the various documents which the Attorney General had put in evidence as illustrative of the Party's policies.[16]   Since in testifying as to the nature of those policies Dr. Mosely had relied on a wide background of study of Party writings, of which the exhibits put into the record were only exemplary, and since even with reference to those particular exhibits Dr. Mosely's testimony rested upon an expert analysis of each article read as a whole—its general tenor, deriving from its use of language, its selection of facts reported, its argumentative and exhortative parts, if any—litigation of the truth *vel non* of individual statements of fact might well have been regarded by the Board as promising to lead into distracting inquiries regarding marginal or remote issues—what in a court would constitute *res inter alios acta*—incommensurate with the materiality of the evidence produced.   Objections to both kinds of questions were, in the Board's discretion, properly sustained.   As for the question which the Party attempted to put to Dr. Mosely concerning approximately half of the

---

troops beyond the 38th parallel in Korea] prove to be disastrous both militarily and politically?  . . .   And was it not paid for in thousands of United States lives?"

[16] *E. g.*, concerning Attorney General's Exhibit No. 284, a thirteeen-page editorial:

"Q: Petitioner's Exhibit 284 is an article . . . entitled, 'Wall Street's War Against the Korean People,' . . . is that not correct?

"A: Yes, it is the subtitle of an editorial article.

"Q: Now, I call your attention to page 11.  Does not the author there say that broad democratic reforms were introduced in North Korea including universal sufferage [*sic*], the secret ballot, and equal status for women, and that the land was distributed to the peasants and that industry was nationalized and that the 8 hour day and social insurance were introduced, and child labor abolished and a system of public education introduced?  . . .   Are these not correct statements of fact?"

international issues which he discussed, whether in each case an informed American observer, in the exercise of independent judgment and sensitive to the best interests of the United States, might not also reasonably have arrived at the view held by the Party and the Soviet,[17] the question was not improperly disallowed as beyond the permissible scope of cross-examination. Dr. Mosely did not purport on direct examination to establish the thought processes or the political processes by which the Soviet and the Party arrived at their positions, but only that the positions were identical. The Party was permitted to show, and two of its witnesses testified, on both direct and cross-examination, that the policies of the Party were adopted in the autonomously reasoned belief, in each case, that a particular policy was sound and in the best interests of the American people. The Board, in its modified reports, took account of and evaluated this testimony. It was not prejudicial that the Party was not allowed to use the Government's expert witness to negative causal connections which his testimony for the Government did not seek to show.

The Party also argues that it should have been permitted to demonstrate, by cross-examination of Dr. Mosely and by original evidence, that many other persons than the Soviet and the Party held views similar to those

---

[17] This question was put in a number of forms. The most typical is the following:

"In your opinion, could an informed American observer basing his views on what is the best interest of the American people reasonably and sincerely conclude, one, that Mr. Malik's proposal was a great service to the cause of peace and in the best interests of the American people as well as all of the people of the world; two, that the representatives of the American government attempted to frustrate Mr. Malik's proposal but were forced into truce negotiations by the overwhelming desire of the people; and three, that American representatives by provocative conduct and various pretexts attempted to cause the breakdown of armistice negotiations in Korea?"

on which the two agreed. We cannot hold that the Board erred in excluding these showings. They took two forms. First, with respect to some twenty-five international issues, the question was put to Dr. Mosely whether many non-Communist commentators did not also support the view expounded by the Party.[18] A similar question was asked of a witness for the Party concerning one more issue. Second, with respect to somewhat more than thirty issues, the Party offered to establish, by questioning Dr. Mosely and by documents proffered in evidence, that particular named individuals and groups had concurred in the views of the Party on each individual issue.[19] The most that the Party could have proved, had it been allowed to make the offered showings, was that on the subject of each specific, isolated one among the forty-five international issues enumerated, a considerable number of persons not Soviet-dominated took positions parallel to those of the Soviet and the Party. This is only to be expected in the case of issues of this character. The Party never offered to show, despite wide latitude allowed by the hearing panel in making proffers after similar proffers had been previously disallowed, that a continuing, substantial body of independent groups and persons concurred with the Party on a significant aggregate num-

[18] *E. g.*, "Professor, is it not a fact that many non-communist commentators and observers have expressed the view that the American proposals for international control of atomic energy were designed to make it impossible for the Soviet Union to accept them and that the American plan had no real chance of adoption?" "Would it not be accurate to state, Professor, that there was a very large and broad measure of agreement among the people and many of the leaders of both the Soviet Union and the United States on the need for the prompt establishment of a second front in Europe?"

[19] *E. g.*, "Is it not a fact, Professor, that the Federation of American Atomic Scientists urged that the United States abandon its proposal for the international ownership of atomic raw materials in the bulletin published by that organization in March 1950?"

ber of policies among the forty-five. Of the particular sources mentioned in the Party's separate questions and offers of proof, the greatest number of issues with reference to which a single source recurs—the New York Times, or individuals writing in the Times—is ten or less, and in most cases the agreement shown is with only a portion of the Party's position. No other source occurs more than roughly half a dozen times; most, two or three times.[20] On the basis of these proffers, the Board's rulings did not amount to an abuse of the discretion which it must be allowed in the conduct of its hearings to avoid opening the sluices to litigation of the views of a multitude of third parties.

Section 13 (e)(7) requires the Board to consider the extent to which "for the purpose of concealing foreign direction, domination, or control, or of expediting or promoting its objectives," an organization engages in specified secret practices or otherwise operates on a secret basis. In its original report the Board concluded that the Communist Party engages in secret practices for both these purposes. The Court of Appeals, in its first opinion, held that the finding of secret practices was warranted, but that the Government had not established by the preponderance of the evidence the purpose of the practices. Although no new evidence on the point was taken on remand, the Board again found in its two modified reports that the purpose of the practices was to promote the objectives of the Communist Party.[21] In its third opinion the Court of Appeals again held the finding as to purpose

---

[20] One name appears in connection with six issues, writers in the New York Herald Tribune in connection with seven, President Franklin Roosevelt and George Bernard Shaw three each, etc. Instances in which the New York Times and the New York Herald Tribune are referred to merely as sources for the printed texts of speeches or statements by statesmen, officials, etc., are not included in this count.

[21] It expressly declined to find a purpose to conceal foreign control.

unsupported by the preponderance of the evidence. Nevertheless, holding that the whole record supported the Board's conclusion that the Communist Party was substantially directed, dominated, or controlled by the Soviet Union, it rejected the Party's contention that the striking of this one subsidiary finding as to purpose of secret practices required remand of the proceeding to the Board.

We think that the Court of Appeals did not err in refusing to remand the case on that ground. Cf. *Labor Board* v. *Newport News Shipbuilding & Dry Dock Co.*, 308 U. S. 241. In the summaries of its modified reports, the Board did not rely on, or even refer to, the finding of secret practices. Thus this case is unlike *Securities & Exchange Comm'n* v. *Chenery Corp.*, 318 U. S. 80, and *Labor Board* v. *Virginia Electric & Power Co.*, 314 U. S. 469, in which proceedings were remanded to administrative agencies when this Court found unsupportable the grounds upon which the agencies had expressly rested the orders reviewed. Where a Court of Appeals strikes as not sustained by the evidence a subsidiary administrative finding upon which the agency itself does not purport to rely, it would be an unwarranted exercise of reviewing power to remand for further proceedings. *Labor Board* v. *Reed & Prince Mfg. Co.*, 205 F. 2d 131 (C. A. 1st Cir.). Remand would be called for only if there were a solid reason to believe that without that subsidiary finding the agency would not have arrived at the conclusion at which it did arrive. Reading the modified reports of the Board in the present case—reports written after the Court of Appeals had once held the finding as to the purpose of the Party's secret practices unsupported—this Court cannot conclude that the Court of Appeals was wrong in regarding the finding stricken as one to which the Board did not attach weight and which did not influence its determination.

D. *The Board Findings as to the World Communist Movement; Evidence of Past Practices; the Preponderance of the Evidence.* Under the Act an organization may be found to be a Communist-action organization only if the relations specified in the "control" and "objectives" components of § 3 (3) exist between it and the "world Communist movement referred to in section 2 . . . ." In the present proceeding, the Board, after recognizing that "in section 2 of the Act Congress has found the existence of a world Communist movement and has described its characteristics," set forth its own description, based on the evidence presented in this record, of contemporary Communist institutions in their international aspect, and particularly of the role of the Soviet Union in those institutions. The Party argues that because this description does not duplicate in all details that of § 2 of the Act, the world Communist movement to which the Board found that the Communist Party bore the required statutory relationship is not the world Communist movement referred to in § 2.

But the attributes of the world Communist movement which are detailed in the legislative findings are not in the nature of a requisite category of characteristics comprising a definition of an entity whose existence *vel non* must be established, by proving those characteristics, in each administrative proceeding under the Act. Congress has itself found that that movement exists. The legislative description of its nature is not made a subject of litigation for the purpose of ascertaining the status of a particular organization under the Act. The Attorney General need not prove, in the case of each organization against whom a petition for a registration order is filed, that the international institutions to which the organization can be ·shown to be related fit the picture in every precise detail set forth in § 2. The only question, once an organization

is found to have certain international relations, is one of statutory interpretation—of identifying the statutory referent. Are the institutions involved in those relations the "world Communist movement" to which Congress referred? We are satisfied from the Board's report that the "world Communist movement" to which its findings related the Communist Party was the same "world Communist movement" meant by Congress.

The Party contends that the Board and the court below erred in relying on evidence of conduct in which it engaged prior to the enactment of the Act to support their conclusion that it is presently a Communist-action organization. This must be rejected. Where the current character of an organization and the nature of its connections with others is at issue, of course past conduct is pertinent. Institutions, like other organisms, are predominantly what their past has made them. History provides the illuminating context within which the implications of present conduct may be known.

Finally, the Party asks that we re-examine the evidence adduced before the Board and review the Board's findings of fact. The Court of Appeals, made thoroughly familiar with this record by three such re-examinations, has held that the Board's conclusions, as expressed in its Modified Report on Second Remand, are supported by a preponderance of the evidence. We see no reason why still another court should independently reappraise the record. We have declined to do this in the case of other agencies as to whom reviewing power on the facts has been vested in the Courts of Appeals, and we find no purpose to be served in departing now from this settled policy of appellate review. *Labor Board* v. *Pittsburgh Steamship Co.*, 340 U. S. 498; *Labor Board* v. *American National Ins. Co.*, 343 U. S. 395; *Federal Trade Comm'n* v. *Standard Oil Co.*, 355 U. S. 396.

## IV.

The Party's constitutional attack on the Subversive Activities Control Act of 1950 assails virtually every provision of this extended and intricate regulatory statute. The registration requirement of § 7, by demanding self-subjection to what may be deemed a defamatory characterization and, in addition, disclosure of the identity of all rank-and-file members, is said to abridge the First Amendment rights of free expression and association of the Communist Party and its adherents. See *N. A. A. C. P.* v. *Alabama,* 357 U. S. 449; *Bates* v. *Little Rock,* 361 U. S. 516; cf. *Thomas* v. *Collins,* 323 U. S. 516; *Joint Anti-Fascist Refugee Committee* v. *McGrath,* 341 U. S. 123. The Party's officers, it is asserted, who by filing a registration statement in its behalf evidence their status as active members of the Party, are required to incriminate themselves in violation of the Fifth Amendment, as are the individual members who must register themselves under § 8 if the Party fails to register or fails to list them. Cf. *Blau* v. *United States,* 340 U. S. 159; *Quinn* v. *United States,* 349 U. S. 155. The provision that Communist organizations label their publications is attacked as a prior restraint on, and such sanctions as denial of tax exemption are attacked as a penalty on the exercise of, the Party's constitutionally protected freedom of speech. Cf. *Talley* v. *California,* 362 U. S. 60; *Speiser* v. *Randall,* 357 U. S. 513. The various consequences of the Party's registration for its individual members—prohibition of application for and use of passports, disqualification from government or defense-facility employment, disqualification from naturalization, subjection to denaturalization, proscription of officership or employment in labor organizations—are said to deny those members due process of law by, in effect, attainting them by association, cf. *De Jonge* v. *Oregon,* 299 U. S. 353; *Wieman* v. *Updegraff,* 344 U. S. 183, and by sub-

jecting them to potential criminal proceedings in which the nature of the organization, membership in which is an element of various offenses, may not be judicially tried. Many of the statute's provisions are challenged as unconstitutionally vague, and it is said that the establishment of an agency, the Subversive Activities Control Board, whose continued existence depends upon its finding the Communist Party a Communist-action organization within the meaning of the Act, necessarily biases the agency and deprives the Party of a fair hearing. In fact, the Party asserts, the statute as written so particularly designates the Communist Party as the organization at which it is aimed, that it constitutes an abolition of the Party by legislative fiat, in the nature of a bill of attainder. The provisions must be read as a whole, it is said; and when so read, they are seen to envisage not the registration and regulation of the Party, but the imposition of impossible requirements whose only purpose is to lay a foundation for criminal prosecution of the Party and its officers and members, in effect "outlawing" the Party.

Many of these questions are prematurely raised in this litigation. Merely potential impairment of constitutional rights under a statute does not of itself create a justiciable controversy in which the nature and extent of those rights may be litigated. *United Public Workers* v. *Mitchell*, 330 U. S. 75; *International Longshoremen's Union* v. *Boyd*, 347 U. S. 222. Even where some of the provisions of a comprehensive legislative enactment are ripe for adjudication, portions of the enactment not immediately involved are not thereby thrown open for a judicial determination of constitutionality. "Passing upon the possible significance of the manifold provisions of a broad statute in advance of efforts to apply the separate provisions is analogous to rendering an advisory opinion upon a statute or a declaratory judgment upon a hypothetical case." *Watson* v. *Buck*, 313 U. S. 387, 402. No rule of practice

of this Court is better settled than "never to anticipate a question of constitutional law in advance of the necessity of deciding it." *Liverpool, New York & Philadelphia S. S. Co.* v. *Commissioners,* 113 U. S. 33, 39; *Arizona* v. *California,* 283 U. S. 423; Mr. Justice Brandeis, concurring, in *Ashwander* v. *Tennessee Valley Authority,* 297 U. S. 288, 341. In part, this principle is based upon the realization that, by the very nature of the judicial process, courts can most wisely determine issues precisely defined by the confining circumstances of particular situations. See *Parker* v. *County of Los Angeles,* 338 U. S. 327; *Rescue Army* v. *Municipal Court,* 331 U. S. 549. In part it represents a conception of the role of the judiciary in a government premised upon a separation of powers, a role which precludes interference by courts with legislative and executive functions which have not yet proceeded so far as to affect individual interests adversely. See the Note to *Hayburn's Case,* 2 Dall. 409; *Massachusetts* v. *Mellon,* 262 U. S. 447. These considerations, crucial as they are to this Court's power and obligation in constitutional cases, require that we delimit at the outset the issues which are properly before us in the present litigation.

This proceeding was brought by the Attorney General under § 13 (a) of the Subversive Activities Control Act, seeking an order of the Board that the Communist Party register as a Communist-action organization pursuant to § 7. The Board has issued such an order, in accordance with § 13 (g)(1), which is here reviewed, under § 14 (a). The effect of that order is to require the Party to register and to file a registration statement within thirty days after the order becomes final, § 7 (c)(3), upon pain of fine up to $10,000 for each day of failure to register. When the order becomes final, other consequences also ensue, for the Party, for its members and for other persons. Certain acts of the Party—distributing its publications

through the mails or through the instrumentalities of interstate or foreign commerce, or causing matter to be broadcast by radio or television, without the required identification—are prohibited, § 10, and tax exemption is denied it, § 11. Specified acts of its members—*e. g.,* applying for or using a United States passport, holding government or defense-facility employment, holding labor union office or employment—are forbidden, §§ 5, 6, and those members are definitively subject to certain disqualifications—if aliens, they may not enter the United States, may be deported, may not be naturalized, may in some circumstances be denaturalized, with qualifications. 8 U. S. C. §§ 1182, 1251, 1424, 1451. Employment by the Party is not "employment" for purposes of the Social Security Act, as amended, 42 U. S. C. § 410; contributions to the Party are not tax deductible, Subversive Activities Control Act of 1950, § 11. Acts by third parties with regard to the Party or its members—the contributing of funds or services to the Party by government or defense-facility personnel, issuance of passports to Party members—are, under specified circumstances, prohibited, §§ 5, 6. All of these consequences depend upon action taken subsequent to the time when the registration order becomes final. Some depend upon action which is, at best, highly contingent.[22] The question is which, if any, of these consequences are now before us for constitutional adjudication, as necessarily involved in the determination of the constitutionality of the Board's registration order.

A closely similar issue was presented to this Court in *Electric Bond & Share Co.* v. *Securities & Exchange Comm'n,* 303 U. S. 419. That was a statutory suit brought

---

[22] For example, before an individual may be subjected to the penalties of §§ 8 and 15 (a) (2), the Party must have failed to register, or failed to list him as a member, and he must subsequently have failed, within the allotted time, to register himself.

by the Securities and Exchange Commission to enforce against certain utility holding companies the provisions of §§ 4 (a) and 5 of the Public Utility Holding Company Act of 1935, 49 Stat. 803. The Act, like the Subversive Activities Control Act, was a statute of many intricate and interlocking sections, with a severability clause. Its fifth section provided that holding companies, as defined, might register with the Commission and file a registration statement containing specified information: unless such a company registered within the time fixed, § 4 (a) subjected it to what the Court referred to as the "penalty for failure to register": criminal liability for engaging in business in interstate commerce; or for selling, transporting, owning or operating utility assets for the transportation of gas or electricity in interstate commerce; or for using the mails or instrumentalities of interstate commerce to distribute or acquire utility securities, or to negotiate, make, or take any step in performing, service, sales or construction contracts for public utility or holding companies; or for owning, controlling or holding voting stock in any subsidiary engaging in any of these activities.[23]  Once a holding company registered, prescribed consequences en-

---

[23] It was evident that the prohibitions of § 4 (a) were so comprehensive that, as pointed out in the brief for the holding companies, "it [was] . . . quite impossible for holding companies to continue in business, unregistered, in the face of these prohibitions." Nor could the companies cease to be holding companies, since § 4 (a) made unlawful, under penalty up to $200,000, the distribution or public offering of utility securities by unregistered holding companies through the mails or instrumentalities of interstate commerce, or the sale of securities by such companies with reason to believe that those securities would be distributed or made the subject of public offering through the mails or instrumentalities of interstate commerce. No doubt for this reason the Court regarded § 4 (a) as a "penalty" for failure to register, rather than as an independent regulatory scheme for unregistered holding companies. See 303 U. S., at 439, 442, 443. A decree requiring the holding companies to comply with §§ 4 (a) and 5 was, in effect, a decree compelling it to register.

sued, some automatic,[24] some requiring the initiation of further proceedings by the Commission. It was unlawful for any registered holding company or any subsidiary company of a registered holding company to sell or offer for sale any security of the holding company from house to house, or to cause any officer or employee of a subsidiary company to sell such a security; it was unlawful for any registered holding company to borrow or to receive any extension of credit from any public utility company in the same holding-company system; it was unlawful for any registered holding company or any subsidiary of such a holding company to make any contribution in connection with the candidacy, nomination, election or appointment of any person for or to any office or position in federal, state or municipal government or to make any contribution to any political party; all contracts made in violation of any provision of the Act were void. Other transactions of registered companies were prohibited unless approved by the Commission, and under the "simplification" provisions of § 11, the Commission was required to take steps to break up the holding-company systems of registered holding companies.

The Commission sued for, and the District Court granted, an injunction restraining companies of the Electric Bond and Share system from operating in violation of § 4 (a) until they had either registered under § 5 or ceased to be holding companies.[25] A cross bill by the com-

---

[24] Section 3 of the Act authorized the Commission to exempt from any provision or provisions of the Act certain described classes of holding companies. It was evident from the nature of Electric Bond and Share, as developed in that litigation, that it did not come within any of these categories, and the Court did not mention § 3 in its opinion.

[25] The decree was without prejudice to any rights which the companies might have at law or in equity after registration, and left the companies free to challenge the validity of any provisions of the Act

panies seeking a declaratory judgment that the Act was unconstitutional in its entirety was dismissed. When the case came here, the companies argued that the scheme of the Act was a single, integrated whole; that the registration sections, which were the mechanism by which holding companies were subjected to the statute's various regulatory provisions, could not be separately considered; and that the unconstitutionality of the regulatory provisions invalidated the registration requirement. The Court affirmed the decree, but on the basis of a deliberate abstention from consideration of any but the registration section, § 5, as enforced by the sanctions of § 4 (a). Noting that if the statute's severability clause were given effect, the registration obligation could be validly enforced even though any or all of the "control" provisions applicable to registered companies were unconstitutional, and finding in the legislative history nothing to indicate that the various regulatory sections "were intended to constitute a unitary system, no part of which can fail without destroying the rest," 303 U. S., at 438–439, the Court declined to decide the broad constitutional questions pressed upon it. Likewise, the District Court's dismissal of the cross bill was sustained:

> ". . . By the cross bill, defendants seek a judgment that each and every provision of the Act is unconstitutional. It presents a variety of hypothetical controversies which may never become real. We are invited to enter into a speculative inquiry for the purpose of condemning statutory provisions the effect of which in concrete situations, not yet developed,

other than §§ 4 (a) and 5. In the present proceeding, of course, the Board's order does not operate to foreclose the Communist Party, or any other person adversely affected by provisions of the Subversive Activities Control Act, from subsequently challenging in appropriate proceedings other of the Act's provisions than those requiring the registration of Communist-action organizations.

cannot now be definitely perceived. We must decline that invitation." *Id.,* at 443.

Not until eight years later were some of these other related, important questions, at last properly presented, decided.[26]

The decision in *Electric Bond & Share* controls the present case. This Act, like the one involved there, has a section directing that if any of its provisions, or any of its applications, is held invalid, the remaining provisions and other possible applications shall not be affected. The authoritative legislative history clearly demonstrates that a major purpose of the enactment was to regulate Communist-action organizations by means of the public disclosure effected by registration, apart from the other regulatory provisions of the Act.[27] Such is, of course, the very purpose of the severability clause. This being so, our consideration of any other provisions than those of § 7, requiring Communist-action organizations to register and file a registration statement, could in no way affect our decision in the present case. Were every portion of the Act purporting to regulate or prohibit the conduct of registered organizations (or organizations ordered to register) and of their members, as such, unconstitutional, we would still have to affirm the judgment below. Expatiation on the validity of those portions would remain mere pronouncements, addressed to future and hypothetical controversies. This is true with regard to those sections of the Act which prescribe consequences legally enforceable against the Communist Party once a final registration order is in effect against it—the "labeling" and tax-exemption denial provisions of §§ 10 and 11. These

---

[26] See *North American Co.* v. *Securities & Exchange Comm'n,* 327 U. S. 686.

[27] See S. Rep. No. 2369, 81st Cong., 2d Sess. 4; H. R. Rep. No. 2980, 81st Cong., 2d Sess. 3; H. R. Rep. No. 1844, 80th Cong., 2d Sess. 2, 5; see also 96 Cong. Rec. 14174, 14237, 14256–14257, 14297, 14598.

are analogous to the proscription of specified credit transactions, or specified security sales, or specified political contributions, by the Public Utility Holding Company Act considered in *Electric Bond & Share*. Although they become operative as soon as a registration order is made final, their application remains in a very real sense problematical. We cannot now foresee what effect, if any, upon the Party the denial of tax exemption will have. We do not know whether the Party now has, or whether it will have at any time after a Board order goes into effect, any taxable income, or, indeed, any income whatever. We do not know that, after such an order is in effect, the Party will wish to utilize the mails or any instrumentality of interstate commerce for the circulation of its publications. We cannot guess the nature of whatever publications it may wish to circulate or their relation to the purposes and functions of the Party. These circumstances may be critical for constitutional determination. It will not do to discount their significance by saying, now, that no difference in circumstances will effect a different constitutional result—that the principles relevant to a determination of the validity of these statutory provisions do not depend upon the variations in circumstances in which they are potentially applicable. For this analysis presupposes that we now understand what are the relevant constitutional principles, whereas the reason of postponing decision until a constitutional issue is more clearly focused by, and receives the impact from, occurrence in particular circumstances is precisely that those circumstances may reveal relevancies that abstract, prospective supposition may not see or adequately assess.

These considerations are equally appropriate in the case of those sections of the Act which proscribe specified conduct by members of an organization concerning which a final registration order is in effect, or which impose obligations upon them, or which subject them to described

disabilities under certain circumstances. It is wholly speculative now to foreshadow whether, or under what conditions, a member of the Party may in the future apply for a passport, or seek government or defense-facility or labor-union employment, or, being an alien, become a party to a naturalization or a denaturalization proceeding. None of these things may happen. If they do, appropriate administrative and judicial procedures will be available to test the constitutionality of applications of particular sections of the Act to particular persons in particular situations. Nothing justifies previsioning those issues now.

But the Party argues that the threat, however indefinite, of future application of these provisions to penalize individuals who are or become its members, affiliates or contributors, will effectively deter persons from associating with it or from aiding and supporting it. Thus, the provisions exercise a present effect upon the Party sufficiently prejudicial to justify its challenging them in this proceeding. In support of this contention, the Party cites cases in which we have held that litigants had "standing" to attack a statute or regulation which operated to coerce other persons to withdraw from profitable relations or associations with the litigants. See, *e. g.,* *Joint Anti-Fascist Refugee Committee* v. *McGrath,* 341 U. S. 123; *Pierce* v. *Society of Sisters,* 268 U. S. 510; *Buchanan* v. *Warley,* 245 U. S. 60; *Truax* v. *Raich,* 239 U. S. 33; cf. *N. A. A. C. P.* v. *Alabama,* 357 U. S. 449; *Bates* v. *Little Rock,* 361 U. S. 516. But these cases purported only to discuss what issues a litigant might raise, not when he might raise them. That a proper party is before the court is no answer to the objection that he is there prematurely. In none of the cases cited was the constitutional issue decided on a record which showed only potential deterrence of association with the litigant on the part of an unnamed and uncounted number of per-

sons. In the *Refugee Committee* case, three organizations sued for injunctive or declaratory relief, challenging their inclusion on the Attorney General's list as Communist organizations. Each alleged that it had already suffered injury as a result of the listing: that contributors had withdrawn support, that persons had refused to take part in fund-raising activities, that members had resigned. The case came here on the pleadings, and we held such allegations sufficient as against a motion to dismiss. In *Pierce* v. *Society of Sisters, supra,* private schools were permitted to attack a state compulsory public-education statute: their complaints had alleged that because of the law, students who otherwise would have continued in attendance at the schools had withdrawn.[28] In *Buchanan* v. *Warley, supra,* a contract had been made, performance refused, and the state courts had denied enforcement on the ground of the challenged ordinance; and in *Truax* v. *Raich, supra,* in which an alien employee sued to enjoin enforcement of a statute requiring certain classes of employers to retain not less than eighty per cent native-born citizens or qualified electors, Raich's employer had been arrested for violation of the statute and Raich had been threatened with immediate discharge. In *Terrace* v. *Thompson,* 263 U. S. 197, both landowners and a prospective tenant brought suit to enjoin enforcement of a state statute forbidding aliens to hold land and providing that land transferred to aliens should be forfeit to the State. The complainants alleged that they were prepared to enter into a lease and would have done so but for the statute.

The present proceeding differs from all of these. The record here does not show that any present members, affiliates, or contributors of the Party have withdrawn because of the threatened consequences to them of its

---

[28] See also *Columbia Broadcasting System, Inc.,* v. *United States,* 316 U. S. 407; *Truax* v. *Corrigan,* 257 U. S. 312.

registration under the Subversive Activities Control Act, or that any prospective members, affiliates, or contributors have been deterred from joining the Party or giving it their support. We cannot know how many, if any, members or prospective members of the Party are also employees or prospective employees of the Government or of defense facilities or labor unions, or how many, if any, contributors to the Party hold government or defense-facility employment. It is thus impossible to say now what effect the provisions of the Act affecting members of a registered organization will have on the Party. Cf. *New Jersey* v. *Sargent,* 269 U. S. 328. To pass upon the validity of those provisions would be to make abstract assertions of possible future injury, indefinite in nature and degree, the occasion for constitutional decision. If we did so, we would be straying beyond our judicial bounds. Of course, the Party may now assert those rights of its members, such as that of anonymity, which are allegedly infringed by the very act of its filing a registration statement, and which could not be otherwise asserted than by raising them here. *N. A. A. C. P.* v. *Alabama, supra; Bates* v. *Little Rock, supra.* But the rights of its members, as potentially affected by the Act, to receive and use passports, seek and hold certain employment, be naturalized and preserve their citizenship once naturalized, are not of this category. We limit our consideration to the constitutionality of § 7 as applied in this proceeding.

## V.

The constitutional contentions raised by the Party with respect to the registration requirement of § 7 are (A) that that requirement, in the context of the Act, in effect "outlaws" the Party and is in the nature of a bill of attainder; (B) that compelling organizations to register and to list their members on a showing merely that they are

foreign-dominated and operate primarily to advance the objectives of the world Communist movement constitutes a restraint on freedom of expression and association in violation of the First Amendment; (C) that requiring Party officers to file registration statements for the Party subjects them to self-incrimination forbidden by the Fifth Amendment; (D) that the Act violates due process by legislative predetermination of facts essential to bring the Communist Party within the definition of a Communist-action organization, and that the evidentiary elements prescribed for consideration by the Board bear no rational relation to that definition; (E) that in several aspects the Act is unconstitutionally vague; and (F) that the Subversive Activities Control Board is so necessarily biased against the Communist Party as to deprive it of a fair hearing.

A. *"Outlawry" and Attainder.* Our determination that in the present proceeding all questions are premature which regard only the constitutionality of the various particular consequences of a registration order to a registered organization and its members, does not foreclose the Party from arguing—and it does argue—that in light of the cumulative effect of those consequences the registration provisions of § 7 are not what they seem, but represent a legislative attempt, by devious means, to "outlaw" the Party. The registration requirement, the Party contends, was designed not with the purpose of having Communist-action organizations register, but with a purpose to make it impossible to register, because of the onerous consequences of registration, and thus to establish a pretext for criminal prosecution of the organization and its members. The Act is said to be aimed particularly at the Communist Party as an identifiable entity, intending to punish it, and in this aspect to constitute a bill of attainder prohibited by Art. I, § 9, cl. 3 of the Constitution.

Of course, "only the clearest proof could suffice to establish the unconstitutionality of a statute on such a ground." *Flemming* v. *Nestor,* 363 U. S. 603, 617. No such proof is offered here. The Act on its face gives no indication that the registration provisions were not intended to be complied with. None of the consequences which attach to registration, whatever may be their validity when weighed separately in the constitutional balance, is so devoid of rational relation to the purposes of the Act as expressed in its second section that it appears a mere pressuring device meant to catch an organization between two fires. Section 2 recites that the world Communist movement, whose purpose is to employ deceit, secrecy, infiltration, and sabotage as means to establish a Communist totalitarian dictatorship, establishes and utilizes action organizations. The Act requires such organizations to register and to label their communications, and prohibits their members from government, defense-facility and certain labor-organization employment. Section 2 sets forth that Communist-action organizations are sections of a world-wide Communist movement and that international travel of its members and agents facilitates the purposes of the movement. The Act restricts the ingress and access to United States citizenship of alien members of Communist-action organizations and deprives all members of the use of United States passports. Section 2 finds that Communist-action organizations purpose to overthrow the Government of the United States by any available, necessary means. The Act forbids government and defense-facility employees to support such organizations, and withdraws from the organizations and their contributors certain tax exemptions. None of this is so lacking in consonance as to suggest a clandestine purpose behind the registration provisions. Nor does the legislative history contain any such suggestion. Rather, the Committee reports on the bills from which the Act

derived express an object "to require the Communist movement in the United States to operate in the open rather than underground," and "to expose the Communist movement and protect the public against innocent and unwitting collaboration with it." [29]

It is true, as the Party asserts, that bills had been introduced in Congress that would have applied to the Communist Party by name,[30] and it is no doubt also true that the form which the Subversive Activities Control Act finally took was dictated in part by constitutional scruples against outlawing of the Party by "legislative fiat." [31]    It is probable, too, that the legislators who voted for the Act in its final form expected that the Communist Party, if it continued to engage in the activities which had been reported to Congress as characterizing its past conduct, would be required to register under § 7.[32]    From this the Party would have us conclude that the Act is only an instrument serving to abolish the Communist Party by indirection.    But such an analysis ignores our duty of respect for the exercise of the legislative power of Congress, and, more specifically, ignores the crucial constitutional significance of what Congress did when it rejected

[29] S. Rep. No. 2369, 81st Cong., 2d Sess. 4.   See note 27, *supra*.

[30] See H. R. 1884, 80th Cong., 1st Sess. (prohibiting Party members from filing as candidates for elective office) ; H. R. 2122, 80th Cong., 1st Sess. (making Party membership unlawful) ; H. R. 4422, 80th Cong., 1st Sess. (requiring registration of Party members as agents of a foreign principal) ; H. R. 4482, 80th Cong., 1st Sess. (disqualifying political parties affiliated with the Communist Party from the ballot) ; H. R. 5852, 80th Cong., 2d Sess. (requiring the registration of "Communist-front" organizations; defining "Communist-front" as including the Communist Party).

[31] H. R. Rep. No. 2980, 81st Cong., 2d Sess. 5; H. R. Rep. No. 1844, 80th Cong., 2d Sess. 6; S. Rep. No. 1358, 81st Cong., 2d Sess. 9.

[32] See H. R. Rep. No. 2980, 81st Cong., 2d Sess. 1–2; S. Rep. No. 1358, 81st Cong., 2d Sess. 5; cf. H. R. Rep. No. 1844, 80th Cong., 2d Sess. 1; 96 Cong. Rec. 13765, 14233, 14585.

the approach of outlawing the Party by name and accepted instead a statutory program regulating not enumerated organizations but designated activities. We would be indulging in a revisory power over enactments as they come from Congress—a power which the Framers of the Constitution withheld from this Court—if we so interpreted what Congress refused to do and what in fact Congress did; that is, if we treated this Act as merely a ruse by Congress to evade constitutional safeguards. Congress deemed it an attempt to achieve its legislative purpose consistently with constitutional safeguards.[33]

---

[33] See, e. g., S. Rep. No. 1358, 81st Cong., 2d Sess. 9:

"The committee gave serious consideration to the many well-intentioned proposals which were before it which attempted to meet the problems by outlawing the Communist Party. Proponents of this approach differed as to what they desired. Some wanted to bar the Communist Party from the ballot in the elections. Others would have made membership in the Communist Party illegal per se.

"The committee believes that there are several compelling arguments against the outlawing approach. There are grave constitutional questions involved in attempting to interfere with the rights of the States to declare what parties and individuals may qualify for appearance on the ballot. To make membership in a specifically designated existing organization illegal per se would run the risk of being held unconstitutional on the grounds that such an action was legislative fiat.

"Among other policy considerations which militate against this type of approach are the following:

"(1) Illegalization of the party might drive the Communist movement further underground, whereas exposure of its activities is the primary need.

"(2) Illegalization has not proved effective in Canada and other countries which have tried it.

"(3) If the present Communist Party severs the puppet strings by which it is manipulated from abroad, if it gives up its undercover methods, there is no reason for denying it the privilege of openly advocating its beliefs in the way in which true political parties advocate theirs. In politics as well as sports, there are certain rules of the game which must be obeyed. Daggers are out of order on the

Whether it has done so—the issue which is now before us—is to be determined by the manner in which the enactment works in its practical application. "So long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power." *Barenblatt* v. *United States,* 360 U. S. 109, 132. *Oklahoma ex rel. Phillips* v. *Atkinson Co.,* 313 U. S. 508; *Sonzinsky* v. *United States,* 300 U. S. 506; *McCray* v. *United States,* 195 U. S. 27. The true and sole question before us is whether the effects of the statute as it was passed and as it operates are constitutionally permissible.

The Act is not a bill of attainder. It attaches not to specified organizations but to described activities in which an organization may or may not engage. The singling out of an individual for legislatively prescribed punishment constitutes an attainder whether the individual is called by name or described in terms of conduct which, because it is past conduct, operates only as a designation of particular persons. See *Cummings* v. *Missouri,* 4 Wall. 277; *Ex parte Garland,* 4 Wall. 333. The Subversive Activities Control Act is not of that kind. It requires the registration only of organizations which, after the date of the Act, are found to be under the direction, domination, or control of certain foreign powers and to operate primarily to advance certain objectives. This finding

American playing field. Undercover methods and foreign direction cannot be tolerated on the political field.

"This legislation does not constitute, therefore, a fiat. The Communist Party of the United States is not made guilty of any offense by reason of the enactment of the provisions of this act. If, however, the Communist Party of the United States or any other party now in existence or to be formed operates in such a way that it comes within the definitions and performs activities which are proscribed under the act, then the legislation will apply to it. . . . If such a party changes its characteristics, then the objectives sought by the committee will have been accomplished."

must be made after full administrative hearing, subject to judicial review which opens the record for the reviewing court's determination whether the administrative findings as to fact are supported by the preponderance of the evidence. Present activity constitutes an operative element to which the statute attaches legal consequences, not merely a point of reference for the ascertainment of particular persons ineluctably designated by the legislature.

The fact that activity engaged in prior to the enactment of the legislation may be regarded administratively and judicially as relevant to a determination that an organization is presently foreign-controlled and presently works to advance the objectives of the world Communist movement, does not alter the operative structure of the Act. The incidents which it reaches are nonetheless present incidents. The past is pertinent only as probative of these. In this proceeding the Board has found, and the Court of Appeals has sustained its conclusion, that the Communist Party, by virtue of the activities in which it now engages, comes within the terms of the Act. If the Party should at any time choose to abandon these activities, after it is once registered pursuant to § 7, the Act provides adequate means of relief. As often as once a year it may apply to the Attorney General for cancellation of registration, and, in the event of his refusal to remove it from the register and to relieve it from the duty of filing annual statements, it may petition the Board for a redetermination of its amenability to the registration requirements of the Act, pursuant to a hearing which, again, is subject to judicial review. §§ 13 (b), (i), (j), 14 (a). Far from attaching to the past and ineradicable actions of an organization, the application of the registration section is made to turn upon continuingly contemporaneous fact; its obligations arise only because, and endure only so long as, an organization presently conducts operations of a described character.

Nor is the statute made an act of "outlawry" or of attainder by the fact that the conduct which it regulates is described with such particularity that, in probability, few organizations will come within the statutory terms. Legislatures may act to curb behavior which they regard as harmful to the public welfare, whether that conduct is found to be engaged in by many persons or by one. So long as the incidence of legislation is such that the persons who engage in the regulated conduct, be they many or few, can escape regulation merely by altering the course of their own present activities, there can be no complaint of an attainder. It would be ingenuous to refuse to recognize that the Subversive Activities Control Act of 1950 was designed to reach the Communist Party's operations as then reported to Congress—operations in which, the Board has found, the Party persists. But to base a determination of constitutionality on this design would be to confuse the occasion of legislation with its operative effect and consequently to mistake decisive constitutional determinants. No doubt, the activity whose regulation the Act seeks to achieve is activity historically associated with the Communist Party. From its legislative study of the Communist Party, Congress concluded that that kind of activity was potentially dangerous to the national interest and that it must be subjected to control. But whatever the source from which the legislative experience and instruction derived, the Act applies to a class of activity only, not to the Communist Party as such. Nothing in this offends the constitutional prohibition of attainder.

B. *The Freedoms of Expression and Association Protected by the First Amendment.* The Communist Party would have us hold that the First Amendment prohibits Congress from requiring the registration and filing of information, including membership lists, by organizations substantially dominated or controlled by the foreign powers controlling the world Communist movement and

which operate primarily to advance the objectives of that movement: the overthrow of existing government by any means necessary and the establishment in its place of a Communist totalitarian dictatorship (§§ 3 (3), 2 (1) and (6)). We cannot find such a prohibition in the First Amendment. So to find would make a travesty of that Amendment and the great ends for the well-being of our democracy that it serves.

No doubt, a governmental regulation which requires registration as a condition upon the exercise of speech may in some circumstances affront the constitutional guarantee of free expression.[34] *Thomas* v. *Collins,* 323 U. S. 516. In that case, the Court held that a State could not constitutionally punish for contempt a public speaker who had addressed a labor-organization meeting in violation of a restraining order prohibiting him from soliciting memberships in a labor union without having first registered as a paid labor organizer and secured an organizer's card. The decision was a narrow one, striking down the registration requirement only as applied to the particular circumstances of the case, *id.,* at 541–542— that is, to an individual who, as the Court several times insisted, had come into the State "for one purpose and one only—to make the speech in question." *Id.,* at 533; see

---

[34] We need not consider now the decisions in which this Court has struck down regulations requiring not merely registration but the securing of a license, issued either at the arbitrary discretion of licensing officials or by the application of licensing standards so broad or uncertain as to permit arbitrary action by officials, as prerequisite to the right to speak. *E. g., Staub* v. *Baxley,* 355 U. S. 313; *Superior Films, Inc.,* v. *Department of Education,* 346 U. S. 587; *Gelling* v. *Texas,* 343 U. S. 960; *Joseph Burstyn, Inc.,* v. *Wilson,* 343 U. S. 495; *Niemotko* v. *Maryland,* 340 U. S. 268; *Kunz* v. *New York,* 340 U. S. 290; *Largent* v. *Texas,* 318 U. S. 418; *Cantwell* v. *Connecticut,* 310 U. S. 296; *Schneider* v. *State,* 308 U. S. 147; *Hague* v. *C. I. O.,* 307 U. S. 496; *Lovell* v. *Griffin,* 303 U. S. 444. The present statute has no such licensing provision.

also *id.,* at 521, 526.[35]   Since this speech was the sole inci-
dent of Thomas' conduct upon which the State relied in
asserting that he was an "organizer" and thus required to
register as such, the Court regarded the statute, in this
application, as basing the obligation to register upon
speech activity alone.[36]   "So long as no more is involved
than exercise of the rights of free speech and free
assembly," the Court said, "it is immune to such a restric-
tion."  *Id.,* at 540.  The present statute does not, of
course, attach the registration requirement to the incident
of speech, but to the incidents of foreign domination and
of operation to advance the objectives of the world Com-
munist movement—operation which, the Board has found
here, includes extensive, long-continuing organizational,
as well as "speech," activity.  Thus the *Thomas* case is
applicable here only insofar as it establishes that subjec-
tion to registration requirements may be a sufficient
restraint upon the exercise of liberties protected by the
First Amendment to merit that it be weighed in the
constitutional balance.

Similarly, we agree that compulsory disclosure of the
names of an organization's members may in certain
instances infringe constitutionally protected rights of
association.  *N. A. A. C. P.* v. *Alabama,* 357 U. S. 449;
*Bates* v. *Little Rock,* 361 U. S. 516; *Shelton* v. *Tucker,*
364 U. S. 479.  But to say this much is only to recognize

---

[35] After the speech, Thomas had also solicited one individual, by
name, to join the union.  The Court declined to decide whether such
a solicitation, apart from the speech, might constitutionally have
been made the basis of punishment for contempt.  323 U. S., at 541.
The state court's order adjudging Thomas in contempt imposed a
single sentence for both "solicitations," and the Court therefore
regarded the statute, in this application, as restraining and punishing
Thomas "for uttering, in the course of his address, the general as well
as the specific invitation."  *Id.,* at 529.

[36] This is clear from the Court's reliance on *De Jonge* v. *Oregon,*
299 U. S. 353.

one of the points of reference from which analysis must begin. To state that individual liberties may be affected is to establish the condition for, not to arrive at the conclusion of, constitutional decision. Against the impediments which particular governmental regulation causes to entire freedom of individual action, there must be weighed the value to the public of the ends which the regulation may achieve. *Schenck* v. *United States,* 249 U. S. 47; *Dennis* v. *United States,* 341 U. S. 494; *American Communications Assn.* v. *Douds,* 339 U. S. 382.

In the *N. A. A. C. P.* and *Bates* cases, this Court examined the circumstances under which disclosure was demanded, and concluded that "whatever interest the State may have in obtaining names of ordinary members has not been shown to be sufficient to overcome [the] . . . constitutional objections to the production order." *N. A. A. C. P.* v. *Alabama,* 357 U. S., at 465. In the *N. A. A. C. P.* case, the Attorney General of Alabama had brought an equity suit to enjoin the Association from conducting further activities within, and to oust it from, the State on the grounds of its non-compliance with Alabama's foreign-corporation registration statute. The Attorney General sought, and the state court ordered, production of lists of the Association's rank-and-file members as pertinent to the issues whether the N. A. A. C. P. was conducting intrastate business in violation of the statute, and whether the extent of that business justified its permanent ouster from the State. Noting that the Association had admitted its presence and conduct of activities in Alabama during almost forty years and that it had offered to comply in all respects with the qualification statute, we said that "we are unable to perceive that the disclosure of the names of [N. A. A. C. P.'s] . . . rank-and-file members has a substantial bearing" upon any issue presented to the Alabama courts. *Id.,* at 464. *Bates* v. *Little Rock, supra,* involved the conviction of

custodians of records of branches of the N. A. A. C. P. for failure to comply with provisions of local regulations which required organizations operating within the municipality to file with a municipal official, *inter alia,* financial statements showing the names of all contributors to the organizations. These regulations were amendments to ordinances levying license taxes on persons engaging in businesses, occupations or professions within municipal limits. Finding that the occupation taxes were based on the nature of the activity or enterprise conducted, not upon earnings or income, and, moreover, that there had been no showing that the N. A. A. C. P. branches were engaged in activity taxable under the ordinances, or had ever been regarded by tax authorities as subject to taxation under the ordinances, the Court concluded that: "In this record we can find no relevant correlation between the power of the municipalities to impose occupational license taxes and the compulsory disclosure and publication of the membership lists of the local branches of the National Association for the Advancement of Colored People." 361 U. S., at 525. Thus, these cases hold that where the required making public of an organization's membership lists bears no rational relation to the interest which is asserted by the State to justify disclosure, and where because of community temper publication might prejudice members whose names were revealed, disclosure cannot constitutionally be compelled.

*Shelton* v. *Tucker, supra,* did not involve legislation which, as a means of regulating an appropriately defined class of organizations whose activities menaced the public welfare, required those organizations to reveal their members. It involved an Arkansas statute which, conversely, as an incident of the State's attempt to control the activities of a class of individuals—the teachers in its public schools and publicly supported institutions of higher learning—required the individuals to disclose the asso-

ciations to which they belonged. The statute's purported justification lay in its furtherance of the State's effective selection of teaching personnel; to subserve this end, it attempted to "ask every one of its teachers to disclose every single organization with which he has been associated over a five-year period." 364 U. S., at 487–488. The Court, finding that "Many such relationships could have no possible bearing upon the teacher's occupational competence or fitness," *id.*, at 488, and hence that "The statute's comprehensive interference with associational freedom goes far beyond what might be justified in the exercise of the State's legitimate inquiry into the fitness and competency of its teachers," *id.*, at 490, struck the legislation down. Again, the *ratio decidendi* of the decision was the absence of substantial connection between the breadth of disclosure demanded and the purpose which disclosure was asserted to serve.

The present case differs from *Thomas* v. *Collins* and from *N. A. A. C. P., Bates,* and *Shelton* in the magnitude of the public interests which the registration and disclosure provisions are designed to protect and in the pertinence which registration and disclosure bear to the protection of those interests. Congress itself has expressed in § 2 of the Act both what those interests are and what, in its view, threatens them. On the basis of its detailed investigations Congress has found that there exists a world Communist movement, foreign-controlled, whose purpose it is by whatever means necessary to establish Communist totalitarian dictatorship in the countries throughout the world, and which has already succeeded in supplanting governments in other countries. Congress has found that in furthering these purposes, the foreign government controlling the world Communist movement establishes in various countries action organizations which, dominated from abroad, endeavor to bring about the overthrow of existing governments, by force if need be, and to establish

totalitarian dictatorships subservient to that foreign government. And Congress has found that these action organizations employ methods of infiltration and secretive and coercive tactics; that by operating in concealment and through Communist-front organizations they are able to obtain the support of persons who would not extend such support knowing of their true nature; that a Communist network exists in the United States; and that the agents of communism have devised methods of sabotage and espionage carried out in successful evasion of existing law. The purpose of the Subversive Activities Control Act is said to be to prevent the world-wide Communist conspiracy from accomplishing its purpose in this country.

It is not for the courts to re-examine the validity of these legislative findings and reject them. See *Harisiades* v. *Shaughnessy,* 342 U. S. 580, 590. They are the product of extensive investigation by Committees of Congress over more than a decade and a half.[37] Cf. *Nebbia* v. *New*

_____

[37] Among the Committee reports, see the following: Investigation of Communist Propaganda, H. R. Rep. No. 2290, 71st Cong., 3d Sess.; Investigation of Nazi and Other Propaganda, H. R. Rep. No. 153, 74th Cong., 1st Sess.; Investigation of Un-American Activities and Propaganda, H. R. Rep. No. 2, 76th Cong., 1st Sess.; Investigation of Un-American Propaganda Activities in the United States, H. R. Rep. No. 1476, 76th Cong., 3d Sess.; Investigation of Un-American Propaganda Activities in the United States, H. R. Rep. No. 1, 77th Cong., 1st Sess.; Special Report on Subversive Activities Aimed at Destroying Our Representative Form of Government, H. R. Rep. No. 2748, 77th Cong., 2d Sess.; Sources of Financial Aid for Subversive and Un-American Propaganda, H. R. Rep. No. 1996, 79th Cong., 2d Sess.; Investigation of Un-American Activities and Propaganda, H. R. Rep. No. 2233, 79th Cong., 2d Sess.; Investigation of Un-American Activities and Propaganda, H. R. Rep. No. 2742, 79th Cong., 2d Sess.; The Communist Party of the United States as an Agent of a Foreign Power, H. R. Rep. No. 209, 80th Cong., 1st Sess.; Report on the Communist Party of the United States as an Advocate of Overthrow of Government by Force and Violence, H. R. Comm. Print, 80th Cong., 2d Sess.; Report of the Committee on Un-

*York*, 291 U. S. 502, 516, 530. We certainly cannot dismiss them as unfounded or irrational imaginings. See *Galvan* v. *Press*, 347 U. S. 522, 529; *American Communications Assn.* v. *Douds*, 339 U. S. 382, 388–389. And if we accept them, as we must, as a not unentertainable appraisal by Congress of the threat which Communist organizations pose not only to existing government in the United States, but to the United States as a sovereign, independent nation—if we accept as not wholly unsupportable the conclusion that those organizations "are not free and independent organizations, but are sections of a worldwide Communist organization and are controlled, directed, and subject to the discipline of the Communist dictatorship of [a] . . . foreign country," § 2 (5)—we must recognize that the power of Congress to regulate Communist organizations of this nature is extensive. "Security against foreign danger is one of the primitive objects of civil society," James Madison wrote in The Federalist (No. 41). "It is an avowed and essential object of the American Union. The powers requisite for attaining it must be effectually confided to the federal councils." The Federalist (Wright ed. 1961) 295. See also The Federalist (Nos. 2–5), *id.*, at 93 *et seq.* Means for effective resistance against foreign incursion—whether in the form of organizations which function, in some technical sense,

American Activities to the United States House of Representatives, Eightieth Congress, H. R. Comm. Print, 80th Cong., 2d Sess.; Soviet Espionage Within the United States Government (second report), H. R. Comm. Print, 80th Cong., 2d Sess.; The Strategy and Tactics of World Communism, H. R. Doc. No. 619, 80th Cong., 2d Sess., and (Country Studies), H. R. Doc. No. 154, 81st Cong., 1st Sess.; Annual Report of the Committee on Un-American Activities For the Year 1949, H. R. Rep. No. 1950, 81st Cong., 2d Sess.; Report on Atomic Espionage, H. R. Rep. No. 1952, 81st Cong., 2d Sess. For a bibliography of published committee hearings during this period, see Internal Security Manual, S. Doc. No. 47, 83d Cong., 1st Sess. 216–223.

as "agents" of a foreign power,[38] or in the form of organizations which, by complete dedication and obedience to foreign directives, make themselves the instruments of a foreign power—may not be denied to the national legislature. "To preserve its independence, and give security against foreign aggression and encroachment, is the highest duty of every nation, and to attain these ends nearly all other considerations are to be subordinated. It matters not in what form such aggression and encroachment come . . . ." *The Chinese Exclusion Case,* 130 U. S. 581, 606. See also *Perez* v. *Brownell,* 356 U. S. 44; *Ex parte Quirin,* 317 U. S. 1; *Hines* v. *Davidowitz,* 312 U. S. 52; *United States* v. *Curtiss-Wright Export Corp.,* 299 U. S. 304, 315–322; *Mackenzie* v. *Hare,* 239 U. S. 299, 311; *Fong Yue Ting* v. *United States,* 149 U. S. 698; Mr. Justice Bradley, concurring in the *Legal Tender Cases,* 12 Wall. 457, 554, 556.

Of course, congressional power in this sphere, as in all spheres, is limited by the First Amendment. Individual liberties fundamental to American institutions are not to be destroyed under pretext of preserving those institutions, even from the gravest external dangers. But where the problems of accommodating the exigencies of self-preservation and the values of liberty are as complex and intricate as they are in the situation described in the findings of § 2 of the Subversive Activities Control Act—when existing government is menaced by a world-wide integrated movement which employs every combination of possible means, peaceful and violent, domestic and foreign, overt and clandestine, to destroy the government itself—the legislative judgment as to how that threat may best be met consistently with the safeguarding of personal freedom is not to be set aside merely because the

---

[38] See the Foreign Agents Registration Act, 52 Stat. 631, as amended, 22 U. S. C. §§ 611–621.

judgment of judges would, in the first instance, have chosen other methods. Especially where Congress, in seeking to reconcile competing and urgently demanding values within our social institutions, legislates not to prohibit individuals from organizing for the effectuation of ends found to be menacing to the very existence of those institutions, but only to prescribe the conditions under which such organization is permitted, the legislative determination must be respected. *United Public Workers* v. *Mitchell*, 330 U. S. 75; *American Communications Assn.* v. *Douds, supra.*

In a number of situations in which secrecy or the concealment of associations has been regarded as a threat to public safety and to the effective, free functioning of our national institutions Congress has met the threat by requiring registration or disclosure.[39] The Federal Corrupt Practices Act, enacted in 1925, 43 Stat. 1070, 2 U. S. C. §§ 241–245, requires all political committees (organizations accepting contributions or making expendi-

---

[39] Compare 18 U. S. C. § 612 (prohibiting the publication or distribution of written statements concerning candidates for designated national elective offices unless such statements contain the names of the persons or associations responsible for the publication or distribution and, in the case of associations, the names of their officers); 37 Stat. 553, as amended, 39 U. S. C. §§ 233–234 (prescribing the withdrawal of second-class mailing privileges from publications which do not file with the Postmaster General, and publish in the second issue of the publication printed after filing, a statement setting forth the names of the publication's editors, publishers, managers and owners, and, if the owners are corporations, the names of stockholders and other security holders; and prohibiting the printing, by publications enjoying second-class privileges, of paid advertisements not marked as such), sustained against First Amendment challenge in *Lewis Publishing Co.* v. *Morgan*, 229 U. S. 288; Communications Act of 1934, § 317, 48 Stat. 1089, 47 U. S. C. § 317 (requiring, in the case of all matter broadcast by radio for which a valuable consideration is paid by any person, an announcement that the matter has been paid for by such person).

tures to influence the election of candidates for designated national offices in two or more States, or branches of national committees) to have a chairman and a treasurer, and makes it the duty of the treasurer to keep detailed financial accounts and to file with the Clerk of the House of Representatives periodic statements containing, *inter alia,* the names and addresses of all persons contributing more than $100 to the committee during any year. *Burroughs* v.. *United States,* 290 U. S. 534, sustained that statute against the claim that Congress lacked constitutional power to regulate such political organizations; the Court found ample authority in congressional power "to preserve the departments and institutions of the general government from impairment or destruction, whether threatened by force or by corruption." *Id.,* at 545. The Federal Regulation of Lobbying Act, 60 Stat. 839, 2 U. S. C. §§ 261–270, applies to any person who solicits or receives money or anything of value to be used principally, or if the person's principal purpose is, to influence the passage or defeat of legislation by Congress. It requires any person receiving any contributions or expending any money for the purposes of influencing the passage or defeat of legislation to file with the Clerk of the House quarterly statements which set out the name and address of each person who has made a contribution of $500 or more not mentioned in the preceding report. It also requires that any person who engages himself for pay for the purpose of attempting to influence the passage or defeat of legislation, before doing anything in furtherance of that objective, register with the Clerk of the House and the Secretary of the Senate, and state in writing, *inter alia,* his name and address and the name and address of the person by whom he is employed, and in whose interest he works. These paid lobbyists must file quarterly reports of all money received and expended in carrying on their work, to whom paid, for what pur-

poses, the names of publications in which they have caused any articles to be published, and the proposed legislation they are employed to support or oppose; this information is to be printed in the Congressional Record. In *United States* v. *Harriss*, 347 U. S. 612, we held that the First Amendment did not prohibit the prosecution of criminal informations charging violation of the registration and reporting provisions of the Act. We said:

> "Present-day legislative complexities are such that individual members of Congress cannot be expected to explore the myriad pressures to which they are regularly subjected. Yet full realization of the American ideal of government by elected representatives depends to no small extent on their ability to properly evaluate such pressures. Otherwise the voice of the people may all too easily be drowned out by the voice of special interest groups seeking favored treatment while masquerading as proponents of the public weal. This is the evil which the Lobbying Act was designed to help prevent.
>
> "Toward that end, Congress has not sought to prohibit these pressures. It has merely provided for a modicum of information from those who for hire attempt to influence legislation or who collect or spend funds for that purpose. It wants only to know who is being hired, who is putting up the money, and how much. . . ." *Id.*, at 625.

The Foreign Agents Registration Act, first enacted in 1938, 52 Stat. 631, and since several times amended, provides, as now set forth in 22 U. S. C. §§ 611–621, that agents of foreign principals must register with the Attorney General and file periodic registration statements (which are to be held by the Attorney General open to public inspection) containing, among other information, the registrant's name, a comprehensive statement of the

nature of the registrant's business, a complete list of the registrant's employees and a statement of the nature of the work of each (unless this requirement is waived by the Attorney General), the name and address of the registrant's foreign principals, with further information as to the principals' character, ownership and control, the names and addresses of all persons other than a registrant's foreign principal who contribute to the registrant in connection with specified activities of the registrant, and detailed financial accounts. Such agents must also file with the Attorney General and the Librarian of Congress, and must label as emanating from a registered agent of a foreign principal, and mark with the name of the agent and the principal, any political propaganda transmitted in the United States mails or through any instrumentality of interstate or foreign commerce. In addition, Title 18 U. S. C. § 2386, derived from the so-called Voorhis Act of 1940, 54 Stat. 1201, requires the registration with the Attorney General of organizations subject to foreign control which engage in political or civilian military activity (as those terms are defined in the section), organizations which engage in both political and civilian military activity (as defined), and organizations whose purpose is the overthrow of government by the use or threat of force or violence or military measures. Organizations required to register must report, *inter alia,* the names and addresses of their officers, branch officers and contributors, a detailed description of their activities, and a detailed statement of assets, and must file copies of publications which they issue or distribute; registration statements must be kept up to date and are to be open for public examination. Committee reports pertinent to the Subversive Activities Control Act of 1950 state that the necessity for the legislation derived in part from the difficulty of enforcing the Foreign Agents Registration and Voorhis Acts against Communist organizations "due in part to

the skill and deceit which the Communists have used in concealing their foreign ties." [40]

Certainly, as the *Burroughs* and *Harriss* cases abundantly recognize, secrecy of associations and organizations, even among groups concerned exclusively with political processes, may under some circumstances constitute a danger which legislatures do not lack constitutional power to curb. In *New York ex rel. Bryant* v. *Zimmerman,* 278 U. S. 63, this Court held that the Due Process Clause of the Fourteenth Amendment was not offended by a state statute requiring filing with the Secretary of State of the constitution and by-laws, rules and regulations, membership oath, roster of members and list of officers of every association of twenty or more members having as a condition of membership an oath. The statute made it unlawful to become or remain a member of such an association with knowledge that it had failed to comply with the filing requirement. Exceptions for labor unions and benevolent orders indicated that the measure was directed primarily at the Ku Klux Klan. Compelling disclosure of membership lists and other information by organizations of the character of the Klan, the Court found, was reasonable both as a means for providing the government of the State with knowledge of the activities of those organizations within its borders, and because "requiring this information to be supplied for the public files will operate as an effective or substantial deterrent from the violations of public and private right to which the association might be tempted if such a disclosure were not required." *Id.,* at 72. It was the nature of the organization regulated, and hence the danger involved in its covert operation, which justified the statute and caused us to distinguish the *Bryant* case in *N. A. A. C. P.* v. *Alabama,*

---

[40] H. R. Rep. No. 2980, 81st Cong., 2d Sess. 2; H. R. Rep. No. 1844, 80th Cong., 2d Sess. 5.

*supra,* 357 U. S., at 465.[41]   In *N. A. A. C. P.* and *Bates* v. *Little Rock, supra,* as we have said, there was no showing of any danger inherent in concealment, no showing that the State, in seeking disclosure, was attempting to cope with any perceived danger.   Nor was this kind of danger—arising when secrecy itself is made an active instrument of public harm—put forth to justify the statute which was held invalid in *Shelton* v. *Tucker, supra.*

Congress, when it enacted the Subversive Activities Control Act, did attempt to cope with precisely such a danger.   In light of its legislative findings, based on voluminous evidence collected during years of investigation, we cannot say that that danger is chimerical, or that the registration requirement of § 7 is an ill-adjusted means of dealing with it.   In saying this, we are not insensitive to the fact that the public opprobrium and obloquy which may attach to an individual listed with the Attorney General as a member of a Communist-action organization is no less considerable than that with which members of the National Association for the Advancement of Colored People were threatened in *N. A. A. C. P.* and *Bates.*   But while an angry public opinion, and the evils which it may spawn, are relevant considerations in adjudging, in light of the totality of relevant considerations, the validity of legislation that, in effecting disclosure, may thereby entail some restraints on speech and association, the existence of an ugly public temper does not, as such and without more, incapacitate government to require publicity demanded by rational interests high in the scale of national concern.   Where the mask of anonymity which an organization's members wear serves the double pur-

---

[41] One aspect of the constitutional attack on the New York statute in the *Bryant* case was that the "liberty" protected by the Due Process Clause comprehended freedom to form harmless associations and engage in non-violent associational activity.

pose of protecting them from popular prejudice and of enabling them to cover over a foreign-directed conspiracy, infiltrate into other groups, and enlist the support of persons who would not, if the truth were revealed, lend their support, see § 2 (1), (6), (7), it would be a distortion of the First Amendment to hold that it prohibits Congress from removing the mask.

These considerations lead us to sustain the registration provisions of § 7, as not repugnant to the First Amendment, insofar as they require Communist-action organizations to file a registration statement containing the names and addresses of its present officers and members. The requirement that persons who were officers or members at any time during the year preceding registration must be listed, see § 7 (d)(2), (4), is a reasonable means of assuring that the obligation to list present members and officers will not be evaded. For reasons which do not require elaboration, the requirement that a registering organization list the aliases of officers and members, see § 7 (d)(5), must also be sustained. Nor do we find that § 7 (d)(3), requiring a financial accounting, or § 7 (d)(6),[42] requiring a listing of all printing presses in the possession or control of the organization or its members violates First Amendment rights. Disclosure both of the financial transactions of a Communist-action organization and of the identity of the organs of publication which it controls might not unreasonably have been regarded by Congress as necessary to the objective which the Act seeks to achieve: to bring foreign-dominated organizations out into the open where the public can evaluate their activities informedly against the revealed background of their character, nature, and connections. Of course, printing presses may not be regulated like guns. That generalization gets us nowhere. On the concrete, specific issue before us, we hold that the

---

[42] Added by an Act of July 29, 1954, 68 Stat. 586.

obligation to give information identifying presses, without more and as applied to foreign-dominated organizations, does not fetter constitutionally protected free expression. No other kind of regulation is involved here. As to the penalties for failure to register, see § 15 (a), which the Party attacks as exorbitant and oppressive, these are not now before us. They have not yet been imposed on the Party and may never be. *United States* v. *Harriss,* 347 U. S. 612; *United States* v. *Wurzbach,* 280 U. S. 396.

It is argued that if Congress may constitutionally enact legislation requiring the Communist Party to register, to list its members, to file financial statements, and to identify its printing presses, Congress may impose similar requirements upon any group which pursues unpopular political objectives or which expresses an unpopular political ideology. Nothing which we decide here remotely carries such an implication. The Subversive Activities Control Act applies only to *foreign-dominated* organizations which work primarily to advance the objectives of a world movement controlled by the government of a *foreign* country. See §§ 3 (3), 2 (4). It applies only to organizations directed, dominated, or controlled by a *particular* foreign country, the leader of a movement which, Congress has found, is "in its origins, its development, and its present practice, . . . a world-wide revolutionary movement whose purpose it is, by treachery, deceit, infiltration into other groups . . . , espionage, sabotage, terrorism, and any other means deemed necessary, to establish a Communist totalitarian dictatorship in the countries throughout the world through the medium of a world-wide Communist organization." § 2 (1). This is the full purported reach of the statute,[43] and its fullest effect. There is no

---

[43] See S. Rep. No. 2369, 81st Cong., 2d Sess. 4; H. R. Rep. No. 2980, 81st Cong., 2d Sess. 3; S. Rep. No. 1358, 81st Cong., 2d Sess. 3, 5, 8; H. R. Rep. No. 1844, 80th Cong., 2d Sess. 2; 96 Cong. Rec. 13731, 14171–14173.

attempt here to impose stifling obligations upon the proponents of a particular political creed as such, or even to check the importation of particular political ideas from abroad for propagation here. The Act compels the registration of organized groups which have been made the instruments of a long-continued, systematic, disciplined activity directed by a foreign power and purposing to overthrow existing government in this country. Organizations are subject to it only when shown, after administrative hearing subject to judicial review, to be dominated by the foreign power or its organs and to operate primarily to advance its purposes. That a portion of the evidence upon which such a showing is made may consist in the expression of political views by the organization does not alter the character of the Act or of the incidents to which it attaches. Such expressions are relevant only as probative of foreign control and of the purposes to which the organization's actions are directed. The Board, in the present proceeding, so understood the Act. The registration requirement of § 7, on its face and as here applied, does not violate the First Amendment.

C. *Self-Incrimination of the Party's Officers.* Section 7 (a) and (c) requires that organizations determined to be Communist-action organizations by the Subversive Activities Control Board register within thirty days after the Board's registration order becomes final. Registration is to be accompanied by a registration statement, prepared in such manner and form as the Attorney General, by regulations, prescribes. § 7 (d). The form which, pursuant to this authority, the Attorney General has prescribed requires that registration statements "shall be signed by the partners, officers, and directors, including the members of the governing body of the organization." 28 CFR § 11.200; Dept. Justice Form ISA–1. If the organization fails to register or to file a registration statement, it is the duty of the executive officer, the secretary,

the president or chairman, the vice-president or vice-chairman, the treasurer, and the members of the governing board, council, or body, to register the organization by filing a registration statement for it within ten days after the expiration of the thirty-day registration period allowed the organization. See 28 CFR § 11.205, issued pursuant to § 7 (h) of the Act. The Party contends that these requirements cannot be imposed and exacted consistently with the Self-Incrimination Clause of the Fifth Amendment. Officers of the Party, it is argued, are compelled, in the very act of filing a signed registration statement, to admit that they *are* Party officers—an admission which we have held incriminating. *Blau* v. *United States,* 340 U. S. 159; cf. *Quinn* v. *United States,* 349 U. S. 155. What is required is said to be not merely the production of documents kept in an official capacity for the Party, see *McPhaul* v. *United States,* 364 U. S. 372; *United States* v. *White,* 322 U. S. 694; *Wilson* v. *United States,* 221 U. S. 361, but individual action by the officers which, by establishing a connection between the officers and the documents, in effect convicts the officers out of their own mouths. Cf. *Curcio* v. *United States,* 354 U. S. 118.

Manifestly, insofar as this contention is directed against the provisions of § 7 (h) and 28 CFR § 11.205, requiring that designated officers file registration statements in default of registration by an organization, it is prematurely raised in the present proceeding. The duties imposed by those provisions will not arise until and unless the Party fails to register. At this time their application is wholly contingent and conjectural. Cf. *Alabama State Federation of Labor* v. *McAdory,* 325 U. S. 450.[44]

We find that the self-incrimination challenge to § 7 (a) and (d), as implemented by the Attorney General's regu-

---

[44] *A fortiori* we do not reach at this time the question of the validity of § 8 of the Act. See note 22 *supra*.

lations and forms, is also premature at this time. The privilege against self-incrimination is one which normally must be claimed by the individual who seeks to avail himself of its protection. *Vajtauer* v. *Commissioner of Immigration,* 273 U. S. 103; *United States* v. *Murdock,* 284 U. S. 141; *Rogers* v. *United States,* 340 U. S. 367; see also *Smith* v. *United States,* 337 U. S. 137, 147–148; *United States* v. *Monia,* 317 U. S. 424, 427. We cannot know now that the Party's officers will ever claim the privilege. There is no indication that in the past its high-ranking officials have sought to conceal their identity, and no reason to believe that in the future they will decline to file a registration statement whose whole effect, in this regard, is further to evidence a fact which, traditionally, has been one of public notice. Within thirty days after the Board's registration order becomes final, the Party's officers may file signed registration statements in the form required by Form ISA–1. Or they may file statements claiming the privilege in lieu of furnishing the required information. If a claim of privilege is made, it may or may not be honored by the Attorney General. We cannot, on the basis of supposition that privilege will be claimed and not honored, proceed now to adjudicate the constitutionality under the Fifth Amendment of the registration provisions. Whatever proceeding may be taken after and if the privilege is claimed will provide an adequate forum for litigation of that issue.

The Party contends, however, that under the Subversive Activities Control Act there will be no opportunity for its officers to claim the Fifth Amendment privilege without, at the same time, giving up all the protection which the Fifth Amendment secures them. Persons who come forward to make the claim, it is said, will as much reveal themselves to the Attorney General as officers of the Party as if they had in fact filed a registration statement. But it is always true that one who is required to

assert the privilege against self-incrimination may thereby arouse the suspicions of prosecuting authorities. Nevertheless, it is not and has never been the law that the privilege disallows the asking of potentially incriminatory questions or authorizes the person of whom they are asked to evade them without expressly asserting that his answers may tend to incriminate him. *State* v. *Kemp,* 126 Conn. 60, 9 A. 2d 63; *O'Connell* v. *United States,* 40 F. 2d 201 (C. A. 2d Cir.); *In re Knickerbocker Steamboat Co.,* 139 F. 713 (D. C. S. D. N. Y.); *In re Groban,* 99 Ohio App. 512, 135 N. E. 2d 477, aff'd, 164 Ohio St. 26, 128 N. E. 2d 106, aff'd, 352 U. S. 330; *Allhusen* v. *Labouchere,* L. R. 3 Q. B. D. 654; *Fisher* v. *Owen,* L. R. 8 Ch. D. 645. And see *United States* v. *Hiss,* 185 F. 2d 822 (C. A. 2d Cir.); *Commonwealth* v. *Granito,* 326 Mass. 494, 95 N. E. 2d 539. In *United States* v. *Sullivan,* 274 U. S. 259, this Court sustained a conviction for failure to file an income tax return, despite the defendant's objection that answers called for on the return would have incriminated him. Mr. Justice Holmes, for a unanimous Court, wrote that "If the form of return provided called for answers that the defendant was privileged from making he could have raised the objection in the return, but could not on that account refuse to make any return at all. . . . [I]f the defendant desired to test that or any other point he should have tested it in the return so that it could be passed upon. He could not draw a conjurer's circle around the whole matter by his own declaration that to write any word upon the government blank would bring him into danger of the law." *Id.,* at 263–264. This would, of course, be the normal rule. Perhaps *Sullivan* is distinguishable, however, from the situation of registration under the Subversive Activities Control Act. Tax returns must be filed generally, and answers to tax return questions may involve any of a wide variety of activities, whereas the obligation to file a registration

statement compels a few particular individuals to come forward, to identify themselves, and to suggest, at least, their connection with a relatively limited potential sphere of criminal conduct. Then, too, in *Sullivan,* Mr. Justice Holmes assumed that some, at least, of the answers to the questions on the tax return would not have been incriminating, whereas in the case of the registration statement, any claim of the privilege would involve the withholding of all information; thus, there is, presumably, a greater governmental interest in having the privilege claimed specifically on the form in the tax-return circumstances. To suggest these possible distinctions is to recognize that the applicability of the *Sullivan* principle here may raise novel and difficult questions as to the reach of the Fifth Amendment—questions which should not be discussed in advance of the necessity of deciding them. See *Peters* v. *Hobby,* 349 U. S. 331, 338. The stage at which that decision will become necessary, if at all, is the stage at which *Sullivan* itself was decided: when enforcement proceedings for failure to register are instituted against the Party or against its officers. See *People* v. *McCormick,* 102 Cal. App. 2d Supp. 954, 228 P. 2d 349.

In arguing that the issue is not now premature, the Party cites *Boyd* v. *United States,* 116 U. S. 616, for the proposition that, where a statute compelling the production of potentially incriminating information allows the exercise of the Fifth Amendment privilege only under circumstances which effectively nullify the Amendment's protection, the statute may be held "unconstitutional and void," not merely unenforceable in cases in which a proper claim of privilege is made. Assuming *arguendo* that this proposition is correct, the most that can be drawn from it of pertinence to the present case is that, in a prosecution of the Party for failure to register, or in a prosecution of its officers for failure to register the Party, the Court would have to determine whether the Subversive Activities Con-

trol Act is a statute which, like the statute in *Boyd,* unconstitutionally circumscribes the effectual exercise of the privilege. Obviously, such a determination would never have to be made if an enforcement proceeding were never brought—either because Party officials registered pursuant to § 7 (a) and (d) without complaint, or because they did choose to assert the privilege in some form in which it could be recognized. The *Boyd* case involved a statute providing that in proceedings other than criminal arising under the revenue laws, the Government could secure an order of the court requiring the production by an opposing claimant or defendant of any documents under his control which, the Government asserted, might tend to prove any of the Government's allegations. If production were not made, the allegations were to be taken as confessed. On the Government's motion, the District Court had entered such an order, requiring the claimants in a forfeiture proceeding to produce a specified invoice. Although the claimants objected that the order was improper and the statute unconstitutional in coercing self-incriminatory disclosures and permitting unreasonable searches and seizures, they did, under protest, produce the invoice, which was, again over their constitutional objection, admitted into evidence. This Court held that on such a record a judgment for the United States could not stand, and that the statute was invalid as repugnant to the Fourth and Fifth Amendments. In *Boyd,* production had been ordered, objected to, and, the Court held, unconstitutionally compelled. There is nothing in the case which justifies advisory adjudication of self-incrimination questions prior to the time when a demand for information has been, at the least, made and resisted.

D. *Legislative Predetermination of Adjudicative Fact.* It is next asserted that the Act offends the Due Process Clause of the Fifth Amendment by predetermining legislatively facts upon which the application of the registra-

tion provisions to the Communist Party depends. Two arguments are made in this regard. The first is that although § 3 (3), defining a "Communist-action organization," purports to require findings that an organization is controlled by "the foreign government or foreign organization controlling the world Communist movement referred to in section 2 . . ." and operates primarily to advance the objectives "of such world Communist movement as referred to in section 2 . . . ," the existence of a world Communist movement, its direction by the government of a foreign country, and the nature of its objectives are "found" by Congress in § 2, and may not be litigated in proceedings before the Board. Thus, an organization is precluded from showing operative facts which would take it out of § 3 (3): *viz.*, that there is no world Communist movement, or that, if there is, it is not controlled by a foreign government, or that it does not have the objectives attributed to it by § 2. The second argument is that the Board was in effect foreclosed from finding that the Party was not a Communist-action organization by the declarations, in § 2 (9), (12), and (15), that there are in the United States individuals who knowingly and willfully participate in the world Communist movement, that there is a Communist network in the United States, and that the "Communist movement in the United States is an organization . . . ." Given these "facts," it is asserted, nothing is left to the Board but to supply the name of the organization—a name which, the Party contends, is obvious. Further, it is pointed out, Congress in 1954, prior to the Board's final determination in this proceeding, enacted the Communist Control Act, 68 Stat. 775, 50 U. S. C. § 841 *et seq.*, which declares in its second section:

> "The Congress hereby finds and declares that the Communist Party of the United States, although purportedly a political party, is in fact an instrumentality of a conspiracy to overthrow the Govern-

ment of the United States. . . . [T]he policies and programs of the Communist Party are secretly prescribed for it by the foreign leaders of the world Communist movement. . . . [I]ts role as the agency of a hostile foreign power renders its existence a clear present and continuing danger to the security of the United States. . . ."

The Board could not, therefore, the Party argues, find that the Communist Party was not a Communist-action organization without contradicting Congress.

*First:* We have held, *supra,* that the congressional findings that there exists a world Communist movement, that it is directed by the Communist dictatorship of a foreign country, and that it has certain designated objectives, *inter alia,* the establishment of a Communist totalitarian dictatorship throughout the world through the medium of a world-wide Communist organization, § 2 (1), (4), are not open to re-examination by the Board. We find that nothing in this violates due process. Under § 3 (3) of the Act, an organization may not be found to be a Communist-action organization unless it is shown to be, first, "substantially directed, dominated, or controlled by the foreign government or foreign organization controlling the world Communist movement referred to in section 2 . . . ." The only operative function of § 2 in this respect is to designate what Congress meant by "world Communist movement," "the foreign government," etc. The characteristics of the movement and the source of its control are not to be established by the Attorney General in proceedings before the Board, nor may they be disproved. But this is because they are merely defining terms whose truth, as such, is irrelevant to the issues in such proceedings. They are referents which identify *"the* foreign government" to which § 3 (3) adverts. The Board, construing the statute, concluded that that foreign government was the Soviet Union. We affirm that construction.

The statute, then, defines a Communist-action organization in terms of substantial direction, domination, or control by the Soviet Union. The Government offered evidence to show that the Soviet Union substantially directed, dominated, or controlled the Communist Party. The Party had an opportunity to rebut this showing, and it attempted to do so. The Board found that the Government's showing was persuasive; it issued a 240-page report so concluding; and the Court of Appeals affirmed. None of the operative facts were "predetermined," except in the sense in which any statute, as construed, designates the nature of the facts pertinent to issues which may be litigated under it. If, in future years, in a future world situation, the Soviet Union is no longer the foreign country to which § 2 (1) and (4), fairly read in their context, refer—so that substantial domination by the Soviet Union would not bring an organization within the terms of § 3 (3)—that, too, will be a matter of statutory construction which no "findings" in the statute foreclose. The Board or a reviewing court will be able to say that the "world Communist movement," as Congress meant the term in 1950 (and whether or not there really existed, in 1950, a movement having all the characteristics described in § 2), no longer exists, or that Country $X$ or $Y$, not the Soviet Union, now directs it. A similar process of adjudication is required under § 3 (3)(a)(ii), the "objectives" component of the definition of a Communist-action organization. It provides that, in order to be found a Communist-action organization, an organization must be shown to operate "primarily to advance the objectives of such world Communist movement as referred to in section 2 . . . ." What those objectives are is made clear by the terms of § 2 itself. They are there described in detail. Whether they are in fact the objectives of some "world Communist movement" which in fact exists may not be litigated, because the question is irrelevant. Whether the

particular organization against whom the Attorney General files a petition for a registration order operates primarily to advance those objectives is the pertinent issue under the statute, and this issue may be litigated. That is all that due process requires.

The decisions cited by the Party, *Tot* v. *United States,* 319 U. S. 463; *McFarland* v. *American Sugar Ref. Co.,* 241 U. S. 79; *Manley* v. *Georgia,* 279 U. S. 1; *Western & Atlantic R. Co.* v. *Henderson,* 279 U. S. 639; and see *Bailey* v. *Alabama,* 219 U. S. 219, have no application here. These cases involved statutes which, purporting to attach legal consequences to one set of facts, created a rebuttable presumption of the existence of that set of facts which arose upon proof of other facts having, this Court found, no rational relation to the facts upon which the statutory consequences turned. The Subversive Activities Control Act, however, does not define a Communist-action organization as one which operates primarily to advance whatever objectives are actually held by the world Communist movement, leaving these objectives as facts to be proved. It finds that the particular objectives set out in § 2 *are* those of the world Communist movement and requires the registration of certain foreign-dominated organizations which operate primarily to advance those objectives. One, and only one, set of facts is in issue under § 3 (3)(a)(ii): whether a particular organization does or does not operate primarily to advance those objectives; and, as to this, the legislation "predetermines" nothing.

*Second:* We do not find that the congressional assertions in § 2 (9), (12) and (15), that there exist in the United States individuals dedicated to communism, a "Communist network," a "Communist movement," and a Communist "organization," deprive the Party of the fair hearing which due process of law requires. Fairly read, these findings neither compel nor suggest the outcome in

any particular litigation before the Board. They do not create the impression that there is a single Communist-action organization in the United States, still less that the Communist Party is "it." Nor can we hold that the findings of § 2 of the Communist Control Act of 1954 unconstitutionally prejudice the Party. It is not suggested that these were enacted with a purpose to influence the then-pending proceedings in the present case. Rather, they are a portion of legislation deemed necessary by Congress pursuant to its continuing duty to protect the national welfare. Nowhere in the extensive modified reports of the Board nor in the opinions of the Court of Appeals are the 1954 legislative findings considered. While we must, of course, assume that the Board was aware of them, we cannot say that their very annunciation by Congress—in the absence of any showing that the Board took them into account—foreclosed or impaired a fair administrative determination.

The other constitutional questions raised by the Party have been carefully considered, but do not call for detailed discussion. And we must decline, of course, to enter into discussion of the wisdom of this legislation. The Constitution does not prohibit the requirement that the Communist Party register with the Attorney General as a Communist-action organization pursuant to § 7.

The judgment of the Court of Appeals is

*Affirmed.*

Mr. Chief Justice Warren, dissenting.

When this case was here in 1956, the Court refused to pass upon the constitutional issues raised by the parties, and instead remanded to the Board because of the possibility that the record was tainted by perjured testimony. At that time the Court said: "This non-constitutional issue must be met at the outset, because the case must be decided on a non-constitutional issue, if the record calls

for it, without reaching constitutional problems." *Communist Party of the United States* v. *Subversive Activities Control Board,* 351 U. S. 115, 122. The Court also noted that a remand was required because the "fastidious regard for the honor of the administration of justice requires the Court to make certain that the doing of justice be made so manifest that only irrational or perverse claims of its disregard can be asserted." *Id.,* at 124. These statements, applicable in 1956, are even more applicable today, for, in my opinion, the record in this case presents four serious errors of a non-constitutional nature, the proper resolution of which would not only avoid unnecessary constitutional adjudications, but would also be consistent with the requirements of a fair administration of justice.[1] To be sure, I, like most of my Brethren, have views on the constitutional questions which are raised by this case. I also recognize that a decision as to these constitutional questions would probably put an end to this already protracted litigation. However, I do not believe that strongly felt convictions on constitutional questions or a desire to shorten the course of this litigation justifies the Court in resolving any of the constitutional questions presented so long as the record makes manifest, as I think it does, the existence of non-constitutional questions upon which this phase of the proceedings can and should be adjudicated. After persuasively expounding the reasons which underlie this Court's steadfast reluctance to decide

---

[1] On remand from this Court, the Board expunged the entire testimony of the alleged perjurers Crouch, Matusow, and Johnson. Although the Board concluded, and the Court of Appeals agreed, that the remaining evidence was sufficient to support an order compelling the petitioner to register, there can be no doubt that the Government's case was weakened by the deletion of the testimony of three important witnesses, and it is therefore on the basis of this already abbreviated record that the non-constitutional errors alleged by the petitioner must be considered.

constitutional questions prematurely, *ante,* pp. 71–81, the Court concludes that the resolution of some of the constitutional issues raised by the parties should be left for another day. However, in a surprising turnabout, the Court then proceeds to decide other constitutional questions, and it reaches these questions only by first brushing aside, on the basis of a procedural technicality or a strained analysis, many important non-constitutional issues. I do not think that the Court's action can be justified.

I.

One of the Government's leading witnesses at the initial hearing before the Board was Benjamin Gitlow. Prior to his expulsion from the Communist Party in 1929, Gitlow had been a high official in the Party. His testimony before the Board covered over 1,400 pages in the record, and the Board relied heavily upon his testimony in finding that the Communist International controlled petitioner, subsidized it, and supervised it through foreign representatives in this country. In addition, the Board relied upon Gitlow's testimony to corroborate the testimony of government witness Joseph Kornfeder, whose demeanor led the Board "to examine his testimony with . . . caution." In 1940, Gitlow turned over to the FBI a large quantity of official documents relating to the Party and its past history. He also prepared and gave to the FBI memoranda which explained and interpreted the documents. During his direct examination at the original hearing before the Board, Gitlow identified many of the original documents and explained their contents and significance. On cross-examination, the petitioner, obviously hoping to impeach Gitlow's damaging testimony, moved for the production of the explanatory memoranda which Gitlow had prepared in 1940. The petitioner's motion was denied by the Board. Although

in its first petition in the Court of Appeals to review the order of the Board, the petitioner assigned the Board's denial of the motion for production as error, the court failed to decide the question, presumably because the petitioner had not pressed the point either in its brief or during oral argument. *Communist Party of the United States* v. *Subversive Activities Control Board,* 102 U. S. App. D. C. 395, 403, 254 F. 2d 314, 322. Nor was the issue raised in the petition for certiorari filed in this Court in 1955. However, after this Court remanded the case in 1956, the petitioner again moved the Board to order production of the memoranda. The Board denied the motion, and, on review, the Court of Appeals held that the Board's ruling could not be corrected by a petition to review the Board's order. Relying on *Consolidated Edison Co.* v. *Labor Board,* 305 U. S. 197, the court said that the petitioner's failure to make a motion in the Court of Appeals for leave to adduce additional evidence under § 14 (a) of the Act [2] at the time the Board initially refused to order production of the memoranda constituted a waiver of the objection. After a second remand to the Board by the Court of Appeals, the Party did seek to have the memoranda produced pursuant to § 14 (a) of the Act. However, the Court of Appeals denied the motion, later explaining that the petitioner's

---

[2] The relevant portion of § 14 (a) reads as follows:

"If either party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material, the court may order such additional evidence to be taken before the Board and to be adduced upon the proceeding in such manner and upon such terms and conditions as to the court may seem proper. The Board may modify its findings as to the facts, by reason of the additional evidence so taken, and it shall file such modified or new findings, which, if supported by the preponderance of the evidence shall be conclusive, and its recommendations, if any, with respect to action in the matter under consideration." 64 Stat. 1001–1002.

procedural misstep could not be rectified *nunc pro tunc.* *Communist Party of the United States* v. *Subversive Activities Control Board,* 107 U. S. App. D. C. 279, 282, 277 F. 2d 78, 81.

Today, the Court refuses to reach this important evidentiary question, and it does so by adopting an argument that was unanimously rejected by the Court of Appeals. 102 U. S. App. D. C., at 402–403, 254 F. 2d, at 321–322. The Court holds that petitioner may not now challenge the Board's refusal to order the production of the Gitlow memoranda because it failed to raise the question in its 1955 petition for certiorari. With due respect, I must dissent from this holding, which, to the extent that it transforms Rule 23, par. 1 (c) of our Rules of Procedure [3] into an immutable rule of abandonment, is both unorthodox and unwise. The Court's position will not bear analysis.

It is undoubtedly true that piecemeal appeals should be avoided and that claims not preserved throughout a litigation will not generally be entertained at some subsequent, and perhaps terminal, stage of the proceedings. However, this general rule is not an absolute dogma, and has on numerous occasions yielded to subordinating policy considerations. In fact, the United States Reports are replete with instances wherein the Court decided issues which were never even mentioned in the petition for certiorari. See, *e. g., Boynton* v. *Virginia,* 364 U. S. 454; *Mackey* v. *Mendoza-Martinez,* 362

---

[3] Rule 23, par. 1 (c) provides:

"The petition for writ of certiorari shall contain . . . .

. . . . .

"(c) The questions presented for review, expressed in the terms and circumstances of the case but without unnecessary detail. The statement of a question presented will be deemed to include every subsidiary question fairly comprised therein. *Only the questions set forth in the petition or fairly comprised therein will be considered by the court."* (Emphasis added.)

U. S. 384; *Neese* v. *Southern R. Co.*, 350 U. S. 77; *Alma Motor Co.* v. *Timken-Detroit Axle Co.*, 329 U. S. 129; *Marshall* v. *Pletz*, 317 U. S. 383; *Erie R. Co.* v. *Tompkins*, 304 U. S. 64. One of the policy considerations which has always led the Court to forsake the general rules of waiver is the admonition that "we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." *Spector Motor Service, Inc.*, v. *McLaughlin*, 323 U. S. 101, 105. Thus, in *Neese* v. *Southern R. Co.*, *supra*, the Court refused to pass upon the constitutional question which had been tendered by the petition for certiorari, and instead rested its decision upon the adjudication of an evidentiary question which had not been raised in the petition for certiorari. In so doing, the Court said: "We need not consider respondent's contention that only the jurisdictional question was presented by the petition for certiorari, for in reversing on the above ground we follow the traditional practice of this Court of refusing to decide constitutional questions when the record discloses other grounds of decision, *whether or not they have been properly raised before us by the parties.*" *Id.*, at 78. (Emphasis added.) And in *Alma Motor Co.* v. *Timken-Detroit Axle Co.*, *supra*, the Court avoided a difficult constitutional adjudication by resting its decision on a non-constitutional ground which, as the Court noted, "was neither considered nor decided by the court below, nor argued here." *Id.*, at 132. Only last Term in *Mackey* v. *Mendoza-Martinez, supra,* the Court, in an effort to avoid an unnecessary constitutional decision, remanded the case to the District Court for consideration by that court of a non-constitutional issue which had not been raised by either party in any court, but which this Court, *sua sponte,* had discovered lurking in the record. This action was taken even though the case had had a lengthy history and had been before this Court on a previous occasion. See also *Boynton* v. *Virginia, supra.* Thus, if

the Court, in order to avoid the adjudication of constitutional questions, has in the past rested its decisions on issues not raised by a petition for certiorari, there certainly should be no objection to avoiding a difficult constitutional decision in this case by resolving a non-constitutional issue which was decided by the Court of Appeals, explicitly raised in the instant petition for certiorari, and thoroughly briefed by counsel for both sides.[4]

Since the petitioner should not be deemed to have waived the Gitlow question if a resolution of that question will make it unnecessary for the Court to reach the constitutional issues presented by this case, the next question which must be considered is whether a determination of the Gitlow question, on the merits, would require a reversal of the judgment below. I think it would. As indicated, the Court of Appeals, relying on the *Consolidated Edison* case, based its decision on the ground that the petitioner waived its objection by not having made a timely motion for leave to adduce additional evidence pursuant to § 14 (a) of the Act. However, the lower court's reliance upon *Consolidated Edison* is misplaced. In that case, an examiner for the Labor Board refused to permit one of the parties to a proceeding to offer the testimony of two witnesses who had not been scheduled to

---

[4] In view of the Court's justified concern over the lengthy history of this litigation, it is noteworthy, I think, that many of the cases to which I have referred also involved protracted litigations, which were lengthened even further by the Court's refusal to adjudicate the constitutional issues argued by the parties. However, what was said in the *Alma Motor* case is equally applicable here: "We agree that much time has been wasted by the earlier failure of the parties to indicate, or the Circuit Court of Appeals or this Court to see, the course which should have been followed. This, however, is no reason to continue now on the wrong course. The principle of avoiding constitutional questions is one which was conceived out of considerations of sound judicial administration. It is a traditional policy of our courts." 329 U. S., at 142.

appear. Instead of invoking §§ 10 (e) and (f) of the National Labor Relations Act (which is very similar to § 14 (a) of the Subversive Activities Control Act) and seeking leave of the Court of Appeals to adduce the testimony of the two witnesses, the offering party objected to the examiner's action in a petition to have the Board's final order set aside. The Court of Appeals rejected the claim. This Court recognized that the examiner's action was arbitrary, but, nevertheless, it held that the party's sole remedy in such a situation was to make a motion for leave to adduce the additional testimony of the proffered witnesses, and that by having failed to pursue that remedy, the party waived its objection.

The wisdom of the Court's holding in *Consolidated Edison,* insofar as the waiver question is concerned, is certainly subject to criticism. Not only did the decision permit a clearly arbitrary ruling of an examiner to stand uncorrected, but it also established a cumbersome procedure whereby resort to the Court of Appeals was required every time the Board excluded evidence which the offering party thought should have been admitted. It is not surprising, therefore, that the Courts of Appeals have consistently sought ways to avoid the impact of this Court's decision in *Consolidated Edison.* Thus, one Court of Appeals adopted the fiction of treating the petition for review as including, *sub silentio,* an application by the party for leave to adduce additional evidence. *Mississippi Valley Structural Steel Co.* v. *Labor Board,* 145 F. 2d 664, 667. On another occasion, the same court limited the *Consolidated Edison* holding "to evidence going to the merits of the charge and not to the question of the regularity or fairness of the hearing as conducted by the Board." *Cupples Company Manufacturers* v. *Labor Board,* 103 F. 2d 953, 956. In fact, even the Court of Appeals whose judgment we are now reviewing applied the *Consolidated*

*Edison* rule with great reluctance.[5]   However, it is not necessary to re-evaluate the holding of *Consolidated Edison,* for, in my opinion, that holding is not applicable to the type of situation presented by this case.   The statute construed in *Consolidated Edison,* like § 14 (a) of this Act, deals only with a situation wherein a party to a proceeding wishes to introduce additional evidence which he has acquired independently and which will bolster his own case.   The statute, by its terms, clearly does not apply to a situation in which a party requests the production of documents for the sole purpose of impeaching his opponent's witnesses.   The party making such a request is not attempting "to adduce additional evidence"; he is merely seeking to use documents in the possession of his adversary to impeach testimony which has already been adduced by his adversary.   It is thus interesting to note that of all the cases which I have found involving an application of the *Consolidated Edison* principle, not one has dealt with the production of documents for purposes of impeachment.[6]   In fact, the most recent decision which involved such a situation properly ignored *Consolidated Edison* and held, on a petition to enforce the Labor

---

[5] After discussing the different ways in which other courts have attempted to avoid applying the *Consolidated Edison* rule, the Court of Appeals said: "There is much force to these various suggestions, and perhaps we misconstrue the opinion of the Supreme Court.   But we are bound by the opinion as we read it."   102 U. S. App. D. C., at 404, 254 F. 2d, at 323.

[6] See *Labor Board* v. *Crompton-Highland Mills, Inc.,* 337 U. S. 217, 221; *Pittsburgh Plate Glass Co.* v. *Labor Board,* 313 U. S. 146, 155; *Coca-Cola Bottling Co. of St. Louis* v. *Labor Board,* 195 F. 2d 955, 956; *Labor Board* v. *Fairchild Engine & Airplane Corp.,* 145 F. 2d 214, 215; *Labor Board* v. *National Laundry Co.,* 78 U. S. App. D. C. 184, 185, 138 F. 2d 589, 590; *California Lumbermen's Council* v. *Federal Trade Comm'n,* 115 F. 2d 178, 183; *Swift & Co.* v. *Labor Board,* 106 F. 2d 87, 91; *Wilson & Co.* v. *Labor Board,* 103 F. 2d 243, 245.

Board's order, that the Board's failure to require the production of a possibly impeaching document required a remand to the Board. This action was taken even though the complaining party had not made a motion in the Court of Appeals for leave to adduce additional evidence. *Labor Board* v. *Adhesive Products Corp.,* 258 F. 2d 403.[7]

Since the Court of Appeals erred in resting its decision on *Consolidated Edison,* it next becomes necessary to consider the Government's contention that, even if the Board should have ordered the production of the memoranda, its failure to do so was merely harmless error. In my judgment, the error committed by the Board was anything but harmless. There can be little doubt that the Board should have ordered the production of the Gitlow memoranda. *Jencks* v. *United States,* 353 U. S. 657, 18 U. S. C. § 3500. It is certainly possible that the petitioner, armed with these memoranda, may have been able to impeach significantly the testimony of Gitlow, who, as has already been indicated, was a key witness for the Government, and whose expulsion from the Party in 1929 undoubtedly made him hostile toward the petitioner. It would be contrary to our traditional scrupulous protection of the right to have potentially impeaching docu-

---

[7] Even the court below has not followed its conception of the *Consolidated Edison* rule consistently. Thus, on April 11, 1958, after the case had been remanded to the Board, the court ordered the Government to produce prior statements made by witness Budenz, even though the petitioner had not made a motion pursuant to § 14 (a) for leave to adduce additional evidence when the Board initially denied a motion for production of the Budenz statements. It is difficult to understand why the court did not follow the same procedure with regard to the Gitlow memoranda, especially in view of the fact that petitioner did make a motion for production, pursuant to § 14 (a), the second time that the case was remanded to the Board. Since the case was being remanded in any event, the court's refusal to 'grant the § 14 (a) motion seems unreasonable.

ments produced for the Court to say that the Board's failure to order the production of this important witness' prior memoranda was merely harmless error. See *Jencks* v. *United States, supra; Campbell* v. *United States,* 365 U. S. 85. Accordingly, since the Court of Appeals committed reversible error in refusing to remand the case for the production of the Gitlow memoranda, I think the Court should abandon its reliance upon an unorthodox procedural technicality, remand the case to the Board for the production of the memoranda and the further cross-examination of Gitlow, and thereby, consistently with its own admonition, avoid the premature adjudication of complex and difficult constitutional issues.

## II.

Another of the Government's major witnesses at the hearing before the Board was Louis Budenz. As the Court's opinion indicates, Budenz' testimony filled some 700 pages in the record and was used by the Board to support many of its findings, including the crucial finding that petitioner received financial aid from the Soviet Union after petitioner's disaffiliation from the Communist International. During his direct examination, Budenz made repeated references to the so-called Starobin letter and to the Childs-Weiner conversation. Budenz admitted that he had given reports to the FBI concerning these matters, but, on the Government's objection, the Board erroneously denied the petitioner's motion for the production of all such prior statements. After this Court remanded the case in 1956, the petitioner renewed its motion. On the Government's objection, the motion was again denied by the Board. The Court of Appeals affirmed the Board's action on the ground that the FBI seemingly did not have in its possession any statements made by Budenz concerning the Starobin and Weiner

matters.[8]  However, in response to a petition for rehearing filed by the petitioner in the Court of Appeals, the Government disclosed for the first time that the FBI did have in its possession disc recordings of a five-day interview with Budenz in 1945, and that these discs contained statements pertinent to the Starobin letter and the Childs-Weiner conversation.  Accordingly, the Court of Appeals

---

[8] The court's conclusion resulted from the Government's representation that Budenz had made no statements to the FBI concerning the Starobin and Weiner matters.  However, in view of the following extract from the record, it would seem that the court should have pressed the inquiry further:

Q. "Prior to your appearance before the Un-American Activities Committee, did you tell the FBI about the Starobin letter?

"A. That, I wouldn't recall.

"Q. You don't recall that.  You spent 100 hours with the FBI, or more, you said, before you went there?

"A. Yes, but the FBI asked me a very great number of questions, and I answered their questions.

"Q. But the Manuilsky business and the Starobin letter—

"A. I may have told them, counselor.  I say I do not recall.  The thing is that—

"Q. May I complete my question, please?

"A. Yes.

"Q. The Starobin letter and the Manuilsky incident were supposed to be quite important in this setup that you got up against the Communist Party, was it not?  You now say you don't recall whether you gave it to the FBI?

"A. I don't recall the time.  The FBI asked me a great number of questions. *Undoubtedly if it were in my book, I must have given it to the FBI.*  The point of the matter is that the FBI particularly at that period, and as a matter of fact this has been the general practice, asked me questions.  I do not rush out and volunteer a lot of information, as a rule.

"Q. But didn't you regard it as an important incident?

"A. Oh, sure it was important.

"Q. *As a matter of fact, you described it in your book, 'This is My Story,' as—and I quote your language—'the most sensational by-product of the San Francisco conference.'  Did you not so describe it?*

"A. *That, I think, was correct.*"  (Emphasis added.)

ordered the Government to produce all statements made by Budenz relating to the matters in question. During the Board proceedings that followed, statements made by Budenz relating to the Starobin letter and the Weiner conversation were excerpted from the recorded interview and the FBI memoranda of later interviews, and these extracts were furnished to the petitioner. Based on the apparent inconsistency between the statements produced and the testimony given by Budenz before the Board, the petitioner moved that Budenz be recalled for cross-examination in the light of the produced documents. As it turned out, however, Budenz was severely ill, and, as stipulated by both parties, was unavailable for further examination. The petitioner then moved to have all of Budenz' testimony stricken on the basis of the inconsistencies referred to, and on the further ground that Budenz' unavailability for cross-examination made it impossible for the petitioner to demonstrate exactly how unreliable all of Budenz' testimony had been. The Board agreed to strike Budenz' testimony on the Starobin and Weiner matters, but it refused to strike any other portion of his testimony. On appeal, the Court of Appeals affirmed the Board's rulings.

This Court now affirms the lower court's holding, saying that great weight must be given to those whose primary responsibility it is to consider the credibility of witnesses. However, the problem is not as simple as the Court would have us believe. A distinction must be drawn between those situations in which the unavailability of a witness is due to the fault of neither party, and those situations in which the witness' unavailability is directly attributable to the conduct of one of the parties. The rule to be applied in each of these cases has been succinctly stated by Professor Wigmore:

"Where the witness' *death* or *lasting illness* would not have intervened to prevent cross-examination

but for the *voluntary act* of the witness himself or the party offering him—as, by a postponement or other interruption brought about immediately after the direct examination, it seems clear that the direct testimony must be struck out. Upon the same principle, the same result should follow where the illness is but temporary and the offering party might have recalled the witness for cross-examination before the end of the trial.

"But, where the death or illness prevents cross-examination under such circumstances that *no responsibility* of any sort can be attributed to either the witness or his party, it seems harsh measure to strike out all that has been obtained on the direct examination. Principle requires in strictness nothing less. But the true solution would be to avoid any inflexible rule, and to leave it to the trial judge to admit the direct examination so far as the loss of cross-examination can be shown to him to be not in that instance a material loss." Wigmore, Evidence (3d ed.), § 1390.

Thus, as Professor Wigmore indicates, if neither the petitioner nor the respondent had been responsible for Budenz' unavailability, then the Court would be correct in saying that the Board must be given wide latitude in deciding whether to strike Budenz' testimony, and that the Board will be reversed only if it has abused its discretion. However, if Budenz' unavailability was caused by the Government's conduct, then, as Professor Wigmore states, "it seems clear that the direct testimony must be struck out."

The record of this case convincingly demonstrates that the Government was directly responsible for creating the situation in which the petitioner found itself in 1958, when it finally obtained Budenz' prior statements but could make no use of them. Not only did the Govern-

ment, by its objections to the petitioner's original motions for production, prompt the Board to refuse production, but it also prevented the Court of Appeals from rectifying the Board's error by representing to the Court that Budenz had made no statements to the FBI concerning the Starobin and Weiner matters. Then, not until it was too late for Budenz to be called for further cross-examination, was the Court of Appeals apprised of the existence of Budenz' prior statements. I do not mean to imply that the Government deliberately withheld this vital information beyond the time that it could have aided the petitioner. But there can be no doubt that the Government's delay in disclosing the existence of Budenz' prior statements made it impossible for the petitioner to make effective use of those statements. Since the Government's voluntary acts caused the curtailment of Budenz' cross-examination, I think the Court of Appeals should have granted the relief which is normal in this type of situation by ordering the Board to strike all of Budenz' testimony.

Nor can the lower court's error be dismissed as harmless. Reference has already been made to the importance of Budenz' testimony to the Government's case. Moreover, as the Court's opinion demonstrates, and as the Court of Appeals admitted, there were marked discrepancies between Budenz' prior statements and his testimony before the Board. Had the petitioner been given Budenz' prior statements, it might have pursued a course of cross-examination which would have thoroughly discredited Budenz and destroyed the Board's apparent faith in his reliability.[9] However, the petitioner was never able to

---

[9] In this connection, it should be noted that in three additional places in its Report the Board found it necessary to explain seeming inconsistencies in Budenz' testimony. If the petitioner could have discredited Budenz' testimony on the basis of his prior statements, it is possible that the Board would have resolved these other discrepancies against Budenz and the Government.

conduct such an examination, and the record is therefore clouded by the not unlikely possibility that much of Budenz' testimony was unreliable. This being the case, regard for the elemental rules of fair procedure requires that Budenz' testimony be stricken from the record. Cf. *Communist Party of the United States* v. *Subversive Activities Control Board,* 351 U. S. 115; *Mesarosh* v. *United States,* 352 U. S. 1.

### III.

I think the Court of Appeals also erred in its interpretation and application of § 3 (3), one of the most crucial provisions of the Act. That section defines a "Communist-action organization" as one (1) which is directed or dominated "by the foreign government or foreign organization controlling the world Communist movement," and (2) which "operates primarily to advance the objectives of such world Communist movement as referred to in section 2 of this title." 64 Stat. 989. Unfortunately, the statute does not, in terms, define the objectives of the world Communist movement which the alleged Communist-action organization must be found to advance. However, to set the framework for its argument, the petitioner suggested that the objectives of the world Communist movement, as contemplated by the Act, should be defined as: (1) the overthrow of all existing capitalist governments by any means necessary, including force and violence, and (2) the establishment of a Communist totalitarian dictatorship, which (3) will be subservient to the Soviet Union. The Court of Appeals tentatively accepted the petitioner's definition of the objectives, and concluded that the Board's findings demonstrate that the Party operates to advance all of the suggested objectives. With regard to the first of the three objectives, the court relied upon the Board's finding that the Party "advocates the overthrow of the Government

of the United States by force and violence *if necessary.*"
(Emphasis added.)

The petitioner contends that, in the light of our decisions in *Dennis* v. *United States,* 341 U. S. 494; and *Yates* v. *United States,* 354 U. S. 298, the objectives component of § 3 (3) should be construed in such a way that an organization could not be deemed to be advancing the first of the three cited objectives unless it engages in advocacy directed at prompting forceful overthrow of the Government, as distinguished from advocacy as an abstract doctrine; that the Board did not find that the Party engaged in illegal advocacy, but instead found that the petitioner merely engaged in the advocacy of force "if necessary," which is tantamount to the advocacy of forceful overthrow as an abstract doctrine; and that the absence of a finding of unlawful advocacy on the part of the petitioner renders the Board's order unsupportable.

In my judgment, the petitioner's argument is eminently correct. In *Yates* v. *United States, supra,* the Court made it clear that a distinction had to be drawn "between advocacy of abstract doctrine and advocacy directed at promoting unlawful action." *Id.,* at 318. It then went on to hold that, while the latter type of advocacy could be prohibited consistently with the dictates of the First Amendment, an attempt to prohibit the former type of advocacy would raise grave constitutional problems. The Court therefore concluded that Congress, well aware of this distinction and of the constitutional problems involved, intended the Smith Act to apply only to advocacy which was aimed at inciting to action. See also *Dennis* v. *United States, supra.* There is no reason to assume that when Congress adopted the Subversive Activities Control Act it was any less aware of the constitutional pitfalls involved in attempting to proscribe advocacy as an abstract doctrine than it was when it passed the Smith Act, for, as the Court said in *Yates,* in construing a con-

gressional enactment, "we should not assume that Congress chose to disregard a constitutional danger zone so clearly marked." *Id.*, at 319. Therefore, since the construction urged by the petitioner will make the statute more compatible with this Court's prior decisions defining the area of prohibition permissible under the First Amendment, it should be adopted, and the Court should hold that the Board cannot require a group to register as a Communist-action organization unless it first finds that the organization is engaged in advocacy aimed at inciting action.[10] Clearly, the Board made no such finding in this case. The Board merely found that the petitioner has engaged in advocating the use of force "if necessary." However, this is not the sort of advocacy which incites to action. At most, it is no more than the formulation of an abstract doctrine, which, as the Court indicated in *Yates,* "is too remote from concrete action to be regarded as the kind of indoctrination preparatory to action which was condemned in *Dennis.*" *Id.*, at 321–322.

The Court brushes aside the petitioner's argument by saying that, because this statute is "regulatory" and not "prohibitory," the *Yates* and *Dennis* cases are inapplicable. However, it blinks reality to say that this statute is not prohibitory. There can be little doubt that the registration provisions of the statute and the harsh sanctions which are automatically imposed after an order to register has been issued make this Act as prohibitory as any criminal statute. Therefore, for the reasons which I have stated, I think the Board's order ought to be vacated and the case remanded so that the Board can

---

[10] The expansive lengths to which the Court has on occasion gone in construing a statute in a manner designed to avoid constitutional challenges is demonstrated by the decision in *Scales* v. *United States,* decided this day, *post,* p. 203. Certainly, the interpretation of this Act suggested by the petitioner would require far less legislative redrafting than the Court undertook to accomplish in *Scales.*

determine whether the evidence supports a finding that the petitioner is engaging in advocacy aimed at inciting the forceful overthrow of the Government.

## IV.

Finally, I think the Court of Appeals erred in sustaining an order of the Board which was based, in part, on a finding which the court admitted lacked evidentiary support. Section 13 (e) of the Act lists eight criteria which the Board should consider in determining whether a group is a Communist-action organization. The seventh of these criteria is the extent to which "for the purpose of concealing foreign direction, domination, or control, or of expediting or promoting its objectives," 64 Stat. 999, an organization engages in certain secret practices or otherwise operates on a secret basis. In its original Report, the Board concluded that the Party engaged in secret practices in order to achieve both of the purposes recited in the Act. The Court of Appeals, in its first opinion, held that the finding of secret practices was proper, but that the Government's evidence failed to demonstrate the purposes for which these practices were pursued. While recognizing this deficiency in the Government's evidence, the Court nevertheless affirmed the Board's order. The two Modified Reports, issued by the Board after the first and second remands, eliminated the original finding that one of the purposes of the secret practices was the concealment of foreign control. However, though no additional evidence was taken regarding secret practices, and even though the Court of Appeals had already expressed its view that the Board's purpose findings were unsupported by the evidence, the two Modified Reports reiterated the finding that the secret practices were engaged in to promote the objectives of the Communist Party. In its third opinion, the Court of Appeals adhered to its ruling that the Board's finding was unsupported by the evidence,

134

but it nevertheless affirmed the order, holding that the finding was merely a subsidiary one and that the whole record supported the Board's conclusion that the petitioner met the definition of a Communist-action organization contained in § 3 (3).

The Court now adopts the lower court's reasoning, and holds that since the unsupported finding was merely "subsidiary," it is not necessary to remand the case to ascertain whether the Board would reach the same ultimate conclusion in the absence of the unsupported finding. I submit that the Court's action does not square either with the facts, as they appear in the record, or with the prior decisions of this Court. It is unrealistic to characterize the Board's secrecy finding as insignificant and subsidiary. It directly relates to one of the eight enumerated criteria listed in § 13 (e). The Board devoted 19 pages to it in the Modified Report. It is also the only one of the § 13 (e) standards concerning which there was any substantial amount of evidence of post-Act conduct on the part of the Party.[11] In view of these circumstances, and in view of the fact that the Board found it necessary to reassert the finding, even though it knew that the Court of Appeals considered the finding unsupported by the evidence, how can it be said that the

---

[11] At this point, it should be observed that the vast bulk of the evidence introduced by the Government at the hearing before the Board related to the Party's activities prior to its disaffiliation from the Communist International in 1940. In order to link this stale evidence to the Party's current activities, with which the Act is concerned, the Board indulged in a presumption of continuity, whereby it reasoned that since the Party was under Soviet control prior to 1940, and since the Party still adheres to the principles of Soviet Communism, it must be presumed that the Party is still controlled by the Soviet Union. The validity of such a presumption is certainly dubious. However, if the Board is to be permitted to rely upon this presumption, the least to which the Party is entitled is that the record be free from serious procedural errors and that the findings upon which the Board rests its order be supported by some evidence.

finding is unimportant?   Surely, if the finding is as unimportant to the Board's conclusion as the Court of Appeals and this Court seem to think it is, the Board would have abandoned the finding altogether rather than retain it and risk another remand either by the Court of Appeals or by this Court.   These factors would not seem to indicate that the finding was trivial, but, on the contrary, that it was crucial to the Board's ultimate conclusion.   This being the case, it will not do for the Court of Appeals or for this Court. to conclude that the Board would have reached the same conclusion without relying upon the unsupported finding.   Congress has placed the responsibility for making that determination in the Board and not in the courts.   As this Court said in *Securities & Exchange Comm'n* v. *Chenery Corp.*, 318 U. S. 80, 88, "If an order is valid only as a determination of policy or judgment which the agency alone is authorized to make and which it has not made, a judicial judgment cannot be made to do service for an administrative judgment."   An agency's "action must be measured by what . . . [it] did, not by what it might have done."   *Id.*, at 93–94.   See also *Labor Board* v. *Virginia Elec. & Power Co.*, 314 U. S. 469.   Therefore, because the Board's order is clouded by the fact that it rests upon a finding which is admittedly unsupported by the evidence, I think the Court should strike the secrecy finding and remand the case to the Board for reconsideration.

## V.

In my view, the Court today strays from the well-trod path of our prior decisions by reaching out to decide constitutional issues prematurely.   If the Court would remand on any one of the four errors which I have discussed, and I think each warrants a remand, the resolution of the difficult constitutional issues presented by this case would certainly be postponed, and perhaps

made totally unnecessary. For, if further cross-examination of Gitlow based on the memoranda discredited his testimony, or if all of Budenz' testimony were stricken, or if the Board were required to find that the petitioner actually engaged in advocacy aimed at inciting action, or if the secrecy finding were stricken, the Government's case might be so weakened that it would be impossible for the Board to conclude, on the basis of the present record, that the petitioner is a Communist-action organization, as that term is used in the statute. Moreover, a remand on the basis of these non-constitutional errors is the only disposition that would be consistent with the "fastidious regard for the honor of the administration of justice" which the Court found so compelling in 1956.[12]   351 U. S., at 124.

I think it is unwise for the Court to brush aside the non-constitutional errors disclosed by this record. However, since the Court insists upon doing so, I feel constrained

[12] I cannot agree with the theory of MR. JUSTICE DOUGLAS that the non-constitutional errors herein discussed are less important than the mere possibility of perjury which clouded the record in 1956 and which prompted the Court to remand the case to the Board at that time. For all we know, a cross-examination of Gitlow based on his prior memoranda, or a full cross-examination of Budenz based on his prior statements to the FBI and his testimony inconsistent therewith, might have disclosed further possibilities of perjury. Nor can I agree with the suggestion that since Congress, in the Communist Control Act of 1954, branded the Communist Party as "an instrumentality of a conspiracy to overthrow the Government of the United States," 68 Stat. 775, the Board's hearings and findings are merely superfluous, and the non-constitutional errors committed by the Board and the Court of Appeals are therefore unimportant. In the first place, this theory did not dissuade the Court from remanding to the Board in 1956 because of defects in the record. Moreover, there is nothing in the language or legislative history of the Communist Control Act of 1954 to indicate that Congress intended to repeal those provisions of the Subversive Activities Control Act which carefully delineate the Board's functions and describe the procedural mechanism by which the Board is to apply the Act.

to express my views on a dispositive constitutional issue which now confronts us by virtue of the Court's holding on the non-constitutional questions. I agree with MR. JUSTICE BRENNAN that, once having entered the area of constitutional adjudication, the Court must decide now whether the Act violates the Fifth Amendment privilege against self-incrimination by requiring the petitioner's officers to submit a registration statement on behalf of the petitioner. For the reasons set forth in his opinion, which I join, I believe that the Act does constitute a violation of the Fifth Amendment.

MR. JUSTICE BLACK, dissenting.

I do not believe that it can be too often repeated that the freedoms of speech, press, petition and assembly guaranteed by the First Amendment must be accorded to the ideas we hate or sooner or later they will be denied to the ideas we cherish. The first banning of an association because it advocates hated ideas—whether that association be called a political party or not—marks a fateful moment in the history of a free country. That moment seems to have arrived for this country.

The Subversive Activities Control Act of 1950[1] here involved defines "Communist action" organizations and requires them to register with the Attorney General giving much information of every kind with regard to their property, income, activities and members. The Communist Party has been ordered to register under that Act by the Subversive Activities Control Board and has challenged the validity of that order on the ground, among others, that the Act is unconstitutional in that it amounts to a complete outlawry of the Communist Party. The contention is that this Act, considered as a whole and in its relation to existing laws which affect members of the Party, imposes such overhanging threats of disgrace,

---

[1] 64 Stat. 987, as amended, 50 U. S. C. §§ 781–798.

humiliation, fines, forfeitures and lengthy imprisonments upon registered organizations and their members, most of which burdens become effective automatically upon registration, that it will be impossible for the Party to continue to function if the registration order is upheld.

The Court's opinion is devoted chiefly to the task of explaining why it will not decide any of the substantial issues raised by this attack upon the constitutionality of the Act as it is actually written and will actually operate and why it must decide the case just as though none of these other burdens existed and we were dealing with an Act that required nothing more than the registration of an organization. I cannot agree to decide the case on any such hypothetical basis. If registration were the only issue in the case, I would agree at once that Congress has power to require every "person" acting as an agent of a foreign principal to file registration statements comprehensively showing his agency activities as is required, for example, by the Foreign Agents Registration Act.[2] That Act requires the registration of any "person"—including an individual, partnership, association, corporation, organization, or other combination of individuals—"who acts or agrees to act, within the United States, as . . . a public-relations counsel, publicity agent, information-service employee, servant, agent, representative, or attorney for a foreign principal . . . ."[3] Referring to that Act, I said in *Viereck* v. *United States:*

> "Resting on the fundamental constitutional principle that our people, adequately informed, may be trusted to distinguish between the true and the false, the bill is intended to label information of foreign origin so that hearers and readers may not be deceived by the belief that the information comes

---

[2] 52 Stat. 631, as amended, 22 U. S. C. §§ 611–621.

[3] 22 U. S. C. § 611.

from a disinterested source. Such legislation implements rather than detracts from the prized freedoms guaranteed by the First Amendment." [4]

The Act before us now, however, unlike the Foreign Agents Registration Act involved in the *Viereck* case, is not based on the principle that "our people, adequately informed, may be trusted to distinguish between the true and the false." Instead, the present Act, like many other pieces of current legislation, is based on the precisely contrary principle that "our people [even when] adequately informed may [not] be trusted to distinguish between the true and the false." In this regard, the principle upon which Congress acted in passing the Subversive Activities Control Act is identical to that upon which it acted in making membership in the Communist Party a crime in the Smith Act,[5] a provision under which the Court has today sustained the conviction and imprisonment for six years of a person for being a mere member of the Communist Party with knowledge of its purposes.[6] Statutes based upon such a principle, which really amounts to nothing more than the idea that the Government must act as a paternal guardian to protect American voters from hearing public policies discussed, do not implement "the prized freedoms guaranteed by the First Amendment"—they are designed to and do directly detract from those freedoms.

The difference between the Subversive Activities Control Act and the Foreign Agents Registration Act is strikingly illustrated by the reasons Congress has itself given for the enactment of the statute now before us. When Viereck registered under the earlier and genuine registration statute, he was not thereby branded as being engaged

---

[4] 318 U. S. 236, 251 (dissenting opinion).

[5] 18 U. S. C. § 2385.

[6] *Scales* v. *United States, post,* p. 203.

in an evil, despicable undertaking bent on destroying this Nation. But that is precisely the effect of the present Act. Registration as a "Communist-action organization" under the Subversive Activities Control Act means, according to the express provisions of the Act, that the Party and its members who register are under the control of a foreign dictatorship,[7] that they have devised "clever and ruthless espionage and sabotage tactics," [8] and that they are a part of a "world-wide revolutionary movement whose purpose it is, by treachery, deceit, infiltration . . . terrorism, and any other means deemed necessary, to establish a Communist totalitarian dictatorship in the countries throughout the world." [9]  A registrant organization is declared, by a finding of Congress, to be "an organization numbering thousands of adherents, rigidly and ruthlessly disciplined," merely awaiting a chance to overthrow this Government by force.[10]  And the members of such an

---

[7] 50 U. S. C. § 781 (4). "The direction and control of the world Communist movement is vested in and exercised by the Communist dictatorship of a foreign country."

[8] 50 U. S. C. § 781 (11). "The agents of communism have devised clever and ruthless espionage and sabotage tactics which are carried out in many instances in form or manner successfully evasive of existing law."

[9] 50 U. S. C. § 781 (1). "There exists a world Communist movement which, in its origins, its development, and its present practice, is a world-wide revolutionary movement whose purpose it is, by treachery, deceit, infiltration into other groups (governmental and otherwise), espionage, sabotage, terrorism, and any other means deemed necessary, to establish a Communist totalitarian dictatorship in the countries throughout the world through the medium of a world-wide Communist organization."

[10] 50 U. S. C. § 781 (15). "The Communist movement in the United States is an organization numbering thousands of adherents, rigidly and ruthlessly disciplined. Awaiting and seeking to advance a moment when the United States may be so far extended by foreign engagements, so far divided in counsel, or so far in industrial or financial straits, that overthrow of the Government of the United

organization are declared by the Act to have "repudiate[d] their allegiance to the United States, and in effect transfer[red] their allegiance to the foreign country in which is vested the direction and control of the world Communist movement." [11]

This difference standing alone would be sufficient to establish the essential dissimilarity of the Subversive Activities Control Act from genuine registration statutes such as the Foreign Agents Registration Act. For the need of Government to provide means by which the people can obtain useful information—the basis of every genuine registration statute—can certainly be accomplished without resort to official legislative pronouncements as to the treasonable nature of those compelled to register. But this difference does not stand alone in the case of the Subversive Activities Control Act—indeed, there are so many other differences of so much greater magnitude that the recitals of the Act branding those who register under it pale almost into insignificance.

The plan of the Act is to make it impossible for an organization to continue to function once a registration order is issued against it. To this end, the Act first provides crushing penalties to insure complete compliance with the disclosure requirements of registration. Thus, if the Party or its members fail to register within the time required by the Act, or if they fail to make annual reports as required, or to keep records as required, each individual guilty of such failure can be punished

States by force and violence may seem possible of achievement, it seeks converts far and wide by an extensive system of schooling and indoctrination. . . ."

[11] 50 U. S. C. § 781 (9). "In the United States those individuals who knowingly and willfully participate in the world Communist movement, when they so participate, in effect repudiate their allegiance to the United States, and in effect transfer their allegiance to the foreign country in which is vested the direction and control of the world Communist movement."

by a fine of $10,000, by imprisonment for five years, or both, for each offense [12]—and each offense means "each day of failure to register" [13] or "each listing of the name or address of any one individual" [14] either by the organization or by an individual. Thus, for a delay of thirty days in filing required reports, a fine of $300,000 and imprisonment for 150 years could be imposed by a trial judge.

Having thus made it mandatory that Communist organizations and individual Communists make a full disclosure of their identities and activities, the Act then proceeds to heap burden after burden upon those so exposed. Certain tax deductions allowed to others are denied to a registered organization.[15] Mail matter must be stamped before the organization sends it out to show that it was disseminated by a "Communist action" organization,[16] with all the treasonable connotations given that term by the recitals of "fact" in the Act. Members of a registered organization cannot hold certain jobs with the Government, or any jobs with private businesses engaged in doing certain work for the Government.[17] Members cannot use or attempt to use a passport and cannot even make application for a passport without being subject to a penalty of five years in the penitentiary.[18] The Act thus makes it extremely difficult for a member of the Communist Party to live in this country and, at the same time, makes it a crime for him to try to get a passport to get out.

In addition to these burdens imposed directly by the Act itself, the registration requirement must also be considered in the context of the other laws now existing

[12] 50 U. S. C. § 794 (a) (2).
[13] 50 U. S. C. § 794 (a).
[14] 50 U. S. C. § 794 (b) (2).
[15] 50 U. S. C. § 790.
[16] 50 U. S. C. § 789 (1).
[17] 50 U. S. C. § 784.
[18] 50 U. S. C. § 785.

which affect the Communist Party. The Act requires that the information obtained upon registration be given wide publicity [19] thus insuring that those identified as members of the Party will be subjected to all the civil disabilities,[20] criminal prosecutions [21] and public harrassments [22] that have become common in recent years. I agree with MR. JUSTICE DOUGLAS that this aspect of the Act is alone sufficient to establish its invalidity under the self-incrimination provision of the Fifth Amendment. But I think the interrelationship between the present Act and these other laws goes deeper than that, for I think that interrelationship establishes all but conclusively that the present Act cannot be upheld as a mere registration statute. The information elicited by the Act must be considered, not, as in the *Viereck* case, an aid to the exercise of individual judgment by the people, but rather a part of a pattern of suppression by the Government, for that is certainly the inevitable effect of any system that requires registration on the one hand and imposes pains and penalties upon those registering on the other.

[19] 50 U. S. C. § 788.

[20] There seems to be little doubt that a registered member of the Communist Party would find it almost impossible to get or retain employment in this country. See, *e. g., American Communications Assn.* v. *Douds,* 339 U. S. 382; *Barsky* v. *Board of Regents,* 347 U. S. 442; *Lerner* v. *Casey,* 357 U. S. 468; *Beilan* v. *Board of Education,* 357 U. S. 399; *Nelson* v. *County of Los Angeles,* 362 U. S. 1; *Konigsberg* v. *State Bar of California,* 366 U. S. 36; *In re Anastaplo,* 366 U. S. 82. Cf. *Shelton* v. *Tucker,* 364 U. S. 479.

[21] See, *e. g., Dennis* v. *United States,* 341 U. S. 494; *Yates* v. *United States,* 354 U. S. 298; *Scales* v. *United States, post,* p. 203; *Noto* v. *United States, post,* p. 290.

[22] See, *e. g., Watkins* v. *United States,* 354 U. S. 178; *Sweezy* v. *New Hampshire,* 354 U. S. 234; *Barenblatt* v. *United States,* 360 U. S. 109; *Uphaus* v. *Wyman,* 360 U. S. 72; *Uphaus* v. *Wyman,* 364 U. S. 388; *Wilkinson* v. *United States,* 365 U. S. 399; *Braden* v. *United States,* 365 U. S. 431.

144

All of these enormous burdens, which are necessarily imposed upon the Party and its members by the act of registration, are dismissed by the Court on the basis of an alleged conflict with the Court-created rule that constitutional questions should be avoided whenever possible. Thus, the Court engages in extended discussions as to whether the people involved will ever want to do the things the Act says they cannot do and whether they will ever object to doing the things the Act says they must do, suggesting, among other things, that the members of the Communist Party may never object to providing the evidence needed to send them to prison for violating the Smith Act; that they may never protest because they are forced to give up the tax deductions that other people receive; that they may be willing to stamp all the Party's mail as coming from an evil organization; that they may never want to hold the jobs from which the Act disqualifies them; and that they may never want to get a passport to get out of the country. On the basis of all these "uncertainties" the Court seems to consider its hands tied because, it says, these are as yet only potential impairments of constitutional rights. In its view, there is no "justiciable" issue at all between the United States and the Communist Party except the bare requirement of registration.

In the context of this case, I can find no justification for the Court's refusal to pass upon the serious constitutional questions raised. The Court of Appeals met its responsibility by deciding the questions. The Government has not asked that the Court refrain from giving a full decision on these important matters. Assuming that the Act is wholly valid aside from registration and that Congress does have power to outlaw groups advocating dangerous ideas, it seems to me unfair to Congress for this Court to refuse to decide whether its Act can be fully enforced. And assuming that the Act is not wholly valid

because of some limitation upon that power, it seems to me that we should say so now. By refusing to do so, the Court in effect allows this serious question to be decided by default. For the Party can no more continue to function with all of these tremendous burdens of undetermined constitutional validity overhanging it and its members than it could if the burdens were considered and upheld. The only sense in which the Court has avoided a constitutional issue is by permitting the destruction of a group seeking to raise the issue of the constitutionality of its destruction.[23]

This whole Act, with its pains and penalties, embarks this country, for the first time, on the dangerous adventure of outlawing groups that preach doctrines nearly all Americans detest. When the practice of outlawing parties and various public groups begins, no one can say where it will end. In most countries such a practice once begun ends with a one-party government. There is something of tragic irony in the fact that this Act, expressly designed to protect this Nation from becoming a "totalitarian dictatorship" with "a single political party," has adopted to achieve its laudable purpose the policy of outlawing a party—a policy indispensable to totalitarian dictatorships. I think we should meet and decide this whole question now in the administration of a sound judicial policy that carries out our responsibilities both to Congress and to the American people.

---

[23] In this regard, I think the present case is identical to *Ex parte Young,* 209 U. S. 123. There the Court reached and decided the constitutional question tendered, saying: "It may therefore be said that when the penalties for disobedience are by fines so enormous and imprisonment so severe as to intimidate the company and its officers from resorting to the courts to test the validity of the legislation, the result is the same as if the law in terms prohibited the company from seeking judicial construction of laws which deeply affect its rights." *Id.,* at 147.

In my judgment, the Act here under consideration is unconstitutional on at least three grounds in addition to its direct conflict with the self-incrimination provisions of the Fifth Amendment. It is, in the first instance, a classical bill of attainder which our Constitution in two places prohibits, for it is a legislative Act that inflicts pains, penalties and punishments in a number of ways without a judicial trial.[24] The legislative fact-findings as to Communist activities, which the Court—despite the constitutional command for trial of such facts by a court and jury—accepts as facts, supply practically all of the proof needed to bring the Communist Party within the proscriptions of the Act. The Act points unerringly to the members of that Party as guilty people who must be penalized as the Act provides. At the same time, these legislative fact-findings fall little short of being adequate in themselves to justify a finding of guilt against any person who can be identified, however faintly, by any informer, as ever having been a member of the Communist Party. Most of whatever is lacking in the legislative fact-findings is later supplied by administrative fact-findings of an agency which is not a court, which is not manned by independent judges, and which does not have to observe the constitutional right to trial by jury and other trial safeguards unequivocally commanded by the Bill of Rights. Yet, after this agency has made its findings and its conclusions, neither its findings of fact nor the findings of fact of the legislative body can subsequently be challenged in court by any individual who may later be brought up on a charge that he failed to register as required by the Act and the Board. The Act thus not only is a legislative bill of attainder but also violates due process by short-cutting practically all of the Bill of Rights, leaving no

[24] *Cummings* v. *Missouri,* 4 Wall. 277, 323. And see *United States* v. *Lovett,* 328 U. S. 303.

hope for anyone entangled in this legislative-administrative web except what has proved in this case to be one of the most truncated judicial reviews that the history of this Court can afford.[25]

I think also that this outlawry of the Communist Party and imprisonment of its members violate the First Amendment. The question under that Amendment is whether Congress has power to outlaw an association, group or party either on the ground that it advocates a policy of violent overthrow of the existing Government at some time in the distant future or on the ground that it is ideologically subservient to some foreign country. In my judgment, neither of these factors justifies an invasion of rights protected by the First Amendment. Talk about the desirability of revolution has a long and honorable history, not only in other parts of the world, but also in our own country. This kind of talk, like any other, can be used at the wrong time and for the wrong purpose. But, under our system of Government, the remedy for this danger must be the same remedy that is applied to the danger that comes from any other erroneous talk—education and contrary argument.[26] If that remedy is not sufficient, the only meaning of free speech

---

[25] This provides yet another difference between the Act under consideration here and the Act under which the prosecution involved in the *Viereck* case was brought. Before Viereck could be convicted for having failed to register or report as a foreign agent, he was entitled to have all the facts upon which his guilt depended determined by a jury under an indictment returned by a grand jury and during the course of a judicial proceeding in which he was accorded the protection of all the forms and procedures designed through the years to protect defendants charged with the commission of a criminal offense.

[26] Cf. *Whitney* v. *California*, 274 U. S. 357, 378: "Among free men, the deterrents ordinarily to be applied to prevent crime are education and punishment for violations of the law, not abridgment of the rights of free speech and assembly." (Brandeis, J., concurring.)

148

must be that the revolutionary ideas will be allowed to prevail.[27]

This conclusion is not affected by the fact that those advocating a policy of revolution are in sympathy with a foreign government. If there is one thing certain about the First Amendment it is that this Amendment was designed to guarantee the freest interchange of ideas about all public matters and that, of course, means the interchange of *all* ideas, however such ideas may be viewed in other countries and whatever change in the existing structure of government it may be hoped that these ideas will bring about. Now, when this country is trying to spread the high ideals of democracy all over the world—ideals that are revolutionary in many countries— seems to be a particularly inappropriate time to stifle First Amendment freedoms in this country. The same arguments that are used to justify the outlawry of Communist ideas here could be used to justify an outlawry of the ideas of democracy in other countries.

The freedom to advocate ideas about public matters through associations of the nature of political parties and societies was contemplated and protected by the First Amendment. The existence of such groups is now, and for centuries has been, a necessary part of any effective promulgation of beliefs about governmental policies. And the destruction of such groups is now and always has been one of the first steps totalitarian governments take. Within recent months we have learned of such practices in other countries. Only a few weeks ago an executive edict outlawing all parties, groups and associations all the way down through Rotary Clubs was issued in a country where

---

[27] Cf. *Gitlow* v. *New York*, 268 U. S. 652, 673: "If in the long run the beliefs expressed in proletarian dictatorship are destined to be accepted by the dominant forces of the community, the only meaning of free speech is that they should be given their chance and have their way." (Holmes, J., dissenting.)

the government is largely in the hands of a single man. Indeed, our own ancestors were not unfamiliar with this practice. Men and women belonging to dissenting religious, political or social groups in England before the colonization of this country were sometimes imprisoned, mutilated, degraded by humiliating pillories, exiled and even killed for their views.

A typical example of the type of legislation under which this sort of persecution was carried on is provided by a statute enacted in 1593 to destroy dissenting religious sects and force all the people of England to become regular attendants at the established church.[28] The basic premise upon which its commands rested was not at all unlike that upon which the Act here proceeds:

> "For the better discovering and avoiding of such traiterous and most dangerous Conspiracies and Attempts, as are daily devised and practised against our most gracious Sovereign Lady the Queen's Majesty and the happy Estate of this common Weal, by sundry wicked and seditious Persons, who terming themselves Catholicks, and being indeed Spies and Intelligencers, not only for her Majesty's foreign Enemies, but also for rebellious and traiterous Subjects born within her Highness Realms and Dominions, and hiding their most detestable and devilish Purposes under a false Pretext of Religion and Conscience, do secretly wander and shift from Place to Place within this Realm, to corrupt and seduce her Majesty's Subjects, and to stir them to Sedition and Rebellion . . . ."

These attainted Catholics were not permitted to go "above five Miles" from their homes. For violation of this command they could be sentenced to prison and have

---

[28] 35 Elizabeth, cc. I and II, entitled "An Act to retain the Queen's Majesty's Subjects in their due Obedience" and "An Act for Restraining Popish Recusants to some certain Places of Abode."

150

all their goods, lands and other possessions forfeited "to the Queen's Majesty." One has only to read this statute to see how thoroughgoing government can be in making life miserable for groups whose beliefs have fallen into disfavor.

That statute also has peculiar relevance to the consideration of the Subversive Activities Control Act because it too used disclosure as a lever to secure effective enforcement of its provisions. Thus, one section of the statute provided:

"And be it further enacted and ordained by the Authority aforesaid, That if any Person which shall be *suspected* to be a Jesuit, Seminary or Massing Priest, being examined by any Person having lawful Authority in that Behalf to examine such Person which shall be *so suspected*, shall refuse to answer directly and truly whether he be a Jesuit, or a Seminary or Massing Priest, as is aforesaid, every such Person so refusing to answer shall, for his Disobedience and Contempt in that Behalf, be committed to Prison by such as shall examine him as is aforesaid, and thereupon shall remain and continue in Prison without Bail or Mainprise, until he shall make direct and true Answer to the said Questions whereupon he shall be so examined." (Emphasis supplied.)

One cannot help but wonder whether this Court, were it called upon to consider the constitutionality of a provision of that kind in this country, would pass it off as involving nothing more than potential impairments of religious freedoms and a right to travel which the attainted persons might never want to exercise.

There were many other statutes of this kind passed in England before our Revolutionary War.[29] By no means

---

[29] A brief history of some of these statutes is set out in my dissenting opinion in *American Communications Assn.* v. *Douds*, 339 U. S. 382, 447–448, notes 3 and 4.

all of them were aimed at the Catholics. Indeed, during the times when the Catholics were themselves in power, almost identical repressive measures were adopted in an attempt to curb the rise of Protestantism.[30] And the persecution of Puritans in England, dramatized by some of the most famous writers of the time, is a story that is, I hope, familiar to most Americans.[31] It is a matter of history that not one of these laws achieved its purpose. Many men died, suffered and were driven from their country. And, in a sense, it might be said that our own country profited from these laws because it was largely founded by refugees from English oppression. But England itself gained little if any profit from its policies of repression. The outlawed groups were not destroyed. Many people have thought that these repressive measures were more effective to bring about revolutions than to stop them. Be that as it may, it cannot be denied that the most tranquil period of English history, from an internal standpoint, has been the period since England abandoned these practices of trying to inculcate belief by oaths and force.

Even after the American Revolution, England continued to pass statutes outlawing groups and punishing their members. One that is of particular interest here because of the many similarities between it and the Act involved in this case was passed in 1799 under the title "An Act for the more effectual Suppression of Societies established for Seditious and Treasonable Purposes; and for better preventing Treasonable and Seditious Practices." [32] The premise upon which this Act was passed

---

[30] Several examples of the persecution inflicted upon Protestants by Catholics were set out in the Appendix to my concurring opinion in *Joint Anti-Fascist Refugee Comm.* v. *McGrath*, 341 U. S. 123, 146–149.

[31] See, *e. g.*, Bunyan, The Pilgrims Progress; Milton, Areopagitica.

[32] 39 George III, c. 79.

152

was also similar to that used here—"a traitorous Conspiracy has long been carried on, in conjunction with the Persons from Time to Time exercising the Powers of Government in *France*, to overturn the Laws, Constitution, and Government, and every existing Establishment, Civil and Ecclesiastical, both in *Great Britain* and *Ireland* . . . ." The Act broadly provided for the suppression and prohibition "as unlawful Combinations and Confederacies" of all such societies, "particularly . . . *Societies of United Englishmen, United Scotsmen, United Britons, United Irishmen,* and *The London Corresponding Society* . . . ." This 1799 English Act, like the Subversive Activities Control Act here, comprehensively provided for fines, forfeitures, penalties and imprisonments. It went on to outlaw places where debates could take place or lectures be given or books be gathered and read unless, under very restrictive standards, licenses had been granted by Justices of the Peace. Great emphasis was laid upon the fact that unlicensed gatherings should be treated as nuisances and disorderly houses. Following the course that such repressive measures always must, and indeed precisely the course that is here being followed by our own Government with respect to the Communist Party,[33] the English Act placed print-

---

[33] Section 7 (d) (6) of the Act, 50 U. S. C. § 786 (d) (6), requires the "listing, in such form and detail as the Attorney General shall by regulation prescribe, of all printing presses and machines including but not limited to rotary presses, flatbed cylinder presses, platen presses, lithographs, offsets, photo-offsets, mimeograph machines, multigraph machines, multilith machines, duplicating machines, ditto machines, linotype machines, intertype machines, monotype machines, and all other types of printing presses, typesetting machines or any mechanical devices used or intended to be used, or capable of being used to produce or publish printed matter or material, which are in the possession, custody, ownership, or control of the Communist-action or Communist-front organization or its officers, members, affiliates, associates, group, or groups in which the Communist-action or Communist-front organization, its officers or members have an interest."

ing presses, type and everything else useful for publishing discussion of public matters under strict regulations.

The parliamentary debates underlying the enactment of this 1799 English statute indicate plainly the close parallel between it and the Act here under consideration. The chief fear of the English rulers that brought on the 1799 Act was that the people of England would be seduced away from their loyalty to their government if societies were left free to discuss public matters and if the common people were left free to read and hear arguments. William Pitt, the Younger, in offering the bill which provided the basis for the Act, expressed his fear that debating societies and other such manifestations of liberty of press and speech might call "the attention of the lower orders of the people to objects of discussion of the most mischievous tendency, objects which are not calculated for their understandings, and which are of all others the most liable to be attended with dreadful effects." [34] He thought these "dreadful effects" could be averted, in large part, by making individual authors sign everything they wrote. But he then went on to urge that "in order to make the measure effectual, and prevent the press from becoming an engine of corruption and innovation in the hands of factions who are ready to circulate cheap publications, adapted to inflame and pervert the public mind, it will be necessary to keep a general register, not only of the presses used by printers, but of those in the possession of private persons." [35] All of this, Mr. Pitt explained, was necessary in order to render "more effectual" an Act passed at the previous session of Parliament entitled "An Act to empower his majesty to secure and detain such persons as his majesty shall suspect are conspiring against his person and government." [36]

---

[34] Parliamentary Debates, Hansard, 1st Series, 34, at 987.

[35] *Id.*, at 988.

[36] *Ibid.*

The debates on the English statute also show the true nature of the "revolutionary" principles advocated by the various societies named which were being used to justify their outlawry. These principles were chiefly parliamentary reform providing for annual sessions of Parliament, universal suffrage and fair parliamentary representation, and repeal of the right of the King to veto measures passed by Parliament.[37] It is, of course, true that Congress has no power to outlaw political parties advocating such measures in this country. But I wonder how this Court could ever reach the question in view of its holding today. And if the Court is, as it holds, truly bound by legislative findings as to the nature of political parties and their involvement with foreign powers, how could it strike down the very statute I have just described? For that statute purported to establish, as a matter of fact, that the named societies were a part of a "traitorous Conspiracy" acting "in conjunction with the Persons from Time to Time exercising the Powers of Government in *France*."

At the very time England was going through its era of terror about the "Jacobins," a heated political struggle involving many of the same issues was going on in this country between the two chief political parties. One of those parties, the Federalists, wanted to outlaw the party of Jefferson on the ground that they too were "Jacobins" and therefore a threat to our security. The Jeffersonians quite naturally opposed such outlawry and in fact opposed any measure which would restrict the freedoms of speech, press, petition and assembly. The difference between the two parties was expressed by Jefferson in this way: "Both of our political parties, at least the honest part of them, agree conscientiously in the same object, the public good . . . . One fears most the

---

[37] *Id.*, at 984–998.

ignorance of the people; the other, the selfishness of rulers independent of them. Which is right, time and experience will prove." [38]  This conflict of ideals and policies was temporarily resolved in favor of the Federalists and the result was the infamous era of the Alien and Sedition Acts. [39]  These laws, passed over vigorous Jeffersonian opposition, declared that it was necessary in order to protect the security of the Nation to give the President the broadest of powers over aliens and to make substantial inroads upon the freedoms of speech, press and assembly.

The enforcement of these statutes, particularly the Sedition Act, constitutes one of the greatest blots on our country's record of freedom. [40]  Publishers were sent to jail for writing their own views and for publishing the views of others.  The slightest criticism of Government or policies of government officials was enough to cause biased federal prosecutors to put the machinery of Government to work to crush and imprison the critic. Rumors which filled the air pointed the finger of suspicion at good men and bad men alike, sometimes causing the social ostracism of people who loved their free country with a deathless devotion. [41]  Members of the

---

[38] 4 Memoir of Jefferson 28.

[39] The so-called Alien and Sedition Acts comprised three different statutes enacted in 1798: 1 Stat. 570; 1 Stat. 577; and 1 Stat. 596.

[40] For a graphic discussion of the period of the Alien and Sedition Acts, see Bowers, Jefferson and Hamilton, 1925, c. XVI, "Hysterics," and c. XVII, "The Reign of Terror."

[41] Much of this sort of misdirected persecution was doubtless due to the attitude and public statements of the influential Federalist Secretary of State, Timothy Pickering.  See Miller, Crisis in Freedom, 89–90 (1951): "By Pickering and his followers, it was held that since honest men who valued the national welfare would not cavil at the Sedition Act, it could be presumed that those who criticized it were no better than Jacobin fellow-travelers.  It was laid down as a sound principle that 'when a man is heard to inveigh against this law, set him

Jeffersonian Party were picked out as special targets so that they could be illustrious examples of what could happen to people who failed to sing paeans of praise for current federal officials and their policies. Matthew Lyon, a Congressman of the Jeffersonian Party, was prosecuted, convicted and forced to serve a prison sentence in a disreputable jailhouse because of criticisms he made of governmental officials and their activities. This was a particularly egregious example of the repressive nature of the Sedition Act for Lyon's conviction could not possibly have been upheld under even the most niggardly interpretation of the First Amendment.[42]

down as a man who would submit to no restraint which is calculated for the peace of society. He deserves to be suspected.' Thus, Jacobin sympathizers were to be known by their attitude toward the Sedition Act; a critical or skeptical frame of mind was *prima facie* evidence of guilt. The Secretary of State looked darkly upon such troublemakers: 'Those who complain of legal provisions for punishing intentional defamation and lies, as bridling the liberty of speech and of the press,' he said, 'may, with equal propriety, complain against laws made for punishing assault and murder, as restraints upon the freedom of men's actions.' " In such an atmosphere, it is small wonder, as Miller observes, that "it became impossible for the Federalists to distinguish between a genuine, freedom-loving American democrat and a French Jacobin bent upon overturning religion, morality and the State." *Id.*, at 90.

[42] The indictment against Lyon alleged two counts of libel against President Adams. The first count alleged that Lyon had made and published the following statement: "As to the Executive, when I shall see the effects of that power bent on the promotion of the comfort, the happiness, and accommodation of the people, that Executive shall have my zealous and uniform support. But whenever I shall, on the part of our Executive, see every consideration of public welfare swallowed up in a continual grasp for power, in an unbounded thirst for ridiculous pomp, foolish adulation, and selfish avarice—when I shall behold men of real merit daily turned out [of] office for no other cause than independency of sentiment—when I shall see men of firmness, merit, years, abilities, and experience, discarded in their applications for office, for fear they possess that independence, and men of meanness preferred for the ease with

Lyon was but one of many who had to go to jail, be fined, or otherwise be made to suffer for the expression of his public views. Carpenters, preachers, lawyers, and many others furnished grist for the prosecutor's biased political activities in the "administration of justice." Unfortunately, our federal courts did not emerge from this fever of hysteria with the kind of reputations that shed lustre on the business of judging. Although the Founders had provided for federal judges to be appointed for life, thus intending to give them the independence necessary for the higher responsibility they had, some federal judges, even including members of the highest courts, presided

which they can take up and advocate opinions, the consequence of which they know but little of—when I shall see the sacred name of religion employed as a State engine to make mankind hate and persecute each other, I shall not be their humble advocate!" The second count of the indictment alleged that Lyon had caused the publication of the following letter from a person in France: "The misunderstanding between the two Governments has become extremely alarming; confidence is completely destroyed; mistrusts, jealousies, and a disposition to a wrong attribution of motives, are so apparent as to require the utmost caution in every word and action that are to come from your Executive—I mean if your object is to avoid hostilities. Had this truth been understood with you before the recall of Monroe—before the coming and second coming of Pinckney; had it guided the pens that wrote the bullying speech of your President, and stupid answer of your Senate, at the opening of Congress in November last, I should probably have had no occasion to address you this letter. But when we found him borrowing the language of Edmund Burke, and telling the world that, although he should succeed in treating with the French, there was no dependence to be placed in any of their engagements, that their religion and morality were at an end, and they had turned pirates and plunderers, and that it would be necessary to be perpetually armed against them, though you are at peace; we wondered that the answer of both Houses had not been an order to send him to the mad-house. Instead of this, the Senate have echoed the speech with more servility than ever George the Third experienced from either House of Parliament." Cong. Globe, 26th Cong., 1st Sess. 411 (1840).

over grand juries and trials in a way that is sad to be recalled even at this late date.[43]

All the governmental activities set out above designed to suppress the freedom of American citizens to think their own views and speak their own thoughts and read their own selections, and even more, occurred under the 1798 Sedition Act. And all these things happened despite the fact that the promoters of that legislation were unable to make it as strong as their philosophical and political brethren in England had made their Act for the complete suppression of all kinds of societies. But even this comparatively less repressive law and its enforcement were too much of an infringement upon personal liberty to stand the test of public opinion among the plain, sturdy pioneers of America. In the very next election following its enactment, Jefferson was elected President on a platform which contained, as its principal plank, a promise to abandon the Sedition Act and the policy of repression behind it.[44] Members of Congress and the Senate were elected to help him carry out his pledge. The pledge was carried out, and in order to try to make amends to those who had suffered under this obnoxious

[43] The part played by federal judges in the creation of the atmosphere of hysteria which characterized the period is discussed in Bowers, Jefferson and Hamilton, 398–402. See also Miller, Crisis in Freedom, 135–142.

[44] The significance of the issue of political freedom in the election of 1800 is shown by the fact that Jefferson devoted a large part of his inaugural address to that subject. It was at that time that he gave new emphasis to the creed of political freedom by which this country lived and prospered for so long: "If there be any among us who would wish to dissolve this Union or to change its republican form, let them stand undisturbed as monuments of the safety with which error of opinion may be tolerated where reason is left free to combat it." The part of Jefferson's First Inaugural Address dealing with political freedom is reprinted in Jones, Primer of Intellectual Freedom, 142 (Harvard University Press, 1949).

law, Congress was busy for many years indemnifying those who had been prosecuted under its provisions and even their descendants.[45]  The superior judgment of the people over that of their legislators who passed the Act in the first place was graphically illustrated when Matthew Lyon, who had been sent to jail for refusing to refrain from criticizing Federalist officeholders, was triumphantly re-elected by the people of Vermont while still in jail.

I regret, exceedingly regret, that I feel impelled to recount this history of the Federalist Sedition Act because, in all truth, it must be pointed out that this law—which has since been almost universally condemned as unconstitutional [46]—did not go as far in suppressing

[45] In 1840, for example, President Van Buren signed a bill that indemnified the descendants of Matthew Lyon for the persecution he had suffered under the Sedition Act.  See Cong. Globe, 26th Cong., 1st Sess. 410–414, 478 (1840).  Appropriately, this act of official denouncement of the Sedition Law was accomplished on July 4 of that year.  6 Stat. 802.

[46] Perhaps the strongest denunciation of the Sedition Act as unconstitutional has come from Congress itself.  The report of the Committee of the House of Representatives which presented the bill passed in 1840 to refund the fine imposed under that Act upon Matthew Lyon stated: "The committee do not deem it necessary to discuss at length the character of that law, or to assign all the reasons, however demonstrative, that have induced the conviction of its unconstitutionality.  No question connected with the liberty of the press ever excited a more universal and intense interest—ever received so acute, able, long-continued, and elaborate investigation— was ever more generally understood, or so conclusively settled by the concurring opinions of all parties, after the heated political contests of the day had passed away.  All that now remains to be done by the Representatives of the people who condemned this act of their agents as unauthorized, and transcending their grant of power, to place beyond question, doubt, or cavil, that mandate of the Constitution prohibiting Congress from abridging the liberty of the press, and to discharge an honest, just, moral, and honorable obligation, is to refund from the Treasury the fine thus illegally and wrongfully obtained from one of their citizens: for which purpose the committee

the First Amendment freedoms of Americans as do
the Smith Act and the Subversive Activities Control
Act. All the fervor and all the eloquence and all the
emotionalism and all the prejudice and all the parades
of horrors about letting the people hear arguments for
themselves were not sufficient in 1798 to persuade the
members of Congress to pass a law which would di-
rectly and unequivocally outlaw the party of Jefferson,
at which the law was undoubtedly aimed.[47] The same
arguments were made then about the "Jacobins," mean-
ing the Jeffersonians, with regard to their alleged sub-
servience to France, that are made today about the
Communists with regard to their subservience to Russia.
Even the language of the charges that were hurled was
substantially the same as that used in the charges made
today. The Jacobins were "trained, officered, regimented,
and formed to subordination, in a manner that our militia
have never yet equalled"; and "it is as certain as any

---

herewith report a bill." Cong. Globe, 26th Cong., 1st Sess. 411 (1840).
Cf. *Abrams* v. *United States*, 250 U. S. 616, 630: "I wholly disagree
with the argument of the Government that the First Amendment left
the common law as to seditious libel in force. History seems to me
against the notion. I had conceived that the United States through
many years had shown its repentance for the Sedition Act of 1798,
by repaying fines that it imposed." (Holmes, J., dissenting.)

[47] The real aim of the Sedition Act emerges with indisputable
clarity from the debates surrounding its enactment. Thus John Allen,
one of the supporters of the Act in the House of Representatives,
urged the necessity of the Act in the following terms: "I hope this
bill will not be rejected. If ever there was a nation which required
a law of this kind, it is this. Let gentlemen look at certain papers
printed in this city and elsewhere, and ask themselves whether an
unwarrantable and dangerous combination does not exist to overturn
and ruin the Government by publishing the most shameless falsehoods
against the Representatives of the people of all denominations, that
they are hostile to free Governments and genuine liberty, and of
course to the welfare of this country; that they ought, therefore, to
be displaced, and that the people ought to raise an *insurrection*

future event can be, that they [the Jeffersonians] will take arms against the laws as soon as they dare . . . ." [48]

These charges echoed fears that were expressed time and time again during the congressional debate on the Alien and Sedition Acts. The very same fears are again being voiced today as a justification for curtailing the liberties of the people of America. Thus, § 2 (15) of the Subversive Activities Control Act under consideration says that "[t]he Communist movement in the United States is an organization numbering thousands of adher-

---

against the Government. . . . I say, sir, this paper [the Aurora, a paper which supported the Jeffersonian party] must necessarily, in the nature of things, be supported by a powerful party; I do not say of whom that party is composed. The anonymous pieces and paragraphs it contains, evince the talents and industry employed to give it currency; and it is perfectly well understood, by all parties and persons, to contain the opinions of certain great men, and certain gentlemen in this House. This inflammatory address to the Irishmen, is, therefore, understood by them to come clothed with high authority. This is the work of a party; this paper is devoted to party; it is assiduously disseminated through the country by a party; to that party is all the credit due; to that party it owes its existence; if they loved the peace of our Zion, if they sought the repose of our country, it would cease to emit its filth; it has flourished by their smiles; it would perish at their frowns." 8 Annals of Cong. 2093–2100. It is, of course, true that some Congressmen who favored the Sedition Act did so on broader grounds. "Harrison Gray Otis would have employed the Sedition Act against all associations, including the Masons: 'The spirit of association,' he warned, 'is a dangerous thing in a free government, and ought carefully to be watched.'" Miller, Crisis in Freedom, 187.

[48] These charges were made by Fisher Ames in writings published in April 1799. See Ames, Laocoon, reprinted in II Works of Fisher Ames, 109, at 115, 116. Similar sentiments were expressed by Richard Peters, a federal district judge, in a letter, dated August 24, 1798, to Secretary of State Pickering. Judge Peters apparently thought it necessary, for the good of the country, "to get rid of a Set of Villains who are ready to Strike when they think the Crisis arrives." See Miller, Crisis in Freedom, 137.

ents, rigidly and ruthlessly disciplined" only awaiting "a moment when . . . overthrow of the Government of the United States by force and violence may seem possible of achievement . . . ."

This excuse for repression is, of course, not a distinctively American creation. It is the same excuse that was used for the 1799 English Act described above. Thus, Charles Abbot, a member of Parliament, urged as one of the justifications for outlawing the societies named in that Act: "The malignancy of their character is distinguishable by the restless spirit which it infuses into the lowest orders of the people, encouraging them to take up arms, and teaching them that they have great and powerful partisans and leaders *who are secretly prepared to seize the favorable moment* for showing themselves openly at their head, when they can hope to do so with impunity." [49]

The truth is that this statutory outlawry of the Communist Party is not at all novel when considered in the perspective of history. Quite the contrary, it represents nothing more than the adoption by this country, in part at least, of one of the two conflicting views that have emerged from a long-standing and widespread dispute among political philosophers as to what kind of Government will best serve the welfare of the people. That view is that Governments should have almost unlimited powers. The other view is that governmental power should be very strictly limited. Both the Smith Act and the Subversive Activities Control Act are based upon the view that officials of the Government should have power to suppress and crush by force critics and criticisms

[49] Parliamentary Debates, Hansard, 1st Series, 34, at 1073. (Emphasis supplied.) Cf. *Dennis* v. *United States*, 341 U. S. 494, 510, in which this Court upheld convictions for advocacy of overthrow of the Government "as speedily as circumstances would permit."

of governmental officials and their policies. The contrary view, which Congress necessarily rejected in passing these laws, is that current public officials should never be granted power to use governmental force to keep people from hearing, speaking or publishing such criticisms of Government or from assembling together to petition their Government to make changes in governmental policies, however basic the majority may deem these policies to be.

It is my belief that our Constitution with its Bill of Rights was expressly intended to make our Government one of strictly limited powers. The Founders were intimately familiar with the restrictions upon liberty which inevitably flow from a Government of unlimited powers. By and large, they had found this experience a painful one. Many of them were descended from families that had left England and had come to this country in order to escape laws that could send them to jail or penalize them in various ways for criticizing laws and policies which they thought bore too heavily and unfairly upon them. Others had personally felt the brunt of such repressive measures. Only after they won the Revolutionary War did these people have an opportunity to set up a Government to their liking. To that end they finally settled upon the Constitution, which very clearly adopted the policy of limiting the powers of the Federal Government. Even then the people of this country were not completely satisfied. They demanded more precise and unequivocal limitations upon the powers of Government and obtained the Bill of Rights, the central provisions of which were the First Amendment guarantees of complete religious and political freedom.[50]

---

[50] See *Konigsberg* v. *State Bar of California*, 366 U. S. 36, 56 (dissenting opinion); *Feldman* v. *United States*, 322 U. S. 487, 501–502 (dissenting opinion).

In the very face of the provisions of the First Amendment, however, the Court today upholds laws which ignore the wisdom of the Founders' decision to set up a limited Government and adopt the policy of force to crush views about public matters entertained by a small minority in this country. This, to me, marks a major break in the wall designed by the First Amendment to keep this country free by leaving the people free to talk about any kind of change in basic governmental policies they desire to talk about. I see no possible way to escape the fateful consequences of a return to the era in which all governmental critics had to face the probability of being sent to jail except for this Court to abandon what I consider to be the dangerous constitutional doctrine of "balancing" to which the Court is at present adhering. That doctrine is not a new one. In fact, history shows that it has been the excuse for practically every repressive measure that Government has ever seen fit to adopt. Mr. Pitt proved, in 1799, that he was a master of the concept and language of "balancing" in his speech urging the passage of laws to muzzle the press of England in order to prevent the dissemination of the "revolutionary" ideas that England should have parliamentary reform:

> "We cannot too highly prize that sacred liberty [of the press] when we consider that it has been instrumental in bringing our constitution to that envied perfection which it possesses. Yet it must also be admitted that when abused, the most fatal consequences have ever resulted from it. It has been the great principle of the constitution that the liberty of the press should flourish, but it is also clear from the nature of the principle itself, and for the security of the press, that the author or publisher of every work should be amenable to the laws of his country." [51]

---

[51] Parliamentary Debates, Hansard, 1st Series, 34, at 987.

And there certainly was no shortage of "balancers" in our own Congress when the Alien and Sedition Acts of 1798 were passed.[52]

The "balancing test" of First Amendment freedoms is said to justify laws aimed at the advocacy of overthrow of the Government "as speedily as circumstances would permit."[53] Thus, the "test" being used here is identical to the arguments used to justify the Alien and Sedition Acts of 1798 in this country and the 1799 Sedition Act in England. The unprecedented incorporation into our constitutional law of this time-worn justification for tyranny has been used to break down even the minimal protections[54] of

---

[52] See, e. g., the argument of Representative Harper on the floor of the House in favor of the passage of the Sedition Act: "He had often heard in this place, and elsewhere, harangues on the liberty of the press, as if it were to swallow up all other liberties; as if all law and reason, and every right, human and divine, was to fall prostrate before the liberty of the Press; whereas, the true meaning of it is no more than that a man shall be at liberty to print what he pleases, provided he does not offend against the laws, and not that no law shall be passed to regulate this liberty of the press. He admitted that a law which should say a man shall not slander his neighbor would be unnecessary; but it is perfectly within the Constitution to say, that a man shall not do this, or the other, which shall be injurious to the well being of society; in the same way that Congress had a right to make laws to restrain the personal liberty of man, when that liberty is abused by acts of violence on his neighbor." 8 Annals of Cong. 2102.

[53] *Dennis* v. *United States,* 341 U. S. 494. See also *Yates* v. *United States,* 354 U. S. 298; *Scales* v. *United States, post,* p. 203; *Noto* v. *United States, post,* p. 290.

[54] As the Court said in *Bridges* v. *California,* 314 U. S. 252, 263: "What finally emerges from the 'clear and present danger' cases is a working principle that the substantive evil must be extremely serious and the degree of imminence extremely high before utterances can be punished. Those cases do not purport to mark the furthermost constitutional boundaries of protected expression, nor do we here. They do no more than recognize a minimum compulsion of the Bill of Rights. For the First Amendment does not speak equivocally. It prohibits any law 'abridging the freedom of speech, or of the

the First Amendment forged by Mr. Justice Holmes and Mr. Justice Brandeis which would bar prosecution for speech or writings in all cases except those in which the words used "so imminently threaten immediate interference with the lawful and pressing purposes of the law that an immediate check is required to save the country." [55]

I realize that these laws are aimed only at the Communist Party. No one need console himself, however, that the policy of using governmental force to crush dissident groups upon which they are based can or will be stopped at that point. The weakening of constitutional safeguards in order to suppress one obnoxious group is a technique too easily available for the suppression of other obnoxious groups to expect its abandonment when the next generally hated group appears. Only eleven years ago, this Court upheld a governmental penalty directed at Communists on the ground that "only a relative handful" would be affected by the penalty involved in that case.[56] Today, it upholds statutes which I think totally outlaw that Party, claiming nonetheless that "[n]othing which we decide here remotely carries . . . [the] implication . . . [that] Congress may impose similar requirements upon any group which pursues unpopular political objectives or which expresses an unpopular political ideology." I am very much afraid that we will see the day when the very implication which the Court now denies is found.

---

press.' It must be taken as a command of the broadest scope that explicit language, read in the context of a liberty-loving society, will allow."

[55] *Abrams* v. *United States*, 250 U. S. 616, 630 (Holmes, J., dissenting). I have recently expressed my belief that the "balancing test" can derive no support whatever from the "clear and present danger" test used by Mr. Justice Holmes and Mr. Justice Brandeis. See *Konigsberg* v. *State Bar of California*, 366 U. S. 36, 56 (dissenting opinion).

[56] *American Communications Assn.* v. *Douds*, 339 U. S. 382, 404.

I am ready to admit that strong arguments can be made for saying that Governments in general should have power to suppress the freedoms of speech, press, petition and assembly. These arguments are particularly strong in countries where the existing Government does not represent the will of the people because history shows that people have a way of not being willing to bear oppressive grievances without protest. Such protests, when bottomed upon facts, lead almost inevitably to an irresistible popular demand for either a redress of those grievances or a change in the Government. It is plain that there are Governments in the world today that desperately need to suppress such protests for they probably could not survive a week or even a day if they were deprived of the power to use their informers to intimidate, their jails to imprison and their firing squads to shoot their critics. In countries of that kind, repressive measures like the Smith Act and the Subversive Activities Control Act are absolutely necessary to protect the ruling tyrants from the spread of information about their misdeeds. But in a democracy like ours, such laws are not only unnecessary but also constitute a baseless insult to the patriotism of our people.

I believe with the Framers of the First Amendment that the internal security of a nation like ours does not and cannot be made to depend upon the use of force by Government to make all the beliefs and opinions of the people fit into a common mold on any single subject. Such enforced conformity of thought would tend only to deprive our people of the bold spirit of adventure and progress which has brought this Nation to its present greatness. The creation of public opinion by groups, organizations, societies, clubs, and parties has been and is a necessary part of our democratic society. Such groups, like the Sons of Liberty and the American Corresponding Societies, played a large part in creating sentiment in this country that led the people of the Colonies to want a nation of

their own.   The Father of the Constitution—James Madison—said, in speaking of the Sedition Act aimed at crushing the Jeffersonian Party, that had that law been in effect during the period before the Revolution, the United States might well have continued to be "miserable colonies, groaning under a foreign yoke." [57]

In my judgment, this country's internal security can better be served by depending upon the affection of the people than by attempting to instill them with fear and dread of the power of Government.   The Communist Party has never been more than a small group in this country.   And its numbers had been dwindling even before the Government began its campaign to destroy the Party by force of law.   This was because a vast majority of the American people were against the Party's policies and overwhelmingly rejected its candidates year after year.   That is the true American way of securing this Nation against dangerous ideas.   Of course that is not the way to protect the Nation against *actions* of violence and treason.   The Founders drew a distinction in our Constitution which we would be wise to follow.   They gave the Government the fullest power to prosecute overt actions in violation of valid laws but withheld any power to punish people for nothing more than advocacy of their views.

I am compelled to say in closing that I fear that all the arguments and urgings the Communists and their sympathizers can use in trying to convert Americans to an ideology wholly foreign to our habits and our instincts are far less dangerous to the security of this Nation than laws which embark us upon a policy of repression by the outlawry of minority parties because they advocate radical changes in the structure of Government.   This widespread program for punishing ideas on the ground that

---

[57] Miller, Crisis in Freedom, 84.

they might impair the internal security of the Nation not only sadly fails to protect that security but also diverts our energies and thoughts from the many far more important problems that face us as a Nation in this troubled world.

I would reverse this case and leave the Communists free to advocate their beliefs in proletarian dictatorship publicly and openly among the people of this country with full confidence that the people will remain loyal to any democratic Government truly dedicated to freedom and justice—the kind of Government which some of us still think of as being "the last best hope of earth."

MR. JUSTICE DOUGLAS, dissenting.

## I.

The Subversive Activities Control Board found, and the Court of Appeals sustained the finding, that petitioner, the Communist Party of the United States, is "a disciplined organization" operating in this Nation "under Soviet Union control" to install "a Soviet style dictatorship in the United States." Those findings are based, I think, on facts; and I would not disturb them.

The other objections made are not of the character of those which led us to reverse and remand for additional hearings five years ago. There we had a record tainted by perjury. *Communist Party* v. *Control Board,* 351 U. S. 115, 124–125. No one—no matter how venal—could suffer penalties under our regime of law where perjury tainted the record. The present errors that are urged are not of that character.

Had they appeared in a normal administrative hearing and been timely claimed, they might give us pause. If we had before us the question whether a particular organization was, to use the statutory words, a "Communist-front organization" (64 Stat. 987, 989, 50 U. S. C. § 782 (4))

or a "Communist-infiltrated organization" (68 Stat. 775, 777, 50 U. S. C. § 782 (4A)) the errors urged might loom large. For then the decision might turn on intangibles to be closely appraised. The present problem, however, is in a somewhat different posture. We are in a field where Congress has found and declared that the Communist Party is "in fact an instrumentality of a conspiracy to overthrow the Government of the United States," that its "policies and programs" are "secretly prescribed for it by the foreign leaders of the world Communist movement," that it is "the agency of a hostile foreign power." 68 Stat. 775. These congressional findings amount to no more than facts of which some Justices have already taken judicial notice. See, *e. g., Communications Assn.* v. *Douds,* 339 U. S. 382, 427 *et seq.* (opinion of Mr. Justice Jackson). This does not mean that anything goes and that the hearings are *pro forma.* It does suggest, however, that where, as here, the case does not turn on nice nuances which in closer contests might have to be carefully weighed, we should not prolong the administrative hearings which already have extended a decade. With this as a starting point, I agree with the Court that the Court of Appeals did not err in overruling the objections based on procedural errors.

May then the Communist Party, under control of a foreign power, be required to register?

The vices of registration may be not unlike those of licensing. Despite *Times Film Corp.* v. *Chicago,* 365 U. S. 43, I think licensing is an impermissible form of regulation when it vests discretion in the authorities to grant or withhold the exercise of First Amendment rights or to permit them to be exercised only on condition. *Lovell* v. *Griffin,* 303 U. S. 444, 451–452. Licensing, like a tax payable on the exercise of a First Amendment right (*Murdock* v. *Pennsylvania,* 319 U. S. 105), is therefore

unconstitutional. See *Thomas* v. *Collins,* 323 U. S. 516. Yet registration, like licensing, may have aspects of harassment and burden. That is why we said in *Thomas* v. *Collins, supra,* 540:

> "If the exercise of the rights of free speech and free assembly cannot be made a crime, we do not think this can be accomplished by the device of requiring previous registration as a condition for exercising them and making such a condition the foundation for restraining in advance their exercise and for imposing a penalty for violating such a restraining order. So long as no more is involved than exercise of the rights of free speech and free assembly, it is immune to such a restriction. If one who solicits support for the cause of labor may be required to register as a condition to the exercise of his right to make a public speech, so may he who seeks to rally support for any social, business, religious or political cause. We think a requirement that one must register before he undertakes to make a public speech to enlist support for a lawful movement is quite incompatible with the requirements of the First Amendment."

Freedom of association is included in the bundle of First Amendment rights. *N. A. A. C. P.* v. *Alabama,* 357 U. S. 449, 460. So if we had only the question whether those who band together to espouse a political, educational, literary, civic, or ideological cause could be made to register, I would protest. The late Zechariah Chafee spoke of the danger in limiting our freedoms under political pressures. "Universities," he wrote, "should not be transformed, as in Nazi Germany, into loud-speakers for the men who wield political power." The Blessings of Liberty (1956) 241. There have been attempts here to interfere by law in a myriad of ways with the shaping of

public opinion through many groups, attacked because they were nonconformists of one kind or another. As we said recently, the identification of members of groups and fear of reprisal "might deter perfectly peaceful discussions of public matters of importance." *Talley* v. *California,* 362 U. S. 60, 65. There is, in my view, a disability on the part of government to probe the intimacies of relationships in the myriad of lawful societies and groups in this country. See, for example, *United States* v. *Rumely,* 345 U. S. 41, 48, 56–58 (concurring opinion); *Bates* v. *Little Rock,* 361 U. S. 516, 527 (concurring opinion); *Uphaus* v. *Wyman,* 364 U. S. 388, 401, 405–408 (dissenting opinion). From those precedents I would hopefully deduce two principles. First, no individual may be required to register before he makes a speech, for the First Amendment rights are not subject to any prior restraint. Second, a group engaged in lawful conduct may not be required to file with the Government a list of its members, no matter how unpopular it may be. For the disclosure of membership lists may cause harassment of members and seriously hamper their exercise of First Amendment rights. The more unpopular the group, the greater the likelihood of harassment. In logic then it might seem that the Communist Party, being at the low tide of popularity, might make out a better case of harassment than almost any other group on the contemporary scene.

We have, however, as I have said, findings that the Communist Party of the United States is "a disciplined organization" operating in this Nation "under Soviet Union control" with the aim of installing "a Soviet style dictatorship" here. These findings establish that more than debate, discourse, argumentation, propaganda, and other aspects of free speech and association are involved. An additional element enters, *viz.,* espionage, business activities, or the formation of cells for subversion,

as well as the use of speech, press, and association by a foreign power to produce on this continent a Soviet satellite.[1]

Picketing is free speech *plus* (*Bakery Drivers Local* v. *Wohl,* 315 U. S. 769, 776–777 (concurring opinion); *Giboney* v. *Empire Storage Co.,* 336 U. S. 490, 497–503) and hence can be restricted in all instances and banned in some. Registration of those who disseminate propaganda of foreign origin (see *Viereck* v. *United States,* 318 U. S. 236, 251 (dissenting opinion)) has been thought to fall in the same category as barring speech in places that will create traffic conditions (*Schneider* v. *State,* 308 U. S. 147, 160; *Cox* v. *New Hampshire,* 312 U. S. 569) or provoke breaches of the peace. *Chaplinsky* v. *New Hampshire,* 315 U. S. 568. Though the activities themselves are under the First Amendment, the manner of their exercise or their collateral aspects fall without it.

Like reasons underlie our decisions which sustain laws that require various groups to register before engaging in specified activities. Thus lobbyists who receive fees for attempting to influence the passage or defeat of legislation in Congress may be required to register. *United*

---

[1] For accounts of the attempts of Communists to infiltrate American trade unions see S. Doc. No. 89, 82d Cong., 1st Sess.; Taft, The Structure and Government of Labor Unions (1954), pp. 19 *et seq.;* Murray, American Labor and the Threat of Communism (1951), 274 Annals Am. Acad. Pol. & Soc. Sci. 125; Paschell and Theodore, Anti-Communist Provisions in Union Constitutions (1954), 77 Monthly Lab. Rev. 1097.

Eric Sevareid writing in the Washington Post for January 15, 1961, said:

"Americans get too hysterical about the Marxists in their midst. Americans do, considering that there are so few. But I notice that it is the hard core of Marxists who now threaten to split Belgium in two; that it was the hard core of Marxists who drove the British Labor Party down the official policy line of neutralism."

*States* v. *Harriss,* 347 U. S. 612.[2]   Criminal sanctions for failure to report and to disclose all contributions made to political parties are permitted.   *Burroughs* v. *United States,* 290 U. S. 534.   Publishers of newspapers desiring reduced postal rates have long been required to file with the Postmaster General and with the local post office certain data concerning ownership and circulation; and those disclosure requirements have been sustained.   *Lewis Publishing Co.* v. *Morgan,* 229 U. S. 288.   In short, the exercise of First Amendment rights often involves business or commercial implications which Congress in its wisdom may desire to be disclosed, just as it did in strictly financial matters under the Public Utility Holding Company Act of 1935.   See *Electric Bond & Share Co.* v. *Securities & Exchange Comm'n,* 303 U. S. 419.

If lobbyists can be required to register, if political parties can be required to make disclosure of the sources of their funds, if the owners of newspapers and periodicals must disclose their affiliates, so may a group operating under the control of a foreign power.

The Bill of Rights was designed to give fullest play to the exchange and dissemination of ideas that touch the politics, culture, and other aspects of our life.   When an organization is used by a foreign power to make advances here, questions of security are raised beyond the ken of disputation and debate between the people resident here.   Espionage, business activities, formation of cells for subversion, as well as the exercise of First Amendment rights, are then used to pry open our society

---

[2] The dissents in that case were on grounds not material to the bare issue of registration now before us.   The concealment of the main interests behind legislative proposals has been conspicuous. The example of the American Fair Trade League—controlled by manufacturers but purporting to represent retailers only—is told in Federal Trade Commission, Report on Resale Price Maintenance (1945), pp. 43–48.

and make intrusion of a foreign power easy. These machinations of a foreign power add additional elements to free speech just as marching up and down adds something to picketing that goes beyond free speech.

These are the reasons why, in my view, the bare requirement that the Communist Party register and disclose the names of its officers and directors is in line with the most exacting adjudications touching First Amendment activities.

## II.

While the Act is pregnant with constitutional questions, I deal now with only one, *viz.*, whether § 7 of the Act is unconstitutional and void as conflicting with the provision against self-incrimination accorded by the Fifth Amendment.

The registration statement prepared by the Attorney General pursuant to § 7 (a) and (b) of the Act asks in Item 2 the name, address, position, and functions of any individual "who at any time during the twelve months preceding the execution of the statement was an officer, director, or person performing the functions of an officer or director" of the Communist Party. Item 3 requires a statement of any alias of any person listed in Item 2. Item 11 asks for the name, alias, and address of each individual "who was a member of the organization at any time during the period" of twelve months prior to the filing of the registration statement. The statement must be signed by the partners, officers, directors, and members of the governing body. 28 CFR, 1960 Supp., § 11.200, Form ISA–1.

Those provisions are not conditional. The Government with all the authority it possesses has ordered the Party to register.

The duty to disclose the names of the officers, directors, and members is explicit. The duty is to make the dis-

closure here and now. The individuals who must make the disclosure are definitely described. There is no uncertainty as to what must be done. The question is whether the command made is constitutional under the Fifth Amendment.

If the requirement of Form ISA–1 that the statement be signed "by the partners, officers, and directors" were deleted and the statement was allowed to be filed by "any agent," the act of signing that implicates the partner, officer, or director would be eliminated. If the Court, sensitive to the high role performed by the Fifth Amendment, also deleted the compulsory disclosure of the others whose association with the Party is required to be disclosed without immunity, the problems presented by those disclosures would disappear. But the Court does none of these things. It requires officers and directors to sign; it requires that the names of officers, directors, and members within the 12-month period be disclosed. Thus the question of self-incrimination of each of those individuals is squarely presented.

### III.

First as to the *officers, directors, and others who must sign the registration statement.* These individuals, who could be prosecuted as "active" Communist agents under *Yates* v. *United States,* 354 U. S. 298, and *Scales* v. *United States, post,* p. 203, cannot, in my view, be compelled to sign a registration statement. A compulsory admission of that ingredient of a crime would plainly violate the Fifth Amendment.

If a person who was on the witness stand in a courtroom or appearing before a Congressional Committee were asked whether he was an officer or director of the Communist Party, our decisions in *Blau* v. *United States,* 340 U. S. 159, 161, and *Quinn* v. *United States,* 349 U. S.

155, would protect him from self-incrimination. Under our system federal officials who desire to establish guilt must use the grand jury to get an indictment and a petit jury to obtain conviction. They cannot require the accused to "do their job for them." Chafee, The Blessings of Liberty (1956), p. 207.

The clause of the Fifth Amendment with which we are here concerned provides that "No person . . . shall be compelled in any criminal case to be a witness against himself." The clause has been hospitably construed. The Court said in *Counselman* v. *Hitchcock,* 142 U. S. 547, 562:

"It is impossible that the meaning of the constitutional provision can only be, that a person shall not be compelled to be a witness against himself in a criminal prosecution against himself. It would doubtless cover such cases; but it is not limited to them. The object was to insure that a person should not be compelled, when acting as a witness in any investigation, to give testimony which might tend to show that he himself had committed a crime. The privilege is limited to criminal matters, but it is as broad as the mischief against which it seeks to guard."

As recently stated by Judge Samuel H. Hofstadter:

"The privilege is applicable to civil cases, grand jury proceedings, legislative inquiries, and virtually every other form of official proceeding. It applies whether the witness is a party to the civil or criminal case or merely a witness. And it applies whether the testimony is directly in issue or is collateral. The witness himself is the judge in each case; he may not be compelled to give testimony which he himself in good faith believes might, in any manner whatever, pave the way to possible prosecution. To claim the privilege requires no special combination of words; the

clause is liberally construed to protect the right it was intended to secure." The Fifth Amendment and the Immunity Act of 1954 (Fund for the Republic, 1955), p. 10.

How then can the Government ask a person to sign a registration statement which makes admissions that would not survive challenge under the Fifth Amendment if asked orally of the individuals that the disclosure implicates?

*United States* v. *White,* 322 U. S. 694, held that the privilege does not excuse an officer of an organization from producing its records on the grounds that the contents of the records will or may incriminate him. As to the officer or director, it is plain that he incriminates himself not merely by producing records but by signing and filing the registration statement. The preparation of the registration statement and its execution are in the same category as the giving of testimony in the *Blau* and *Quinn* cases, if the Fifth Amendment is to have continuing vitality. Part of what is today required is the furnishing of statements and admissions from the pens of men and women whose very signature may start them on the way to prison. We made clear in *Curcio* v. *United States,* 354 U. S. 118, that the ruling in the *White* case was restricted to the production of books and records. We there upheld the custodian's privilege against testifying as to the "whereabouts of books and records" where that testimony might incriminate him. We said ". . . he cannot lawfully be compelled, in the absence of a grant of adequate immunity from prosecution, to condemn himself by his own oral testimony." *Id.,* 124.

It would seem to follow *a fortiori* that a custodian who need not testify concerning the whereabouts of records, if that testimony would tend to incriminate him, need not put into writing the admission that he is an officer or

director of the Communist Party. What more incriminating admission could be compelled? This was the position of Judge Bazelon in the Court of Appeals, 96 U. S. App. D. C. 66, 114, 223 F. 2d 531, 579, and it seems to me unassailable. See also *Shapiro* v. *United States,* 335 U. S. 1, 27; *Wilson* v. *United States,* 221 U. S. 361, 385.

*Electric Bond & Share Co.* v. *Securities & Exchange Comm'n, supra,* is irrelevant to our present problem under the Fifth Amendment. No claim was made in that case that the preparation and filing of a registration statement might implicate an officer or director and that the Fifth Amendment therefore protected him against signing unless immunity was granted. The problem in the present case is quite different. It raises the following kind of question: Can Congress, which has made embezzlement of national bank funds a criminal offense, require embezzlers to register without granting them the full immunity (cf. *Ullmann* v. *United States,* 350 U. S. 422) to which they are entitled? That is the closest analogy to the present case.

The compiling, the signing, and the filing of the registration statement required of officers, directors, and others by the registration form is a form of elicited testimony, not the surrender of pre-existing records. Where, as here, such disclosure will reveal knowledge of and relations with the Communist Party, I do not see how it can be demanded, unless immunity is granted.

The Bill of Rights does not go so far as to forbid all interrogation under threat of punishment. It does not prevent the breaking of myriad bonds of secrecy at the command of the Government. It protects only the individual who has himself become the object of the Government's punitive powers. From him it removes the humiliating presence of the questioner. The power of the Government is limited, so that it cannot punish either the silence or the passive hostility of one who claims the

privilege, whether he be a criminal or a prophet or merely a bewildered citizen suddenly caught in the sinister web of suspicion.

The privilege is often criticized as a shield for wrongdoing. But not every hostile silence which greets official interrogation has its beginning in wrongdoing. In a Nation such as ours the Government must often meet with hostility; we are not constrained to admire its activities; we are free to detest them. That freedom could not long remain if the Government were free to require us to recount all our doings. The Government may still threaten silence with prison, but its power to do so stops short when information sought is incriminating. Even so ardent an advocate of the totalitarian state as Thomas Hobbes respected this core of privacy:

> "A covenant not to defend myself from force, by force, is always void. For (as I have shown before) no man can transfer or lay down his right to save himself from death, wounds, and imprisonment, the avoiding whereof is the only end of laying down any right . . . . A covenant to accuse oneself, without assurance of pardon, is likewise invalid. For in the condition of nature, where every man is judge, there is no place for accusation: and in the civil state the accusation is followed with punishment, which, being force, a man is not obliged not to resist." Leviathan, 23 Great Books 90.

The cases dealing with the duty to keep records [3] (see *Shapiro* v. *United States, supra*) can be put to one side. Under the Smith Act, 18 U. S. C. § 2385, the very subject matter under regulation is interwoven with criminal activity. Where individuals compile and sign

---

[3] See Meltzer, Required Records, The McCarran Act, and the Privilege Against Self-Incrimination, 18 U. of Chi. L. Rev. 687, 719–728.

the registration statement, as they must, it is the very making of the registration statement that will incriminate them, not the underlying documents.

Signing as an officer or director of the Communist Party—an ingredient of an offense that results in punishment—must be done under the mandate of law. That is compulsory incrimination of those individuals and, in my view, a plain violation of the Fifth Amendment.

## IV.

The compulsory disclosure of those who have been *officers, directors, or members* of the Party during the last 12 months is equally objectionable under the Fifth Amendment. Membership in the Party is, by virtue of federal statutes, the start [4] of every prosecution whether it be for active "membership," as in *Scales* v. *United States, supra,* or for conspiracy to teach the doctrine, as in *Dennis* v. *United States,* 341 U. S. 494. Membership is a "link in the chain of evidence" needed for such prosecution, as we held in *Blau* v. *United States, supra,* 161; *Quinn* v. *United States, supra.* It is therefore in the class of disclosure which we have held since the time of Chief Justice Marshall [5] (see *United States* v. *Burr,* 25 Fed.

---

[4] It is also the starting point for certain other quasi-penal disabilities, including the roundup of those who may be put in detention camps by virtue of 50 U. S. C. §§ 812–814.

[5] In answering a claim of the prosecution that a witness cannot refuse to answer unless the answer, unconnected with other testimony, would be sufficient to convict him of a crime, Chief Justice Marshall said:

"This would be rendering the rule almost perfectly worthless. Many links frequently compose that chain of testimony which is necessary to convict any individual of a crime. It appears to the court to be the true sense of the rule that no witness is compellable to furnish any one of them against himself. It is certainly not only a possible but a probable case that a witness, by disclosing a single

Cas. No. 14,692e) could not be demanded by reason of the Fifth Amendment. The compulsory disclosure of membership in the Communist Party, which the *Blau* and *Quinn* cases have put within the protection of the Fifth Amendment, is the necessary and immediate effect of filing as a public record the registration statement required by § 7. As in case of officers and directors who must sign the registration statement, this is, in my view, compulsory incrimination of the members and a plain violation of the Fifth Amendment.

If Congress can through use of the registration device compel disclosure of people's activities that violate federal laws, the Fifth Amendment would be cast into limbo.

As I have said, each person required to be listed in the registration statement, were he to be brought before his interrogators, could not be compelled to admit what the statute here requires petitioner to set forth at length. The only difference that exists between compelling each member and officer and between compelling petitioner is the thin "veil" of petitioner's fictitious juridical personality.

*Hale* v. *Henkel,* 201 U. S. 43, held that a corporation could not claim a privilege against self-incrimination. That case and others—such as *Wilson* v. *United States,*

---

fact, may complete the testimony against himself, and to every effectual purpose accuse himself as entirely as he would by stating every circumstance which would be required for his conviction. That fact of itself might be unavailing, but all other facts without it would be insufficient. While that remains concealed within his own bosom he is safe; but draw it from thence, and he is exposed to a prosecution. The rule which declares that no man is compellable to accuse himself would most obviously be infringed by compelling a witness to disclose a fact of this description.

"What testimony may be possessed, or is attainable, against any individual the court can never know. It would seem, then, that the court ought never to compel a witness to give an answer which discloses a fact that would form a necessary and essential part of a crime which is punishable by the laws." 25 Fed. Cas., at 40.

*supra,* and *United States* v. *White, supra,* which I have mentioned—have implemented a constitutional policy of publicity for associational activities which would be abhorrent if required of individuals and in matters that were less clearly within the realm of day-to-day administrative regulation.

The present requirement for the disclosure of membership lists is not a regulatory provision, but a device for trapping those who are involved in an activity which, under federal statutes, is interwoven with criminality. The primary effect of the required registration is not disclosure to the public but criminal prosecution. I do not see how the Government that has branded an organization as criminal through its judiciary,[6] its legislature,[7] and its executive,[8] can demand that it submit the names of all its members—unless it grants immunity for the disclosure.

Prior to today,[9] the nearest the Court ever came to allowing the registration device to be used as a mecha-

---

[6] See *Barenblatt* v. *United States,* 360 U. S. 109, 128.

[7] See Communist Control Act of 1954, § 2, 68 Stat. 775, 50 U. S. C. § 841.

[8] See List of Organizations, App. A, 5 CFR, part 210 (1949 ed.); *Anti-Fascist Refugee Committee* v. *McGrath,* 341 U. S. 123, 124–129.

[9] Section 6 of the Mann Act (36 Stat. 825, 827, 18 U. S. C. § 2424) provides that anyone harboring an alien woman in a house of prostitution must register. There is no required form—merely a statement in writing giving the following information: the name of the woman, the place where she is kept, all of the facts as to the date of her entry into the United States, the port of entry, her age, nationality, parentage, and all facts concerning her procuration to come to this country within the knowledge of the person required to furnish the statement. One who files is immune from prosecution by the United States for anything reported in the registration statement. See *United States* v. *Mack,* 112 F. 2d 290, 292. But this provision was held in violation of the Fifth Amendment in *United States* v. *Lombardo,* 228 F. 980, aff'd on other grounds, 241 U. S. 73, because the immunity extended only to federal, not state prosecutions.

nism for compulsory disclosure of criminal activities was *United States* v. *Kahriger,* 345 U. S. 22. See also *Lewis* v. *United States,* 348 U. S. 419. Gamblers were required to register with the Collector of Internal Revenue and to pay an occupational tax. The defense of the Fifth Amendment was rejected on grounds that seemed to some of us at the time to be specious. Registration could be required, the Court held, because it pertained only to "the business of wagering in the future." *United States* v. *Kahriger, supra,* 33. The Fifth Amendment, the Court said, "has relation only to past acts, not to future acts that may or may not be committed." *Id.,* 32. The sluice gates, opened a hair's width by that case, are now flung wide. I remain in agreement with what MR. JUS-TICE BLACK said in *United States* v. *Kahriger, supra,* 37: "[W]e have a Bill of Rights that condemns coerced confessions, however refined or legalistic may be the technique of extortion."

V.

It is said that the Party has no standing to assert the rights of its officers, directors or members.

The privilege against self-incrimination is a personal one. It must be claimed; it may be waived. In ordinary circumstances, there is no Fifth Amendment privilege against incriminating another. *Rogers* v. *United States,* 340 U. S. 367. And see *Hale* v. *Henkel, supra,* 69–70; *United States* v. *White, supra,* 704. On the other hand, the intimate connection between associations and their members has long been recognized. In *Beauharnais* v. *Illinois,* 343 U. S. 250, 262, MR. JUSTICE FRANKFURTER writing for the Court said:

> "Long ago this Court recognized that the economic rights of an individual may depend for the effectiveness of their enforcement on rights in the group, even though not formally corporate, to which he belongs."

The case cited was *American Foundries* v. *Tri-City Council,* 257 U. S. 184, where the right of a union to speak for its members was recognized. In *N. A. A. C. P.* v. *Alabama, supra,* the Association was allowed to assert its members' constitutional rights:

> "If petitioner's rank-and-file members are constitutionally entitled to withhold their connection with the Association despite the production order, it is manifest that this right is properly assertable by the Association. To require that it be claimed by the members themselves would result in nullification of the right at the very moment of its assertion. Petitioner is the appropriate party to assert these rights, because it and its members are in every practical sense identical." *Id.,* 459.

We dealt there with a Negro group asserting the First Amendment rights of its members. The members, it was argued, would be harassed if their names were disclosed and that harassment would abridge their First Amendment rights. We agreed with that view, *id.,* 460–462, and held that N. A. A. C. P. could not be forced to disclose to Alabama its membership lists. We did not, I assume, write a rule good for that day only. Nor did I think we wrote only for Negro groups.

Nor did I think we restricted the assertion by a group of the rights of its members to those asserting First Amendment rights. In *Anti-Fascist Refugee Committee* v. *McGrath, supra,* three groups, under circumstances somewhat similar to the present case, claimed the right to invoke their members' rights under both the First and the Fifth Amendments. They had been designated as "communist" by the Attorney General; and the impact of that classification on the status of the members as federal employees was striking and immediate. Could that classification be constitutionally made without a hearing? The consensus of opinion among those who

186

reached the issue seemed clear—that the groups could raise objections that involved the constitutional rights of their members. The view was forcefully asserted by Mr. Justice Jackson. *Id.*, 186. As MR. JUSTICE FRANKFURTER stated:

> "Designation works an immediate substantial harm to the reputations of petitioners. The threat which it carries for those members who are, or propose to become, federal employees makes it not a finicky or tenuous claim to object to the interference with their opportunities to retain or secure such employees as members." *Id.*, 159.

That was my own view then, *id.*, 174–175, and now.

This analysis has support in a long line of cases where the Court has allowed *A* to assert *B's* constitutional right in seeking redress or prevention of harm to himself. The root of this doctrine is found in equity. In *Truax* v. *Raich*, 239 U. S. 33, an injunction had been sought by an employee who was an alien, seeking to restrain enforcement of an Arizona statute. The right invoked was the employee's own right under the Fourteenth Amendment. But the statute imposed no penalty on the alien for working. It penalized his employer for hiring him. Nevertheless, the injunction issued. In *Pierce* v. *Society of Sisters*, 268 U. S. 510, the proprietors of a private school, to protect their monetary interest in preserving the school, were allowed to assert rights of parents in the education of their children. Similarly, a white vendor was allowed to assert his Negro vendee's rights in enforcing a contract to sell real property, subject to a restrictive city ordinance, in *Buchanan* v. *Warley*, 245 U. S. 60. See also *International Harvester* v. *Department of Taxation*, 322 U. S. 435; *Barrows* v. *Jackson*, 346 U. S. 249; *Bates* v. *Little Rock*, 361 U. S. 516.

*Bryant* v. *Zimmerman*, 278 U. S. 63, which sustained a *state* law requiring the Ku Klux Klan to file its

membership lists with state officials was explained in *N. A. A. C. P.* v. *Alabama, supra,* 465, as a case involving an organization whose acts were "unlawful intimidation and violence," not First Amendment activities. That explanation was adequate for that case as only First Amendment rights were being considered in *N. A. A. C. P.* v. *Alabama, supra.* No Fifth Amendment question [10] was, however, raised in *Bryant* v. *Zimmerman, supra.*

Petitioner, the Communist Party, seeks in this case to assert that the statute under which it is ordered to register is unconstitutional, because it will have the necessary effect of depriving members of their privilege against being compelled to reveal their connection with the Party. This is not a case, as the majority opinion admits, like *United States* v. *Sullivan,* 274 U. S. 259, where a taxpayer, because he claimed the privilege against self-incrimination with respect to the source of some of his income, argued that he was wholly excused from filing a tax return. Nor is this a case where "one who is required to assert the privilege against self-incrimination may thereby arouse the suspicions of prosecuting authorities." For here, if an individual were to attempt to claim the privilege against filing for the Party, he would admit an ingredient of a crime, namely, his connection with the Party.

Clearly, this is a situation in which only the Party can effectively assert the privilege of its officers, directors, and members. This is the teaching of *N. A. A. C. P.* v. *Alabama, supra,* and of the opinions of Mr. Justice Jackson, MR. JUSTICE FRANKFURTER and myself in *Anti-Fascist Refugee Committee* v. *McGrath, supra,* and of the

---

[10] The Court had held years earlier in *Twining* v. *New Jersey,* 211 U. S. 78, that the Fifth Amendment was not applicable to the States. And see *Jack* v. *Kansas,* 199 U. S. 372, holding that if immunity from state prosecution were granted, the defense that it offered no immunity from federal prosecution would have been of no avail.

other cases discussed above. When we reject those precedents, we create a special rule for this day only.

The Party is the proper party to raise the objection, because no one else can raise it effectively. The community of interest between the Party and its members is indeed closely analogous to the community of interest between a corporation and its stockholders. See Stevens, Corporations (1949), pp. 788–789. Since the command to register cannot be separated from the means of registration, an attack is properly made on the incriminating features of the statute by petitioner who is commanded to register. See *The Employers' Liability Cases,* 207 U. S. 463, 500–502; *United States* v. *Reese,* 92 U. S. 214, 221. Cf. *Electric Bond & Share Co.* v. *Securities & Exchange Comm'n, supra.*

In *Boyd* v. *United States,* 116 U. S. 616, 638, a court order to produce an invoice, claimed to be privileged under the Fifth Amendment, was held to be unconstitutional and void. One need not, I have assumed, obey an unconstitutional command and raise his constitutional objection only on compliance. Of course, defiance of a governmental command because it is unconstitutional is deep in our traditions. *Thomas* v. *Collins, supra; Staub* v. *City of Baxley,* 355 U. S. 313. Yet heretofore a person claiming that a disclosure would violate his Fifth Amendment rights need not first tender the information claimed to be privileged. A person asked whether he is a member of the Communist Party can invoke the Fifth Amendment and refuse to reply since under existing federal laws the answer would tend to incriminate him. *Quinn* v. *United States, supra,* 162; *Blau* v. *United States, supra,* 161. The answers now demanded by the registration form and the regulations require precisely the kind of answers we held protected against self-incrimination in the *Quinn* and *Blau* cases.

## VI.

The fact that there may be other times when the issue may be raised—as for example if a registration statement is not filed and officers or members are prosecuted for that default under § 15 of the Act—seems immaterial. This case is not in the category of those challenges of a law made before it is known how and in what manner it will be enforced and applied. Cf. *Rescue Army* v. *Municipal Court,* 331 U. S. 549; *Federation of Labor* v. *McAdory,* 325 U. S. 450. A final order to register under the Act has been issued. The disclosure requirements are clear and specific. Now is the time to raise Fifth Amendment questions. To relegate the parties to another time and place in order to raise those constitutional objections is to fashion an extremely harsh rule to fit the Communist Party but no one else. Default means the risk of criminal prosecution. No person, I think, should be forced to wait until his default to raise his constitutional objection. The great injustice in what we do today lies in compelling the officials of the Party to violate this law before their constitutional claims can be heard and determined. Never before, I believe, have we forced that choice on a litigant. See *Terrace* v. *Thompson,* 263 U. S. 197, 216. The modern trend has indeed been to protect a person against prosecutions that may involve infringements of his constitutional rights. At times even equity has stepped in. See *Philadelphia Co.* v. *Stimson,* 223 U. S. 605. The prevention of peril and insecurity, involved in the sanctions of some laws, has led to a generous use of the declaratory judgment procedure so that a person need not run the gantlet of a criminal prosecution to get an adjudication of his rights. See *Railway Mail Assn.* v. *Corsi,* 326 U. S. 88; *United Public Workers* v. *Mitchell,* 330 U. S. 75, 91–94. Cf. *McGrath* v. *Kristensen,* 340 U. S. 162. The order requiring registra-

tion requires disclosure; the constitutionality of that disclosure requirement is before us here and now. This case presents the only effective opportunity to secure the benefits of the Fifth Amendment guarantee. Indeed, if the question were not raised now, the strict rule of *Rogers* v. *United States, supra,* might mean that the question had been waived.

## VII.

My conclusion is that while the Communist Party can be compelled to register, no one acting for it can be compelled to sign a statement that he is an officer or director nor to disclose the names of its officers, directors, or members—unless the required immunity is granted. Why then, one may ask, do we have a registration law? Congress (past or present) is attempting to have its cake and eat it too. In my view Congress can require full disclosure of all the paraphernalia through which a foreign dominated and controlled organization spreads propaganda, engages in agitation, or promotes politics in this country. But the Fifth Amendment bars Congress from requiring full disclosure by one Act and by another Act making the facts admitted or disclosed *under compulsion* the ingredients of a crime.

There is a giving of evidence by the filing of a registration. Its filing is the equivalent of officials testifying in investigations conducted by the Executive or Legislative Branch. It is compulsory disclosure of evidence which links officers, directors, and members of the group with a crime. Force and compulsion are outlawed techniques for federal law enforcement. Coerced confessions are taboo because of the long bitter experience of minorities in trying to maintain their freedom under hostile regimes. Our Constitution protects all minorities, no matter how despised they are.

Accordingly, I dissent.

Mr. Justice Brennan, with whom The Chief Justice joins, dissenting in part.

I agree with the Court and with Mr. Justice Douglas that the order requiring that the Party register and disclose its officers and members is not constitutionally invalid as an invasion of the rights of freedom of advocacy and association guaranteed by the First Amendment to Communists as well as to all others.

I also share the Court's view that we are not called upon in this case to decide the constitutionality of the various duties and sanctions attaching to the Party, and to individual members, once orders to register become final. We are required by this case to decide only the validity of the order requiring the petitioner to register in accordance with § 7 of the Act as implemented by the regulations and Form ISA–1 of the Attorney General. We should properly reach at this time only such constitutional questions as necessarily relate to the requirements governing registration.

The questions in addition to those under the First Amendment which seem to me most nearly within the sphere of permissible constitutional adjudication in this proceeding arise from the interaction of the registration requirements with the criminal statutes under which Communist Party membership is implicated. This interplay poses the question whether the registration requirements violate the Fifth Amendment privilege against self-incrimination.

I do not believe that all of the self-incrimination questions raised by the registration provisions are properly adjudicable now. Some may be better left for subsequent adjudication as the necessity arises. For example, we need not decide now, I think, the constitutionality of the provision of § 8 for the self-registration of individual members. That provision becomes

operative only upon the failure of the petitioner, or its officials, to list members in effecting its registration, pursuant to a final order; the Government's brief observes that the criminal sanction against a member arising from nonregistration must be preceded by a final order of the Subversive Activities Control Board directing him to register. § 15 (a)(2). We cannot know at this time the posture in which the case will appear when a member comes under an enforceable duty to register, if he ever does. I also lay aside the requirements of § 7 (h), and its implementing regulation, 28 CFR § 11.205, that Party officials effect the registration of the organization if the organization fails to register itself within 30 days of a final order. That duty, enforceable by criminal sanctions against the officials, arises only in the contingency of nonregistration by petitioner in accordance with the present order. Here again the situation may not arise. I assume that the opportunity of the officials to raise the same objections is not irrevocably lost if we do not consider them now. Nor, finally, do I now concern myself with whether the Party may interpose the constitutional privilege of its members because of the nature of the information about them required to be supplied to complete the registration statement as described in the Attorney General's Form ISA-1. Section 7 (d) requires that the registration statement accompanying the registration shall provide such information as the names and addresses of members, and their past and present aliases, as well as information about the officers and activities of the organization. The Attorney General's regulations and Form ISA-1 implement this requirement.

But I do think we must reach one issue of self-incrimination, namely, whether the requirements of § 7 (d) as spelled out in the Attorney General's regulations and Form ISA-1 are void as necessarily conflicting with the Fifth Amendment privilege of the Party officials who are

charged with the duties necessary to complete the Party's registration. The statute, the regulations and the Form together clearly require that the registration statement shall be completed, signed and filed by designated officials. These officials are the "partners, officers and directors, including the members of the governing body of the organization"; they are explicitly required by the Form to sign the completed statement and vouchsafe their familiarity with, and the accuracy of, its contents. Whether these officials, consistently with the Fifth Amendment privilege, can be required to complete, sign and file the statement is a serious constitutional question. These requirements are in effect an inquiry into the status of officership and knowledge of Party activities of the signatories. Under today's decision in *Scales* v. *United States, post,* p. 203, the answers to such an inquiry might well implicate the officials in criminality in violation of several federal statutes.

I believe that the constitutional validity of the inquiry that I find implicit in these requirements is ripe for adjudication now. I read the Court's opinion as saying that there is no fatal bar to adjudicability of the question merely in the fact that the organization, and not an individual official of the organization, is asserting the privilege in this proceeding. The requirement of "standing"—that a litigant must show that he himself is affected by the operation of the action he challenges as it affects another—is involved here. But as the cases cited by my Brother Douglas show, and the Court seems to concede, a party has been allowed to assert the constitutional rights of another person not before the Court as a named party in a variety of situations where the effect of the challenged state action on himself is derivative from the impact on the other person. Of course, this Court has indicated on a number of occasions that the privilege is a personal right which must normally be claimed by the individual seeking

its protection. See, *e. g., United States ex rel. Vajtauer* v. *Commissioner of Immigration,* 273 U. S. 103, 113; *United States* v. *Murdock,* 284 U. S. 141, 148; *Rogers* v. *United States,* 340 U. S. 367, 371; *Smith* v. *United States,* 337 U. S. 137, 147–148. These statements were made in the context of an issue of waiver—whether a later claim of privilege should be honored where it was contended that the party had an earlier opportunity to make the claim and had failed to do so. The present case presents quite the opposite situation—not whether the privilege is being claimed too late but too early, not waiver but premature assertion.

The issue of justiciability which confronts us is therefore not whether the petitioner may raise the Fifth Amendment question at all but whether it may do so now. I agree with the Court that the cases which have upheld standing in the first sense are not decisive of our problem. The following considerations, in my view, justify our adjudication now: (a) the order imposes a presently enforceable duty on the organization to complete and file Form ISA–1 and creates an incentive for both organization and officials to make the disclosures implicit in the completion, signing and filing of that Form; (b) the inquiry eliciting these disclosures of officership and knowledge is specific and not open to possibly varying answers; (c) the incriminating character of the information thus disclosed is plain; and (d) finally, if the question is not decided now, the officials must run the risk of not being able to make an acceptable claim of privilege at a later time. There thus inheres in putting off decision the substantial possibility of erosion of the privilege. We may and should avoid that undesirable result by deciding the question now.

I think the reasons advanced by the Court in support of the contrary conclusion are overborne by the considerations I have suggested. The Court says that the officials

may sign the statement and comply with the requirements, or may claim the privilege in such a form that it will be honored and thus avoid incrimination, and that in any event, a claim of privilege cannot be evaluated at this time because of the varying and presently unknowable circumstances which may determine whether it would have to be honored. The possibility of "voluntary" compliance by the officials should not be a bar to a decision now. Given the structure of the statute, compliance cannot indisputably be assumed to be a voluntary waiver of the privilege. The organization is under a duty by virtue of the order now before us to file a statement in accordance with the Attorney General's requirements, on penalty of prosecution for not filing a registration statement; the failure of the officials to complete, sign or file Form ISA–1 might subject it to such prosecution. And if the organization should not register within the 30-day period specified in § 7 (c), the officials are duty-bound under § 7 (h) to effect its registration, also on penalty of criminal sanctions. Plainly enough, then, the order generates pressure on the officials to complete, sign and file to avoid the possibility of prosecution either of the organization or themselves. This pressure may be increased by the uncertainties which attend efforts to make an acceptable claim of the privilege. If we pass the opportunity for decision now, officials may well comply out of fear that a later effort to make an acceptable claim of privilege will fail.

A claim of privilege on the registration form which names the official would be self-defeating. For if the admission of officership in the Communist Party is incriminating, then a claim of privilege by name would amount to the very same admission—the claimant would be asserting that he could not complete, sign or file the form because the admission of his officership would incriminate him. The Court suggests that a claim of the priv-

ilege is potentially always incriminating in that it may arouse the suspicions of the interrogators. However, this registration requirement seems to present a different case in important respects. Claiming the privilege here does more than attract suspicion to the claimant; it admits an element of his possible criminality. Moreover, registration is unique because of the initial burden it puts on the potential defendant to come forward and claim the privilege. He may thereby arouse suspicions that previously had not even existed and, indeed, virtually establish a prima facie case against himself. The usual situation in which the privilege is invoked is a judicial, legislative, or administrative proceeding in which the person claiming it appears because there is already some reason to think that he has information on the subject matter of the inquiry. His invocation of the privilege in such circumstances may confirm the suspicions of his interrogators, but is less likely to arouse them initially than in the case of a registration regulation which calls on all persons everywhere, known or unknown, who fall within a prescribed category, to come forward and identify themselves. At least in governmentally initiated inquiries, there are likely to be certain checks on self-accusation, either the explicit requirement of probable cause governing the maintenance of a criminal prosecution or institutional limitations on the exercise of the power of inquiry. Here there is no such initial burden on government, no requirement, for example, that it identify officials in a proceeding for that purpose and then seek to elicit the desired information as to other officials and members from them. I think, therefore, that if the privilege does protect an official from disclosure of his officership and knowledge when an inquiry explicitly in those terms is made, it would also protect him from disclosure in the kind of "indirect" inquiry and response that seems to me implicit in the suggestion that

a claim of the privilege by name may be an adequate alternative.

There remains consideration of the possibility that an anonymous claim of the privilege may be made and honored by the Attorney General. The organization might simply file a statement in which it asserted the privilege on behalf of its officials, listing their titles but not their names. However, on the Court's own reasoning the right to have a claim of privilege honored may depend on a variety of circumstances, including such factors as already existing public knowledge of the information which the claimant seeks to conceal, and it is difficult to see how following this course would advance the attempt of the claimant to have his privilege honored. In a subsequent enforcement proceeding against the organization for failure to register in accordance with the regulations, or against officials for failing to register the organization, the defense of privilege could be met with the same objection that the Court raises here—that the privilege claim could not be evaluated unless the identity of the claimant were known. The possibility that the Attorney General might honor even an anonymous claim of the privilege would simply mean abandonment of one of the requirements in the Form. But I do not see how we can view this case as if that requirement did not exist, since the order under review is to register in accordance with the Attorney General's requirements as they now are. Certainly an official might be sufficiently dubious as to the efficacy of an anonymous claim of the privilege by the organization on his behalf that he would choose one of the alternatives of complying, claiming the privilege by name, or not making any claim, all dangerous courses for him. Therefore, I cannot believe that the Court's suggestion that a claim may be made in a form in which it could be honored presents an official of petitioner with a suffi-

ciently realistic choice to require us to defer consideration of this question until it arises at some time after a choice among these alternatives is made.

I do not read *United States* v. *Sullivan,* 274 U. S. 259, and other cases which the Court cites, *e. g., In re Groban,* 99 Ohio App. 512, 135 N. E. 2d 477, aff'd, 164 Ohio St. 26, 128 N. E. 2d 106, aff'd, 352 U. S. 330, *O'Connell* v. *United States,* 40 F. 2d 201, as indicating a different result here. Those cases seem to me to hold that an individual cannot thwart a legitimate inquiry by refusing to answer any questions at all on the ground that some incriminating questions might be asked; they require that he must at least respond to the inquiry and make his claims of privilege as the incriminating questions are asked. In *Sullivan* the questions were neutral on their face and were asked pursuant to an inquiry in furtherance of the collection of the revenue; a claim of self-incrimination as to all such questions was meaningless in terms of the traditional requirement that the tribunal before which the claim is made have the opportunity to decide whether the claim shall be allowed. See *United States* v. *Burr,* 25 Fed. Cas. 38; *United States ex rel. Vajtauer* v. *Commissioner, supra,* at p. 113.

Moreover, in *Sullivan* a claim of privilege as to individual questions might have aroused suspicions but would not have pinpointed the taxpayer's criminal activities. No such wholesale immunity for the petitioner's officials would be involved in a conclusion that their claim of privilege should be adjudicated without a requirement that they first make it on the registration form specifically, with the attendant risks I have previously considered. The inquiry implicit in the requirements of completing, signing and filing here is precise; it demands disclosure on matters of officership in, and knowledge of, the Communist Party. The incriminating nature of that inquiry

seems plain on its face, since an admission of officership and knowledge would be not merely a possible link in the chain needed to convict under the Smith Act but would establish a main ingredient of the crime proscribed in the membership clause of the Act as this Court construes it today in *Scales* v. *United States.* Cf. *In re Dewar,* 102 Vt. 340, 148 A. 489. Mr. Justice Holmes wrote in *Sullivan* that the taxpayer "could not draw a conjurer's circle around the whole matter by his own declaration that to write any word upon the government blank would bring him into danger of the law." 274 U. S., at p. 264. Petitioner seeks to draw no such "conjurer's circle" for its officials in an essentially noncriminal area of inquiry, but to assert their privilege against replying to an inquiry in a regulatory area permeated with criminal statutes in circumstances where any word upon the paper responsive to the inquiry would involve them in the admission of one of the major elements of a crime, and where the effect of even claiming the privilege is not merely to arouse suspicions of illegality but to admit the same element of the crime.

Nor am I persuaded that this Fifth Amendment claim should not be adjudicated now because some of the officials may not be entitled to the privilege if the fact of their officership is already known. Even on the assumption that public notoriety or prior admission in these or other proceedings would make the privilege inapplicable to such officials, there is nothing in the record to indicate how many officials fall into this category. The Government contends that since the record does not establish that any officials are not publicly known as such, we should refrain from adjudicating the privilege claim now because no one may actually be entitled to invoke it. But since the record also leaves open the possibility that there may be officials entitled to assert the privilege, and since I see

such difficulty in the way of effective assertion of the privilege now or later without disclosure of the information sought to be protected, I do not believe that these persons should be subjected to the risks and uncertainties of deciding on a course of conduct with a view to litigating this question in a subsequent proceeding. Where the danger of compulsory incrimination in violation of the Fifth Amendment thus appears on the face of the requirements it seems to me improper to force any who are affected to hazard the loss of their protection because some, or even all, have no protection at all. Cf. *People* v. *McCormick,* 102 Cal. App. 2d Supp. 954, 963, 228 P. 2d 349, 354–355.

I do not regard this position on adjudicability as calling for the impermissible decision of a hypothetical case. Nor does it open the way to the invalidation of the requirements on their face despite valid applications simply because they might be invalidly applied in other circumstances. See *United States* v. *Raines,* 362 U. S. 17. If the requirements violate the Fifth Amendment, they do so for all subject to them because they require incrimination without an effective protection of the privilege. And it is because I discern no adequate procedural protection for the privilege that I believe the Court should adjudicate this particular question now.

As to the merits of the Fifth Amendment claim, I believe that officials cannot be compelled to complete, sign and file the registration statement without abridging their privilege against self-incrimination. I do not think that the doctrine of *United States* v. *White,* 322 U. S. 694, applies to an inquiry directed to the fact of officership, *qua* officership, and knowledge, *qua* knowledge, as opposed to the production of organizational records by an officer who is their custodian. It is the individual official's own status and knowledge that is the subject of the inquiry I find implicit in the requirement that an

official complete, sign and file the statement. The principle that a custodian of organizational records may be required to produce them, even if their contents would incriminate him personally, is a recognition that an organization acts only through people, and that to recognize the privilege in the custodian of its records might be to immunize the organization's past acts. But these officials are not directed to produce records of their organization as its custodians, but to complete, sign and file as its officials, and thus to identify themselves as possible participants in a criminal conspiracy and as persons presumptively exhibiting the degree of knowledge and activity necessary for a conviction under the membership clause of the Smith Act. Nor are they called on, in fact, to produce records at all, but rather to complete, sign and file a statement which may or may not incorporate the records of the organization. And more than the incorporation of existing records is required in any event. All the information on Form ISA–1 must be supplied whether or not in existing records. In addition, the requirement of signatures does not involve mere authentication or identification of records, cf. *Curcio* v. *United States,* 354 U. S. 118, 125, because the officials are required to vouchsafe completeness and accuracy of the information supplied in the Form. Thus the requirements go far beyond the compulsory production approved in *White.* If the admission both of officership status and knowledge of Party activities cannot be compelled in oral testimony in a criminal proceeding, I do not see how compulsion in writing in a registration statement makes a difference for constitutional purposes. Cf. *People ex rel. Ferguson* v. *Reardon,* 197 N. Y. 236, 243–244, 90 N. E. 829, 832. Since the immunity granted under § 4 (f). of the statute is not complete, I do not think that the official's compliance with the requirements can be exacted consistently with the Fifth Amendment. And if the officials cannot be required

to complete, sign and file Form ISA–1, I do not see how the present order can be upheld. The requirements patently do not contemplate the effectuation of registration by any except Party officials in the precise manner specified by the requirements. I would therefore hold the order invalid insofar as it directs the petitioner to register in accordance with the requirements.